FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
William R. Restis, Esq. (SBN 246823)
wrr@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
550 West C St., Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

Attorneys for Plaintiffs
and the Putative Classes

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CHAYLA CLAY, ERICA EHRLICHMAN, and LOGAN REICHERT, individually and on behalf of all others similarly situated,

          Plaintiffs,

v.

CYTOSPORT, INC., a California corporation,

          Defendant.

Case No: 3:15-cv-00165-L-DHB

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**\* \* \* REDACTED \* \* \***

**[No Oral Arguments Unless Request by the Court]**

Date:     11:00 a.m.
Time:     October 17, 2016
Judge:    M. James Lorenz
Ctrm:     Courtroom 5B

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

I. INTRODUCTION ................................................................................................. 1

II. FACTS RELEVANT TO CLASS CERTIFICATION ....................................... 3

III. ARGUMENT ......................................................................................................... 7

    A. Plaintiffs Have Standing to Pursue Their Claims on Behalf of the Class . 7

        1. Plaintiffs Have Standing with Respect to Those Class Products They Personally Purchased ..................................................................... 7

        2. Plaintiffs Also Have Standing to Pursue Claims for Products with Similar Misrepresentations. .................................................................. 8

    B. Plaintiffs Meet the Requirements of Rule 23 ........................................... 10

        1. Plaintiffs Meet the Requirements of Rule 23(a) ............................ 10

            a. The Class Is Sufficiently Numerous and Ascertainable ...... 10

            b. Common Questions of Fact and Law Exist ......................... 13

            c. Plaintiffs' Claims Are Typical of the Class ........................ 13

            d. Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Class ......................................... 14

                (1) No conflicts of interest are present ............................ 14

                (2) Plaintiffs and their counsel will continue to prosecute this action vigorously on behalf of the Class ............ 15

        2. Plaintiffs Meet the Requirements of Rule 23(b) ............................ 18

            a. Common Issues of Law and Fact Predominate .................. 18

                (1) Plaintiffs' state consumer protection law claims do not require any individualized analysis ............................ 19

                (2) Breach of written warranty under the MMWA does not require the Court to conduct individual inquiries 22

                (3) The misrepresentations are uniform and the falsity or misleading nature of Defendant's claims can be determined by common evidence ............................ 26

                (4) The Class's restitution, damages, and other relief may be determined on a class-wide basis. ........................ 28

b.      A Class Action Is a Superior Method of Adjudication ....... 31

C.      Plaintiffs May Assert a National Class Under the UCL and FAL........... 32

IV.      CONCLUSION ................................................................................. 35

# **TABLE OF AUTHORITIES**

## **State Cases**

*Bank of the West v. Sup. Ct.*,
  2 Cal.4th 1254 (1992)...................................................................................19, 20

*Brockey v. Moore*,
  107 Cal.App.4th 86 (2003)...............................................................................26

*Chapman v. Skype Inc.*,
  220 Cal.App.4th 217 (2013)..............................................................................20

*Clothesrigger, Inc. v. GTE Corp.*,
  191 Cal.App.3d 605 (1987).....................................................................32, 33, 35

*Colgan v. Leatherman Tool Group*,
  135 Cal.App.4th 663 (2006)..............................................................................29

*Compaq Computer Corp. v. Lapray*,
  135 S.W.3d 657 (Tex. 2004)..............................................................................24

*Davis v. Powertel, Inc.*,
  776 So.2d 971 (Fla. App. 2000) .........................................................................21

*Diamond Multimedia Sys., Inc. v. Sup. Ct.*,
  19 Cal.4th 1036 (1999)...................................................................................34

*Dix v. Am. Bankers Life Assur. Co. of Florida*,
  429 Mich. 410 (1987) ....................................................................................21

*Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*,
  715 So.2d 311 (Fla. Dist. Ct. App. 1998) ...............................................................29

*In re Tobacco II Cases*,
  46 Cal.4th 298 (2009).....................................................................................20

*In re Vioxx Class Cases*,
  180 Cal.App.4th 116 (2009)..............................................................................20

*Office of Atty. Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.*,
  869 So.2d 592 (Fla. App. 2004)..........................................................................21

*Paduano v. Am. Honda Motor Co.*,
  169 Cal.App.4th 1453 (2009).............................................................................19

*Rentas v. DaimlerChrysler Corp.*,
  936 So.2d 747 (Fla. Dist. Ct. App. 2006) ...............................................................22

*Rutledge v. Hewlett-Packard Co.*,
  238 Cal.App.4th 1164 (2015).......................................................................32, 33

*State Farm Fire & Cas. Co. v. Sup. Ct.*,
  45 Cal.App.4th 1093 (1996)..............................................................................22

*Wershba v. Apple Computer, Inc.*,
   91 Cal.App.4th 224 (2001)......................................................................35

**Federal Cases**

*Abraham v. Volkswagen of Am., Inc.*,
   795 F.2d 238 (2d Cir. 1986).....................................................................23

*Aho v. AmeriCredit Fin. Servs., Inc.*,
   277 F.R.D. 609 (S.D. Cal. 2011)...............................................................13

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................18

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S.Ct. 1184 (2013) .............................................................................10

*Ass'n of Public Agency Customers v. Bonneville Power Admin.*,
   733 F.3d 939 (9th Cir. 2013)......................................................................7

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013)..............................................11, 14, 27, 31

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ................................................................................25

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975).....................................................................10

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831-LHK, 2014 WL 2466559 (N.D. Cal. May 30, 2014) .................13

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013)......................................................................18

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004)......................................................................28

*Chacanaca v. Quaker Oats Co.*,
   752 F.Supp.2d 1111 (N.D. Cal. 2010) ........................................................20

*Chambers v. Gen. Trailer Mfg.*,
   No. 04-71066, 2006 WL 1851008 (E.D. Mich. July 5, 2006) ..........................29

*Chavez v. Blue Sky Nat. Beverage Co.*,
   268 F.R.D. 365 (N.D. Cal. 2010) ..........................................................8, 34

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) .............................................................................30

*Delarosa v. Boiron, Inc.*,
   275 F.R.D. 582 (C.D. Cal. 2011) ...............................................................11

*Dilts v. Penske Logistics, LLC*,
   267 F.R.D. 625 (S.D. Cal. 2010).................................................................19

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) ...............................................................25

*Elledge v. Bacharach Instrument Co.*,
   974 F.2d 1338 (6th Cir. 1992) .................................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ......................................................................18, 19

*Flynn v. Sony Elecs., Inc.*,
   No. 09-CV-2109-BAS, 2015 WL 128039 (S.D. Cal. Jan. 7, 2015) .......................12

*Forcellati v. Hyland's, Inc.*,
   876 F.Supp.2d 1155 (C.D. Cal. 2012) ...................................................8, 34

*Gasperoni v. Metabolife, Int'l Inc.*,
   No. 00-71255, 2000 WL 33365948 (E.D. Mich. Sept. 27, 2000)..........................21

*Gay v. Waiters' & Dairy Lunchmen's Union*,
   549 F.2d 1330 (9th Cir. 1977) .................................................................11

*Hahn v. Massage Envy Franchising, LLC*,
   No. 12CV153 DMS, 2014 WL 5099373 (S.D. Cal. Apr. 15, 2014).......................10

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................8, 13, 14, 18

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...................................................................9

*Hap v. Toll Jupiter Ltd. P'ship*,
   No. 07–81027–CIV, 2009 WL 187938 (S.D. Fla. Jan. 27, 2009) ........................22

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal 2011) ..............................................................15

*Hendricks v. Callahan*,
   972 F.2d 190 (8th Cir. 1992) .................................................................24

*Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*,
   No. 3:11-CV-01576-H-RBB, 2012 WL 2861160 (S.D. Cal. Feb. 13, 2012) ...........24

*In re Conagra Foods, Inc.*,
   90 F.Supp.3d 919 (C.D. Cal. Feb. 23, 2015)...........................................30, 31

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   No. 2:11-CV-07166, 2012 WL 10731957 (C.D. Cal. June 29, 2012). ..............33, 34

*In re Napster, Inc. Copyright Litig.*,
   462 F.Supp.2d 1060 (N.D. Cal. 2006) .........................................................7

*In Re: Bextra/Celebrex Sales and Marketing*,
   MDL No. 1699 ..................................................................................15

*Keegan v. Am. Honda Motor Co.*,

284 F.R.D. 504 (C.D. Cal. 2012) ....................................................................21, 28

*Kennedy v. Butler Fin. Solutions*, LLC,
No. 2009 WL 290471 (N.D. Ill. Feb. 4, 2009)........................................25

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013)..............................................................29

*Lintz v. Carey Manor Ltd.*,
613 F. Supp. 543 (W.D. Va. 1985) ....................................................35

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2011)............................................................16

*Mazza v. American Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012)..............................................................33

*McCrary v. Elations Co., LLC*,
No. EDCV 13-00242 JGB, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014)...20, 26, 32

*Michigan Dessert Corp. v. A.E. Staley Mfg. Co.*,
23 F. App'x 330 (6th Cir. 2001)..........................................................24

*Milicevic v. Fletcher Jones Imports, Ltd.*,
402 F.3d 912 (9th Cir. 2005)..............................................................22

*Miller v. Ghirardelli Chocolate Co.*,
912 F.Supp.2d 861 (N.D. Cal. 2012) ....................................................9

*Overstreet v. Norden Labs., Inc.*,
669 F.2d 1286 (6th Cir. 1982)............................................................24

*Perez-Olano v. Gonzalez*,
248 F.R.D. 248 (C.D. Cal. 2008) ........................................................14

*Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*,
779 F.3d 934 (9th Cir. 2015)..............................................................15

*Richardson v. Palm Harbor Homes, Inc.*,
254 F.3d 1321 (11th Cir. 2001)..........................................................22

*Rickard v. Teynor's Homes, Inc.*,
279 F.Supp.2d 910 (N.D. Ohio 2003) ..................................................25

*Ries v. Ariz. Bevs. USA, LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ......................................................8, 10

*Romo v. FFG Ins. Co.*,
397 F.Supp.2d 1237 (C.D. Cal. 2005)...........................................22, 25, 29

*Roper v. Consurve, Inc.*,
578 F.2d 1106 (5th Cir. 1978)............................................................15

*S. Broad. Grp., LLC v. Gem Broad., Inc.*,
145 F.Supp.2d 1316 (M.D. Fla. 2001) ..................................................24

- vi -

*Shady Grove v. Allstate*,
   130 S.Ct. 1431 (2010) ............................................................................................3

*Simms Inv. Co. v. E.F. Hutton & Co. Inc.*,
   699 F.Supp. 543 (M.D.N.C. 1988) ................................................................33, 34

*Stanton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) .................................................................................8

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012). ......................................................................20

*Valentino v. Carter–Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...............................................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................10, 13, 18

*Walton v. Rose Mobile Homes* LLC,
   298 F.3d 470 (5th Cir. 2002) ........................................................................22, 25

*Werdebaugh v. Blue Diamond Growers* ("*Werdebaugh II*"),
   No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ...........30, 31

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-2724-LHK, 2014 WL 2191901 (N.D. Cal. May 23, 2014) ............passim

*Williams v. Gerber Prod. Co.*,
   552 F.3d 934 (9th Cir. 2008) ...............................................................................20

*Wolin v. Jaguar Land Rover N. Am.*, LLC,
   617 F.3d 1168 (9th Cir. 2010) .............................................................................14

*Wolph v. Acer Am. Corp.*,
   272 F.R.D. 477 (N.D. Cal. 2011) ........................................................................11

*Zinser v. Accufix Research Institute, Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .............................................................................19

**Statutes**

15 U.S.C. § 2301 .....................................................................................................2, 23

15 U.S.C. § 2310 ...................................................................................................22, 23

Cal. Bus. & Prof. Code § 17500 .................................................................................32

Cal. Civ. Code § 1770 .........................................................................................19, 21

Cal. Com. Code § 2313 ...............................................................................................25

Cal. Com. Code § 2714 ...............................................................................................29

Fla. Stat. § 672.313 .....................................................................................................25

MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF    Case No. 3:15-cv-00165-L-DHB
CLASS REPRESENTATIVES AND CLASS COUNSEL

Fla. Stat. § 672.714 ................................................................................. 30

Mich. Comp. Laws § 440.2313 .......................................................... 24, 25

Mich. Comp. Laws § 440.2714 ............................................................. 30

Mich. Comp. Laws § 445.903 ................................................................ 21

UCC § 2-313 .......................................................................................... 24

**Regulations**

16 C.F.R. § 700.11 ................................................................................ 25

16 C.F.R. § 700.3 .................................................................................. 25

21 C.F.R. § 101.4 .................................................................................. 27

21 C.F.R. § 101.62 ................................................................................ 27

21 C.F.R. § 101.9 .................................................................................. 26

**Rules**

Fed. R. Civ. P. 23 ..........................................................................passim

**Other Authorities**

Charles Alan Wright, *et al.*, Federal Practice & Procedure (3d ed. 2005) ........... 18

Charles Alan Wright, *et al.*, Federal Practice and Procedure (2d ed. 1986) ........ 19

H.R. Conf. Rep. 105–399, 103 ................................................................. 34

Motion for Class Certification and Appointment of        Case No. 3:15-cv-00165-L-DHB
Class Representatives and Class Counsel

1       Plaintiffs Chayla Clay, Erica Ehrlichman and Logan Reichert respectfully

2   submit this Memorandum of Points and Authorities in support of their Motion for

3   Class Certification, Appointment of Class Representatives and Class Counsel.

## I. __INTRODUCTION__

5       This case involves statements made on the labels of Defendant Cytosport, Inc.'s

6   popular Muscle Milk protein supplement products. There are two protein product

7   types involved in this case: the ready-to-drink Class Products ("Liquid") and the

8   powder Class Products ("Powder"). The Liquid Products come ready-to-drink and are

9   sold in individual-sized containers (*see, e.g.* Figure 1). The Powder Products are sold

10  in powder form, and the consumer typically mixes the powder with water or milk.

11  The Powder Products are sold in plastic bottles or bags (*see, e.g.,* Figure 2).





Figure 1

Figure 2

20  At issue are three general misrepresentations, including Defendant's labeling of its

21  protein products as "lean," and the L-Glutamine and protein content of the Class

22  Products. *See generally* Complaint [Dkt. No. 1]. This Court summarized the three

23  misrepresentations in a recent discovery order:

24      Plaintiffs allege: (1) Defendant's muscle milk Liquid products do not
    contain the quantity of protein that is advertised on each of the product's

25      labels; (2) Defendant advertises and labels that the Muscle Milk powder
    products' proprietary "Precision Protein Blend" contains L-Glutamine, an

26      amino acid that aids in muscle recovery and is essentially for the proper
    operation of the immune system, although they do not contain free form L-
    Glutamine in any appreciable amount; and (3) Defendant falsely advertises

27      that its lean muscle milk products are lean and contain lean lipids, when, in
    fact, they contain products with sunflower and canola oils, which are

28

considerable sources of fat, and contain no less fat than the majority of its competitors.

Dkt. No 102, p. 2.

To be clear, the misrepresentations as to protein amounts relate only to the Liquid Products, not the Powder Products. And the misrepresentations as to "Lean" and L-Glutamine relate only to the Powder Products, not the Liquid Products. Understanding the two class product types, and their corresponding misrepresentations, is helpful when considering the proposed national classes and state subclasses (as defined in Plaintiffs' accompanying Motion).

Plaintiffs first organized the purchasers into two nationwide classes – one for Liquid Products, and one for Powder Products. The nationwide classes include claims for violation of California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"). Those claims are suitable for nationwide class treatment under California law because: (1) Defendant is headquartered in California; (2) the product labels – including the misrepresentations at issue here – were all created in and disseminated from California; (3) a substantial amount of Defendant's sales occur in California; (4) the labels and misrepresentations are uniform nationwide; and (5) there are no state laws conflicting with the UCL and FAL.

Plaintiffs also propose certifying a selection of subclasses for Liquid and Powder products  for each of three states – California, Michigan, and Florida. Those subclasses include claims under each state's respective consumer protection statutes and the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*. The three predominant questions presented by those subclasses' state law claims—breach, reliance, and materiality—are uniform in each state and can be proven on a common basis with common evidence and expert testimony. *See infra* § III(B)(2)(a).

This case is well-suited for class certification. First, the claims are simple, uniform, and as the Court has observed, "[P]laintiffs advance a relatively straightforward claim: they assert that defendant has violated state regulations and

marketed a product that could mislead a reasonable consumer." Order on Motion to Dismiss [Dkt. No. 24] (citations and internal alterations omitted). Second, the Court has already identified common issues as to the Class Products' protein blend, fatty oils and definition of "lean" when it ruled on the parties' recent discovery dispute. [Dkt. No. 102, p. 9] (identifying Defendant's protein blend, fatty oils, and definition of lean to be questions of law and fact capable of common answers). In addition, as demonstrated herein, all of the requirements for class certification are met, and the Court should grant class certification and appoint Plaintiffs and their counsel as Class Representatives and Class Counsel, respectively. *Cf. Shady Grove v. Allstate*, 130 S.Ct. 1431, 1437 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

## II. FACTS RELEVANT TO CLASS CERTIFICATION[1]

### A. Manufacturing and Labeling Activities

Defendant manufactures, distributes, and markets a number of protein Supplements—Powder Products and Liquid Products—collectively called the "Relevant Products" or "Class Products." During the Class Period, the Class Products were manufactured either by Defendant or its third-party "co-packers." Kashima Decl., ¶ 30, Exs. G at p. 143:9-144:12, AA at pp. 23:26-27:12. Regardless of which entity produced the Class Products, Defendant exercised plenary control over the Products' formulation, manufacturing, and labeling. Defendant created the proprietary formulas, or recipes, for each of the Class Products. *Id.,* ¶ 23-24, Exs. H at pp. 45:18-46:19, 48:22-17, G at pp. 13:20-14:2. These formulas are centralized in Defendant's Genesis database and determine the final products' nutritional profile, ████████████████████████████████████████████████ *Id.*, ¶ 24, Exs. H at pp. 45:18-46:19, 48:22-17, G at pp. 51:22-54:17, 59:9-60:4, 132:20-133:9. ██████████████
████████████████████████████████████████████████

---

[1] Discovery was bifurcated into class and merits discovery. Declaration of Trenton R. Kashima ("Kashima Decl.") concurrently filed herewith, Ex. PP, at p. 17.

██████████████████████████████ *Id.*, ¶¶ 31-33, Exs. G at pp. 182:6-184:8, 187:16-188:4, II, JJ, KK. This highly controlled process ensures a uniform product. *Id.*, ¶¶ 32-34. Defendant has *stipulated* that the amount of fat, protein, or L-Glutamine in any Class Product during the Class Period never varied because of the manufacturing process or activities of its third-party co-packers. Joint Motion for Stipulation [Dkt. No. 104].

Furthermore, Defendant and its co-packers kept detailed records of the production of each lot of the Class Products. *Id.*, ¶¶ 36-37. These records include retained samples of the product produced, ████████████████████████████ ███████████████████████ *Id.*, ¶ 32, Exs. G at pp. 184:10-187:15, 188:5-189:1, MM. ██████████████████████████████████████████████████ . *Id.*, ¶ 36, Exs. G, at pp. 192:13-195:5, NN.

Defendant generates the content of its Class Product labels, and grants final approval to use its labels, at its California headquarters. *Id.*, ¶ 2, Ex. A, at pp. 60:13-61:9, 74:7-75:9. ██████████████████████████████████ ████████ . *Id.*, ¶ 4, Exs. G at p. 13:22-14:2, H, at pp. 94:5-20, 129:15-130:11, 131:23-133:21. Defendant's labels are controlled by detailed Standard Operating Procedures, which govern their creation and revision. *Id.*, ¶ 2, Exs. A, at pp. 60:13-61:9, 74:7-75:9, B & C. Defendant tracks the labels used on each product through label file names and a revision date that appears on the labels themselves. *Id.*, ¶¶ 2-3, 31, Exs. MM. Accordingly, Defendant can determine the time period in which each label was used. *Id.*, Exs. L & UU. Defendant has produced its labels for the Class Products used during the Class Period and stipulated that no other labels contain statements or information about protein, L-Glutamine, "Lean Lipids™," or "Lean Muscle" that materially differ from those produced in class discovery. Joint Motion for Stipulation [Dkt. No. 104].

## B. The Misrepresentations

The Class Products contain misrepresentations regarding their (1) "lean" nature, (2) L-Glutamine content, and (3) protein content. *See generally* Complaint [Dkt. No.

1]. Again, the first two misrepresentations—"lean" and L-Glutamine—relate solely to the Powder Products.

The lean claim is based on Defendant's material misrepresentations that the following products were lean: Defendant's Muscle Milk: Lean Muscle Protein Powder, Muscle Milk Light: Lean Muscle Protein Powder, Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein, Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder, and Monster Milk: Lean Muscle Protein Supplement. During the Class Period, these products' labels conveyed uniform claims about being lean, including: (1) the front labels state that they contain "XX g LEAN PROTEIN"; (2) Defendant refers to these Products with a variation of "LEAN MUSCLE PROTEIN," LEAN MUSCLE PROTEIN SUPPLEMENT," "LEAN MUSCLE PROTEIN POWDER," or "NEW LEANER FORMULA"; and (3) the vast majority of the products also advertise that they contain "Lean Lipids." *See id.* ¶¶ 7-9, Appendix A.

Notwithstanding Defendant's labels and advertisements during the Class Period, ███████████████████████████████████████████████ ██████ *Id.*, ¶ 27, Ex. H, at pp. 123:16-124:16. ███████████ Defendant *deliberately fortified* these products with significant amounts of fat, including canola oil, sunflower oil, █████████████, and medium-chain triglycerides. *Id.*, ¶ 27, Ex. G, at pp. 111:7-112:18. Whether the products were lean is a common question whose answer will not vary by class member, but instead apply equally across the classes.

Similarly, Plaintiffs challenge the L-Glutamine claims made on Defendant's Powder Products as materially misleading. Defendant's labels claim that its Muscle Milk: Lean Muscle Protein Powder, Muscle Milk Light: Lean Muscle Protein Powder, Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein, Muscle Milk Gainer: High Protein Gainer Powder Drink Mix, and Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder contain L-Glutamine. The FDA-mandated ingredients list includes it as a component of the Protein Blend. *Id.*, ¶¶ 13-15, Appendix B. It is also included in an "Amino Acid Profile" graphic, which states that the product has a large

amount of "L-Glutamine and Precursors." *Id.*

The above label claims are misleading for two reasons. First, L-Glutamine and its precursors (also known as Glutamic acid) are not the same. *Id.*, ¶ 28, Exs. H, at p. 229:2-7, G, at p. 124:19-23. Glutamic acid is inherently found in protein as a bound amino acid, while L-Glutamine, an unbound amino acid, is not. *Id.*, ¶ 28, Ex. G at p. 125:12-18. Accordingly, by advertising that the above products contain L-Glutamine, Defendant is advertising that they contain unbound L-Glutamine amino acids. Second, even if L-Glutamine is added to these products, the amount is so small that it cannot be detected by scientific testing and would have no physiological effect on the human body.[2] Declaration of Bill Campbell ("Campbell Decl."), concurrently filed herewith, ¶ 9. Defendant's representations about L-Glutamine are equally true or false for all Class Members, and thus such Court rulings will be common to the Class.

Finally, Plaintiffs allege that the Liquid Products do not contain the advertised amount of protein. Defendant also advertises and warrants on its products' front labels and nutrition fact panels that its Liquid Products contain a certain amount of protein. Kashima Decl., ¶¶ 18-20, Appendix C; *see also id.*, Exs. S & T. The protein claim relates solely to the Liquid Products. ████████████████████████ ████████████████████████████████ *Id.*, at ¶ 35, Exs. S at pp. 4:9-5:16. Defendant, however, does keep samples ("retains") of the Class Products. *Id.*, at ¶ 37, Ex. OO. Testing these samples will determine the amount of protein actually present in the Class Products. The questions of the appropriate testing method, any variance allowed, and the test results of the retains will be common to all Class Members. These issues will affect the final determination of whether Defendant has overstated the amount of protein in its Liquid Products. There could not be a better example of a common factual and legal question ripe for class certification.

---

[2] Defendant produced documents that suggest between ████████████ of L-Glutamine was added to the products at issue. Kashima Decl. ¶ 28, Exs. DD-HH. The minimum amount of L-Glutamine that can be detected by High Performance Liquid Chromatography is 50 to 60 mg. *Id.* ¶ 28, Ex. II, at p. 2.

Notably, Defendant originally represented that it had "retains for almost all product produced from January 2011 to January 2015." *Id.*, at ¶ 37, Ex. PP. But, on July 21, 2016, Defendant informed Plaintiffs that an employee had destroyed an unknown number of retained samples of the Class Products, in violation of the litigation hold already in place. *Id.*, at ¶ 37, Ex. QQ. Plaintiffs will explore further the circumstances surrounding Defendant's destruction of the retained samples during the merits phase of discovery, and an adverse inference that testing of the destroyed retains would have been unfavorable to Defendant may be in order. *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1078 (N.D. Cal. 2006). The propriety of such an inference is yet another common legal issue for the entire Class.[3]

## III. ARGUMENT

### A. Plaintiffs Have Standing to Pursue Their Claims on Behalf of the Class

#### 1. Plaintiffs Have Standing with Respect to Those Class Products They Personally Purchased

Article III standing requires a plaintiff to have suffered a redressable injury that is fairly traceable to the actions of the defendant. *Ass'n of Public Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013). The three Named Plaintiffs each purchased Defendant's Class Products during the Class Period. Declaration of Cayla Clay ("Clay Decl."), concurrently filed herewith, ¶ 3; Declaration of Erica Ehrlichman ("Ehrlichman Decl."), concurrently filed herewith, ¶ 3; Declaration of Logan Reichert ("Reichert Decl."), concurrently filed herewith, ¶ 3.

---

[3] The timing of Defendant's disclosure was troubling. Defendant and its counsel disclosed their evidence destruction to Plaintiffs six full months *after* Defendant learned that the destruction occurred, and only shortly *before* Plaintiffs' counsel was scheduled to inspect those retains and depose a witness with knowledge of their destruction. Kashima Decl. ¶ 38, Ex. PP at p. 147:8-15. Additionally, the disclosure was made after Class Discovery had closed. *See* Court's Scheduling Order [Dkt. No. 75] (Class discovery must be completed before May 20, 2016. Completed means that all discovery "must be initiated a sufficient period of time in advance of the cutoff date, so that it may be completed by the cutoff date."), Order RE: Extension of Class Certification Discovery [Dkt. No. 75] (extending the class certification discovery deadline to August 1, 2016).

1
2
3
4

In doing so, each was exposed to the misleading representations Defendant made on the products' labels and, as a result, each suffered damages in the form of the purchase price or some portion thereof. As such, Plaintiffs have standing to pursue claims as to the Class Products they purchased. Their standing is not limited to these products.

2. <u>Plaintiffs Also Have Standing to Pursue Claims for Products with Similar Misrepresentations.</u>

In its Motion to Dismiss, Defendant asserted that Plaintiffs lack standing to sue for products that they did not purchase personally. [Dkt. No. 24-1], at pp. 18-19. The Court rejected this argument, but noted it would "revisit this issue at the class certification stage in determining whether a class can be certified and, if so, the 'contours of that class.'" Order on Motion to Dismiss [Dkt. No. 24], at p. 12. Accordingly, Plaintiffs will address the issue here.

Defendant characterized this issue as one of standing. Motion to Dismiss [Dkt. No. 24-1], at pp. 18-19. To be clear, this is *not* an issue of standing, but rather, a question of typicality or commonality of Plaintiffs' claims under Rule 23(a). *See Werdebaugh v. Blue Diamond Growers,* No. 12-CV-2724-LHK, 2014 WL 2191901, at *17 (N.D. Cal. May 23, 2014) (*citing Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) & *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *Ries v. Ariz. Bevs. USA, LLC*, 287 F.R.D. 523, 538 (N.D. Cal. 2012) (same); *Forcellati v. Hyland's, Inc.*, 876 F.Supp.2d 1155, 1161 (C.D. Cal. 2012) (same). Typicality or commonality is established if the products Plaintiffs did purchase bear "substantially the same misrepresentation" as the other products in question such that all purchasers have claims that "arise from the same facts and legal theory." *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010); *see also Ries*, 287 F.R.D. at 539 ("Although plaintiff[s] did not purchase each type of beverage carrying the misleading label, his claims are reasonably coextensive with those of absent class members.") (alteration in original) (citations and internal quotation marks omitted). To the extent courts sometimes address this as an issue of standing, the analysis is the same:

> The majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar.

*Miller v. Ghirardelli Chocolate Co*., 912 F.Supp.2d 861, 869 (N.D. Cal. 2012).

In *Werdebaugh*, for example, the defendant challenged class certification by arguing that the class included products the named plaintiff himself did not purchase. 2014 WL 2191901 at *3. Rejecting defendant's concerns, the *Werdebaugh* Court examined the different product categories at issue and determined that the labels and alleged misrepresentations were sufficiently similar such that "whatever flavor an accused product may be, 'other members have the same or similar injury, . . . the action is based on conduct which is not unique to the named plaintiffs, and . . . other class members have been injured by the same course of conduct." *Id*. at *15 (*citing Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). A similar result should follow here.

The labels for Defendant's Powder Products contain the same misleading statements regarding their L-Glutamine content and purported leanness: (1) the labels refer to the products as a "lean," "leaner" and/or containing "Lean Protein"; and (2) the labels list L-Glutamine as an ingredient in the "Protein Blend." Kashima Decl. ¶¶ 7-11, 13-15, Appendix A & B. These representations are reinforced on a majority of the Powder Products with references to "Lean Lipids" or "L-Glutamine and its Precursors." *Id*. The key questions and evidence upon which the issue of liability for the lean and L-Glutamine content claims will turn are common for all Class Members. The Plaintiffs are therefore Class Members and typical of the Class.

Defendant's Liquid Products also contain the same misleading statements regarding their protein content: every Liquid Product states its protein content on its front and back label. *Id*., ¶¶ 18-20, Appendix C. Here again, the key questions and evidence upon which the issue of liability for the protein content claim will turn are common for all Class Members, and thus the Plaintiffs are typical.

Minor variations exist among the various Class Products over the course of the Class Period. But these variations would not alter a reasonable consumer's understanding of the product's label and are, therefore, inconsequential. "Slight variation is inherent in consumer class actions, and will almost certainly not detain proceedings unduly." *Ries*, 287 F.R.D. at 539; *Hahn v. Massage Envy Franchising, LLC*, No. 12CV153 DMS, 2014 WL 5099373, at *9 (S.D. Cal. Apr. 15, 2014) (finding variations in consumer contracts did not bar class certification where the relevant terms were substantially similar).

### B. Plaintiffs Meet the Requirements of Rule 23

Class certification is split into two inquires. First, a plaintiff must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequate representation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Once Rule 23(a) is met, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id.* Class certification under Rule 23 is a procedural matter in which the Court generally accepts the substantive allegations as true. *Blackie v. Barrack*, 524 F.2d 891, 900-01 n. 17 (9th Cir. 1975). To the extent that the Court's "rigorous analysis" requires it to "probe behind the pleadings," the Court should only examine the case's merits to the extent required to establish the elements of Rule 23. *Wal-Mart*, 564 U.S. at 349-51; *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1195 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.")

### 1. Plaintiffs Meet the Requirements of Rule 23(a)

#### a. *The Class Is Sufficiently Numerous and Ascertainable*

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. There is no fixed number that satisfies the numerosity requirement, but "as a general matter, a class greater than forty often satisfies the requirement." *Ries*, 287 F.R.D. at 536. A plaintiff need not state the exact

1    number of class members to satisfy this requirement.  Instead, numerosity can be
2    satisfied by logical inference.  *See Gay v. Waiters' & Dairy Lunchmen's Union*, 549
3    F.2d 1330, 1332 n.5 (9th Cir. 1977) (finding that the court may draw reasonable
4    inferences in determining numerosity).
5         Here, numerosity is readily met.  According to Cytosport's discovery responses,
6    over ███████████ of the Class Products were sold nationally.  Kashima Decl., Ex.
7    SS (sales data of the Class Products from 2009-2015).  California, Florida, and
8    Michigan sales during the Class Period were also significant at ███████████
9    ███████████████████████, respectively.  *Id.*  Although the exact number of
10   Class Members is not known, it can be reasonably inferred by the Court that there are
11   more than could be reasonably joined.  *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501
12   (S.D. Cal. 2013) (numerosity established where defendant had sold millions of units
13   nationally and thousands in each state); *see also Delarosa v. Boiron, Inc.*, 275 F.R.D.
14   582, 588 (C.D. Cal. 2011) (sales volume supported a finding of numerosity).
15        Additionally, Class membership must be reasonably ascertainable.  *Wolph v.
16   Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011).  "A class is ascertainable if
17   the class is defined with 'objective criteria' and if it is 'administratively feasible to
18   determine whether a particular individual is a member of the class.'"  *Werdebaugh*,
19   2014 WL 2191901, at *9 (citing *Wolph, supra*).  The Classes meet these criteria.
20   Membership in each Class is objectively defined by the purchase of a specific product.
21   *See Werdebaugh*, *supra*.  Furthermore, because the three misrepresentations, "Lean,"
22   L-Glutamine content, and Protein content, are all contained on the Class Products'
23   labels (Kashima Decl. Appendix A-C) each Class Member was exposed to the
24   misleading statements at issue.  *See Astiana*, 291 F.R.D. at 501 (finding the class
25   definition "purchasers of Defendant's products" was not vague or confusing because
26   "the alleged misrepresentations appeared on the actual packages of the products
27   purchased, [so] there is no concern that the class includes individuals who were not
28   exposed to the misrepresentation").

- 11 -

1    Moreover, Class Members in this case are not merely ascertainable, they are
2  also readily *identifiable* using sales data from third-party retailers. Through third-party
3  discovery, Plaintiffs have obtained declarations from various retailers confirming that
4  it is possible to determine from their records the names of consumers who purchased
5  Class Products during the Class Period.   Marino Decl., ¶ 3.   For example, the
6  custodian of records for Amazon.com, Inc. declared that "Amazon has the ability to
7  identify customers who purchased Class products via the amazon.com website."  *Id.*,
8  Ex. A, ¶ 2.a.   She further stated that "Amazon would be amenable to providing
9  customer information to a third-party administrator" in order to effectuate mailing of
10  notice, provided reasonable confidentiality protections are in place.  *Id.*, Ex. A, ¶ 2.b.

11    Plaintiffs received a similar response from Vitamin Shoppe and GNC, whose
12  custodians of records declared that they maintain certain customer contact
13  information.  *Id.*, Ex. B, ¶ 3; Ex. C, ¶¶ 3 & 4.  Vitamin Shoppe and GNC also stated
14  that, within a reasonable amount of time, they can produce a list of customers who
15  purchased Class Products.  *Id.*, Ex. B, ¶¶ 4 & 5; Ex. C, ¶¶ 6.

16    Even Class Product retailers who expressed their reluctance to search customer
17  data for Class Members agree it is possible.  For example, Costco confirmed that it
18  "has previously sent class notices by direct mail to Costco members in connection
19  with class action lawsuits," and states that it would do so in this case if required to, so
20  long as it is reimbursed for its costs.   *Id.*, Ex. D, at 2-3.   Likewise, Kroger
21  acknowledges that "[i]f class notice is needed then Kroger is willing to work with the
22  requesting party, at the requesting party's expense, to provide notice to potential
23  members of a class."  *Id.*, Ex. E, at 2.

24    It is highly likely that other retailers also have the capacity to identify
25  purchasers of Class Products through their customer data and would comply with a
26  court order to do so.  A class list developed in such a way would accurately identify an
27  ascertainable class of purchasers.  *Cf. Flynn v. Sony Elecs., Inc.*, No. 09-CV-2109-
28  BAS, 2015 WL 128039, at *1 (S.D. Cal. Jan. 7, 2015) (granting a class notice

proposal that included individual notice to known class members and publication notice to unknown class members). Together, the above steps comply with controlling authority on the issue of ascertainability, and Plaintiffs have met their burden of proof.

b.   *Common Questions of Fact and Law Exist*

Rule 23(a)(2) is satisfied "if there are questions of fact and law which are common to the class." FED. R. CIV. P. 23(a)(2). Every question need not be common to satisfy the rule. *Hanlon*, 150 F.3d at 1019. This requirement is, instead, "satisfied by the existence of a 'common contention' that is of 'such a nature that it is capable of classwide resolution.'" *Aho v. AmeriCredit Fin. Servs., Inc.*, 277 F.R.D. 609, 616 (S.D. Cal. 2011), *citing Wal-Mart*, 564 U.S. at 350. "The existence of shared legal issues with divergent factual predicates" or a "common core of salient facts coupled with disparate legal remedies within the class" is sufficient. *Hanlon*, 150 F.3d at 1019-20.

There are several discrete, dispositive factual and legal questions in this case that are undeniably common to all Class Members: (1) whether the Liquid Products contain the amount of protein advertised on the label; (2) whether a subset of the Powdered Products are "lean"; (3) whether Defendant's "lean" claims comport with Federal regulations; (4) whether a subset of the Powdered Products contain L-Glutamine as advertised; and (5) accordingly, whether any answers to the above questions render the Class Products labels deceptive or misleading. *See infra* § III(B)(2)(a). These common questions are more than sufficient to satisfy Rule 23(a)(2). *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 2466559, at *9 (N.D. Cal. May 30, 2014) (finding a class action challenging "all natural" claims on ten different products raised common questions of law and fact).

c.   *Plaintiffs' Claims Are Typical of the Class*

Plaintiffs must also establish that their claims are "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The purpose of the typicality

requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508 (citation omitted). A plaintiff's claim is typical "if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257-58 (C.D. Cal. 2008). Plaintiffs' claims need not be "substantially identical," but only "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

The typicality requirement is fulfilled because Plaintiffs and the absent Class Members have the same injury (*see infra* § III(B)(2)(a)(4)), resulting from substantially similar misrepresentations on Defendant's labels (*see infra* § III(B)(2)(a)(3)). *Astiana*, 291 F.R.D. at 502; *see also* Kashima Decl., Appendix A-C. Additionally, Plaintiffs' claims rest on the same legal theories as those of the Class: violation of consumer protection laws, federal regulations, and the MMWA. *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010); *see infra* § III(B)(2)(a)(1), (2). As such, Plaintiffs' claims are typical of the Class. *See Werdebaugh*, 2014 WL 2191901 at \*17 ("Regardless of what other motivations Werdebaugh may have had when he purchased Blue Diamond's almond milk, he shares with the proposed class the same interests in determining whether Blue Diamond products were deceptively advertised and labeled.").

### d. *Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Class*

The Ninth Circuit has articulated two criteria for determining adequacy of representation under Rule 23(a)(4): "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

#### (1) No conflicts of interest are present

There are no conflicts of interest apparent among Plaintiffs and their counsel

- 14 -

and the Class. The Plaintiffs' "interests in proving [Defendant's] alleged misrepresentation[s] align[] with those of other class members." *Hartless v. Clorox Co.*, 273 F.R.D. 630, 637 (S.D. Cal 2011). There are no questions here of competing interests between future and present claimants, no unique injuries, and no contested insurance funds that could give rise to such a conflict.[4] *See id.*, at 637-38. Rather, "[e]ach potential class member has the same issue: [ ] allegedly false representation[s] on [Defendant's] packaging and damages in the form of the purchase price." *Id.*, at 638. The absence of conflicts here supports certification of the Class and appointment of Plaintiffs and Plaintiffs' counsel as Class Representatives and Class Counsel, respectively.

(2)    <u>Plaintiffs and their counsel will continue to prosecute this action vigorously on behalf of the Class</u>

In answering the second question of adequacy, "[t]he relevant inquiry is whether the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*, 779 F.3d 934, 943 (9th Cir. 2015) (*quoting Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978) (alteration in *Resnick*). The Plaintiffs and Plaintiffs' Counsel have advocated vigorously on behalf of the Class to date and will continue to do so.

The Plaintiffs have proven themselves to be adequate Class representatives by stepping forward to challenge Defendant's misleading label claims on behalf of all affected purchasers, rather than simply seeking compensation for themselves. They have demonstrated that they remain sufficiently interested in and connected to this action and the class through their participation and contributions to date. Clay Decl., ¶ 5, Ehrlichman Decl., ¶ 5, Reichert Decl., ¶ 5. They have assisted their counsel in

---

[4] Should some conflict or potential conflict emerge, the three firms representing Plaintiffs in this case could be assigned separately to represent whatever discrete groups the Court identifies. *See, In Re: Bextra/Celebrex Sales and Marketing,* MDL No. 1699.

drafting the Complaint and initial disclosures. *Id.* They have each responded to two sets of interrogatories and two sets of requests for production from Defendant. *Id.* Each has been deposed by Defense counsel. *Id.* Their purchase records from various retailers have been subject to discovery by Defendant, at the cost of their personal privacy, so that they may establish their claims on behalf of the class. *See* Marino Decl., ¶ 10. The Plaintiffs participated in Early Neutral Evaluation on October 26, 2015. Clay Decl., ¶ 5, Ehrlichman Decl., ¶ 5, Reichert Decl., ¶ 5. Clearly, each of the Plaintiffs has devoted significant time and effort to this litigation to date, and they will continue to do so. *Id.*

The Ninth Circuit has held that a plaintiff is an adequate class representative where "he understands his duties and is currently willing and able to perform them. The Rule does not require more." *Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2011). As their Declarations show, the Plaintiffs were counseled on the responsibilities of being a class representative. Clay Decl., ¶ 4, Ehrlichman Decl., ¶ 4, Reichert Decl., ¶ 4. As their actions to date in this litigation show, they are willing and able to carry out those duties. The Plaintiffs meet the applicable standard, and the Court should appoint them Class Representatives.

Plaintiffs' counsel easily meet the test for adequate class counsel. Rule 23(g) and the accompanying Notes explain the role of adequate class counsel. The Rule is meant to "guide the court in assessing proposed class counsel as part of the certification decision." FED. R. CIV. P. 23, Notes of Advisory Committee on 2003 Amendments. Rule 23(g)(1)(C) provides that a court "must consider" the following: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. FED. R. CIV. P. 23(g)(1)(C.

Plaintiffs' counsel have prosecuted the case vigorously to this point. They expended significant time and resources in investigating the case; drafting the Complaint [Dkt. No. 1]; opposing and defeating Defendant's motion to dismiss [Dkt. No. 24]; bringing their own dispositive motion for partial judgment on the pleadings [Dkt. No. 67]; and pursuing discovery zealously [Dkt. Nos. 87, 95, 96, various motions for determination of discovery disputes]. Declaration of Jeffery R. Krinsk ("Krinsk Decl."), concurrently filed herewith, at ¶ 6. In discovery, Plaintiffs have issued two sets of requests for admissions, the maximum number of interrogatories permissible, and five sets of requests for production. Krinsk Decl., ¶ 4. In addition, Plaintiffs' counsel have conducted considerable third-party discovery via subpoenas to retailers of Class Products, Defendant's co-packers, and market research firms. Marino Decl., ¶ 4.

Through these efforts, Plaintiffs' counsel have incurred significant expense on behalf of the Class. In addition to hard costs, counsel have devoted over $300,000 in billable time in this case to date—a sizable investment in terms of opportunity cost. Declaration of Jason J. Thompson ("Thompson Decl."), concurrently filed herewith, at ¶ 13. The firms representing Plaintiffs have shown that they possess the financial and human resources to continue representing the Class with the same level of vigor demonstrated to date.

Plaintiffs' counsel are highly experienced in class actions, other complex litigation, and claims similar to the ones asserted here. Each firm's resume details its successes in prosecuting such cases—successes that required knowledge of the applicable body of law. Thompson Decl., ¶ 5-11; Declaration of Nick Suciu III ("Suciu Decl."), concurrently filed herewith, at ¶¶ 3-6; Krinsk Decl. Ex. A.

Together, Plaintiffs' counsel offer the Class a wealth of class action experience and legal knowledge stemming from a long history of advocating for consumers. Given the vigor with which counsel and Plaintiffs have prosecuted this case to date and their capacity to continue same, and considering the lack of conflicting interests

among counsel, Plaintiffs and the Class, appointment of the undersigned attorneys as Class Counsel is the appropriate course of action.

## 2. Plaintiffs Meet the Requirements of Rule 23(b)

Certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (internal quotations omitted). Rule 23(b)(3) examines these factors: (1) whether common issues to the Class "predominate" over issues unique to the individual Class members; and (2) whether a class action is "superior" for adjudicating the controversy. *Hanlon*, 150 F.3d at 1022. Here, both factors are met.

### a. *Common Issues of Law and Fact Predominate*

The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The issue of whether common questions of law or fact predominate "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). The legal claims must be "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *Hanlon*, 150 F.3d at 1022 (finding predominance "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication").

Rule 23(b)(3) does not require a plaintiff to prove that "each 'element of her claim is susceptible to classwide proof.'" *Amgen Inc.,* 133 S. Ct. at 1196. Instead, predominance is a pragmatic inquiry involving more than a simple comparison of the number of common and individual issues. 7AA Charles Alan Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE § 1778 (3d ed. 2005); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Predominance "requires an assessment of the relationship between individual and common issues which takes into consideration all

factors that militate in favor of, or against, class certification." *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 634 (S.D. Cal. 2010). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Id.* But, "[i]f the main issues in a case require the separate adjudication of each class member's individual claim or defense… the economy and efficiency of class action treatment are lost." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001), *citing* 7A Charles Alan Wright, *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1778 at 535–39 (2d ed. 1986).

(1)     Plaintiffs' state consumer protection law claims do not require any individualized analysis

Plaintiffs' state consumer protection law claims are particularly susceptible to class determination. California's UCL, FAL, and CLRA[5], Florida's DUTPA, and Michigan's CPA[6] are all based on an *objective standard* and *require no individual evidence of deception or reliance*. *C.f. Halliburton*, 563 U.S. at 810 ("Whether common questions of law or fact predominate in such an action often turns on the element of reliance"). Hence, liability in this case is not established by the Class Member's *individual* conduct or mental state, but by the deceptive nature of Defendant's representations.

The UCL prohibits "fraudulent" and "deceptive" advertising that is *likely to mislead the public*. *Bank of the West v. Sup. Ct.*, 2 Cal.4th 1254, 1267 (1992). The CLRA also prohibits "unfair methods of competition and unfair or deceptive acts or practices," such as "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." CAL. CIV. CODE § 1770 (a)(5). Whether suing under the UCL, FAL or CLRA, the legal test for "fraudulent" and "deceptive" business practices is the same.[7] At trial, Plaintiffs

---

[5] Specifically, a violation of CAL. CIV. CODE § 1770 (a)(5).
[6] Specifically, a violation of MICH. COMP. LAWS § 445.903(c).
[7] As a result, courts often analyze these three statutes together. *See, e.g., Paduano v. Am. Honda Motor Co.*, 169 Cal.App.4th 1453, 1468–73 (2009) (analyzing UCL and

- 19 -

1    must prove that a "reasonable consumer" would likely be deceived by Defendant's
2    misrepresentations. *Williams v. Gerber Prod. Co*., 552 F.3d 934, 938 (9th Cir. 2008)
3    *citing Bank of the West*, 2 Cal.4th at 1267; *Chapman v. Skype Inc*., 220 Cal.App.4th
4    217, 230 (2013) ("The standards for determining whether a representation is
5    misleading under the UCL and FAL apply equally to claims under the CLRA").

6         California courts have "repeatedly and consistently [held] that relief under the
7    UCL [and FAL] is available without individualized proof of deception, reliance and
8    injury." *In re Tobacco II Cases*, 46 Cal.4th 298, 320 (2009). On the other hand, the
9    CLRA "require[s] that 'plaintiffs… show not only that a defendant's conduct was
10   deceptive but that the deception caused them harm." *In re Vioxx Class Cases*, 180
11   Cal.App.4th 116, 129 (2009). "Causation, on a class-wide basis, may be established
12   by materiality." *Id.* And, importantly, materiality is judged by through the eyes of a
13   "reasonable consumer." *In re Tobacco II Cases*, 46 Cal.4th at 327 ("'a presumption,
14   or at least an inference, of reliance arises wherever there is a showing that a
15   misrepresentation was material... [a] misrepresentation is judged to be 'material' if 'a
16   reasonable man would attach importance to its existence or nonexistence in
17   determining his choice of action in the transaction in question'"); *McCrary v. Elations
18   Co., LLC*, No. EDCV 13-00242 JGB, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13,
19   2014) ("[T]he determination of materiality, and thus reliance, is determined using
20   objective criteria that apply to the entire class and do not require individualized
21   determination"). These objective legal standards render "claims under the UCL, FAL,
22   and CLRA ideal for class certification because they will not require the court to
23   investigate 'class members' individual interaction with the product.'" *Tait v. BSH
24   Home Appliances Corp*., 289 F.R.D. 466, 480 (C.D. Cal. 2012).

25        Similarly, under the FDUTPA and the MCPA, "a party asserting a deceptive
26   trade practice claim need not show individual reliance on the representation or

27   _____

28   CLRA claims together); *Chacanaca v. Quaker Oats Co*., 752 F.Supp.2d 1111, 1124–
     25 (N.D. Cal. 2010) (analyzing UCL, FAL, and CLRA claims together).

omission at issue." *Keegan v. Am. Honda Motor Co*., 284 F.R.D. 504, 541 (C.D. Cal. 2012) *citing Office of Atty. Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc*., 869 So.2d 592, 598 (Fla. App. 2004); *Dix v. Am. Bankers Life Assur. Co. of Florida*, 429 Mich. 410, 418 (1987) ("We hold that members of a class proceeding under the Consumer Protection Act need not individually prove reliance… It is sufficient if the class can establish that a reasonable person would have relied on the representations"); *Gasperoni v. Metabolife, Int'l Inc*., No. 00-71255, 2000 WL 33365948, at *7 (E.D. Mich. Sept. 27, 2000) ("Under this statute, reliance and causation are satisfied by proof that plaintiffs purchased and consumed the product"). Instead, liability is established if the practice was likely to deceive a reasonable consumer. *Wyndham,* 869 So.2d at 598, *citing Davis v. Powertel, Inc*., 776 So.2d 971, 974 (Fla. App. 2000) ("[T]he question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances").[8]

As the Central District Court recently held, "[w]ith small differences in wording, all three states appear to employ the same causation and reliance standard. The touchstone of each state's law is whether a reasonable person would have found the relevant omission misleading." *Cf. Keegan*, 284 F.R.D. at 541 (analyzing California, Florida, and New York law). None of the above-cited statutes require examination into the *individual* circumstances of a particular Class Member.

The only determinations that must be made by the Court are whether Defendant's L-Glutamine, Lean, and Protein label representations are <u>*objectively*</u> false or misleading (and for the purposes of the CLRA, whether the same claims are <u>*objectively*</u> material). The legal questions identified above as "common" pursuant to

---

[8] MICH. COMP. LAWS § 445.903(c) and CAL. CIV. CODE § 1770(a)(5) are identical: prohibiting Defendant from "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities [that/which] they do not have." Accordingly, the Court's analysis of the California and Michigan claim should not differ.

Rule 23(a) will clearly predominate over any other questions that might arise under the consumer protection statutes. All class members' claims will rise, or fall, based on the answer to a small number of key questions. Defendant's liability under UCL, FAL, CLRA, FDUTPA, and the MCPA can be determined on a class-wide basis.[9]

> (2)    Breach of written warranty under the MMWA does not require the Court to conduct individual inquiries

Plaintiffs also seek to certify their MMWA claims for the State Subclasses. The MMWA "creates a federal private cause of action for a warrantor's failure to comply with the terms of a written warranty." *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 917 (9th Cir. 2005) *citing* 15 U.S.C. § 2310(d)(1)(B).[10]  In order to prove a violation of the MMWA, Plaintiffs must establish that Class Members are a "consumer who is damaged by the failure of a ... warrantor ... to comply with any obligation ... under a written warranty." *Id.*  This federal cause of action is independent of any state law protections and protects consumers *even if the state law is less expansive*. *Romo v. FFG Ins. Co.*, 397 F.Supp.2d 1237, 1241 (C.D. Cal. 2005).

The MMWA defines what constitutes a "written warranty" under federal law:

[A]ny written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of

---

[9]   The UCL also prohibits any business practice that is forbidden by law and "[v]irtually any law-federal, state or local can serve as a predicate for a section 17200 action." *State Farm Fire & Cas. Co. v. Sup. Ct.*, 45 Cal.App.4th 1093, 1102-03 (1996). A violation of the FDUTPA can similarly be "premised on the violation of another law proscribing unfair or deceptive practice." *Hap v. Toll Jupiter Ltd. P' ship*, No. 07–81027–CIV, 2009 WL 187938, at *9 (S.D. Fla. Jan. 27, 2009). Thus, violations of the various food labeling regulations may independently establish a violation of the California and Florida law. No individual inquiries are required.

[10]   *See also Walton v. Rose Mobile Homes* LLC, 298 F.3d 470, 474 (5th Cir. 2002) ("MMWA creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty.'"); *Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325 (11th Cir. 2001) ("The Act's consumer-suit provision, for instance, supplies a federal remedy for breach of written and implied warranties, but not for oral express warranties, which remain the domain of state law."); *Rentas v. DaimlerChrysler Corp.*, 936 So.2d 747, 750–51 (Fla. Dist. Ct. App. 2006) ("[W]e hold that the MMWA does provide an independent federal cause of action for breach of warranty.")

- 22 -

performance over a specified period of time.

15 U.S.C. § 2301(6). The MMWA similarly defines who is a "warrantor" and who is a protected "consumer" under the Act. 15 U.S.C. § 2301 (3) ("The term 'consumer' means a *buyer* (other than for purposes of resale) of any consumer product"); § 2301(5) ("The term 'warrantor' means any supplier or other person who gives or offers to give a written warranty"). Stated differently, what constitutes a "written warranty" and the duty not to breach obligation(s) thereunder are dictated by the MMWA, not state law.

Here, the Plaintiffs' MMWA claims, much like their state law claims, do not require the Court to conduct an examination into the conduct of the *individual* Class Members. By definition, all Class Members are "customers" under the MMWA. *See* Notice of Motion. Further, the existence of Defendant's "written warranty" is evident from the front of each of the Liquid Products' labels. *See, infra,* §III(B)(2)(a)(3). The only question that remains is whether the written warranty was breached. This is a question tested by an objective standard that can be determined through protein testing.

The MMWA also eliminates the traditional warranty requirements that might prevent certification of Plaintiffs' claims. Privity is still a requirement found in numerous states' law for breach of <u>written</u> warranty.[11] Yet, privity is not an element of a MMWA claim. As noted by the Second Circuit in *Abraham v. Volkswagen of Am., Inc.*:

> [i]t is clear that with regard to written warranties, full or limited, privity is not required and transferees of the original purchaser may enforce them during their effective period. This result flows directly from the statutory definitions of "consumer," "supplier" and "warrantor," and from the

---

[11] Privity is not required in California and Florida when the affirmation of fact appears on the label of the product. *Monsanto Agr. Prod. Co. v. Edenfield*, 426 So. 2d 574, 576 (Fla. Dist. Ct. App. 1982) ("With the demise of the privity doctrine in Florida, manufacturers became liable to remote purchasers for breach of both express and implied warranties."); *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 696 (1954) (Privity is not required "where the purchaser of a product relied on representations made by the manufacturer in labels or advertising material.")

enforcement provisions authorizing actions by consumers for breach of a written warranty. 15 U.S.C. § 2310(d).

795 F.2d 238, 248 (2d Cir. 1986). Thus, *individual* inquiries about where each of the Class Products were purchased, and from whom, are not required. *Rentas,* 936 So.2d at 751 (holding purchasers of a used car could pursue a breach of written warranty claim against the manufacturer under the MMWA, absent privity of contract).

Under the same analysis applied by the Second Circuit in *Abraham*, MMWA eliminates Plaintiffs' need to prove reliance at trial. For statutory support, states that still read a reliance requirement into the UCC cite to the definition of express warranty under section UCC 2-313: "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain*." UCC § 2-313 (emphasis added); *see also, e.g., Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 675 (Tex. 2004) (UCC § 2-313 "incorporates a reliance element, providing that a seller's statement that is 'part of the basis of the bargain' creates an express warranty"); *Hendricks v. Callahan*, 972 F.2d 190, 193 (8th Cir. 1992) (same, applying Minnesota law); *Overstreet v. Norden Labs., Inc*., 669 F.2d 1286, 1291 (6th Cir. 1982) (same, applying Kentucky law).[12]

The MMWA contains equivalent language, except the Federal Trade Commission ("FTC") has not conflated the requirement that a written warranty "form

---

[12] California does not require reliance to establish a breach of express warranty. *Horvath v. LG Elecs. Mobilecomm U.S.A*., Inc., No. 3:11-CV-01576-H-RBB, 2012 WL 2861160, at *4 (S.D. Cal. Feb. 13, 2012). Florida and Michigan law is less clear. However, courts have recently held that reliance is not required. *S. Broad. Grp., LLC v. Gem Broad., Inc*., 145 F.Supp.2d 1316, 1324 (M.D. Fla. 2001), *aff'd sub nom. S. Broad. v. GEM Broad*., 49 F.App'x 288 (11th Cir. 2002) (holding that while the Florida Supreme Court has yet to seize on the subject, the Court would likely adopt the modern trend that reliance is not required to establish a breach of express warranty); *Michigan Dessert Corp. v. A.E. Staley Mfg. Co*., 23 F. App'x 330, 334 (6th Cir. 2001) ("Michigan case law has not settled the question of what constitutes a 'basis of the bargain' for purposes of express warranties."); *Elledge v. Bacharach Instrument Co., 974* F.2d 1338 (6th Cir. 1992) (noting that "'particular reliance on such statements' is not needed.") (*citing* MICH. COMP. Laws § 440.2313, Cmt. 3 ("[N]o particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.") Thus, even if MMWA does not eliminate reliance requirement, reliance is no longer a requisite for asserting a breach of warranty under California, Florida, and Michigan law.

the part of the basis of the bargain" with the traditional notion of reliance. *Rickard v.*
*Teynor's Homes, Inc.*, 279 F.Supp.2d 910, 919-20 (N.D. Ohio 2003) (The FTC is the
"agency to which Congress entrusted the task of implementing and elaborating the
provisions of the MMWA.") This language was meant only to prohibit post-sale
disclosures and exclude traditional repair contracts:

> "Written warranty" and "service contract" are defined in sections 101(6) and
> 101(8) of the Act, 15 U.S.C. 2301(6) and 15 U.S.C. 2301(8), respectively. A
> written warranty must be "part of the basis of the bargain." This means that
> it must be *conveyed at the time of sale of the consumer product* and the
> consumer *must not give any consideration beyond the purchase price* of the
> consumer product in order to benefit from the agreement.

16 C.F.R. § 700.11 (emphasis added); 16 C.F.R. § 700.3 (a) (written warranties
covered under the MMWA do not coincide with the definition of express warranties
under the UCC). Here, "[the] court should accord particular deference to the FTC's
regulatory interpretation of the MMWA because the regulations represent a
longstanding, consistent interpretation of the statute." *Walton*, 298 F.3d at 490;
*Kennedy v. Butler Fin. Solutions*, LLC, No. 2009 WL 290471, at *4 (N.D. Ill. Feb. 4,
2009) (same).[13] Because the Protein claims were conveyed to each Class Member *via*
the Products' labels, Plaintiffs' MMWA claims do not interject individualize issues
into the Court's analysis. *Cf. Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 569
(S.D.N.Y. 2014) (certifying a warranty claim where express promise was made on
each product's label).[14] Here again, the common questions identified above will
clearly predominate over any other warranty-related questions that might arise, and all
class members' claims will rise, or fall, based on the answer to these key questions.

---

[13] *See also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (Defendant
may not use state law to place additional requirements on federal statutes which would
"stand[ ] as an obstacle to the accomplishment and execution of the full purposes and
objectives of Congress."); *Romo*, 397 F.Supp.2d at 1241 ("Congress did provide for a
substantive right of action in the provisions of the [MMWA], and it would frustrate
congressional purpose to circumscribe the scope of that protection because state law is
less expansive.").

[14] If Plaintiffs' MMWA claims are not certified, Plaintiffs seek to certify the RTD
Subclasses under each states' warranty statutes: CAL. COM. CODE § 2313 (Count IIX);
FLA. STAT. § 672.313 (*id.*); MICH. COMP. LAWS § 440.2313 (*id.*).

           (3)    <u>The misrepresentations are uniform and the falsity or misleading nature of Defendant's claims can be determined by common evidence</u>

This case is well suited for certification because, in addition to identifying common and predominating questions of law or fact, Plaintiffs can prove their legal claims based on *evidence* common to the Class. Each of the Plaintiffs' claims are predicated on representations made on the Class Products' labels. Accordingly, the "primary evidence" in this case are the labels themselves. *Brockey v. Moore,* 107 Cal.App.4th 86, 100 (2003). During the pendency of the Class Period, all the labels bore the same misrepresentations. Kashima Decl., ¶¶ 7-11, 13-15, 18-20; *McCrary*, 2014 WL 1779243, at *10 (When all class members were exposed to the same labeling claims, a "common core of salient facts" is created).[15] Again, Defendant has stipulated that the Class Product labels are materially identical to one another with regard to the Lean, L-Glutamine, and protein claims. Joint Motion for Stipulation [Dkt. No. 104].

Indeed, Defendant's Liquid Products all had the same representation on the front of each Product during the Class Period: "[XX] g PROTEIN." Kashima Decl., ¶¶ 18-20, Appendix C. The Liquid Products' labels also listed the amount of protein contained within the Product on the Nutritional Fact's label. *Id.* Accordingly, the only question that remains is whether these Supplements actually contained the amount of protein advertised. Because Defendant retains samples of previously produced lots of its Liquid Products, this question will be answered through testing using the appropriate FDA mandated methodology. *Id.*, ¶ 37; *see also* 21 C.F.R. § 101.9(g)(2), (4).

Defendant's Powdered Products also have multiple, uniform "Lean" misrepresentations on their labels:

---

[15] None of the statements on the labels of the Class Products are directly contradicted by Defendant's other print or electronic advertisements. Kashima Decl. ¶ 22, Ex. P, p. 10:3-15.

- • The products' front labels state that the Products contain "XX g LEAN PROTEIN";
- • The products are labeled to these Products as some variation of "LEAN MUSCLE PROTEIN," LEAN MUSCLE PROTEIN SUPPLEMENT," "LEAN MUSCLE PROTEIN POWDER," or "NEW LEANER FORMULA"; and
- • The majority of the products' "Left Panels" advertise that the products contain "Lean Lipids."

Kashima Decl., ¶¶ 7-11, Appendix A. Even though these Powder Products were repeatedly labeled as "Lean," they were all uniformly fortified with significant amounts of fat from three sources: canola oil, sunflower oil (███████████ ██████, and medium-chain triglycerides (MCT). *Id.,* ¶ 27; *Astiana*, 291 F.R.D. at 509 (class certification is proper when the falsity of Defendant's claims can be determined by examining a discrete number of ingredients). The deceptive nature of these "Lean" representations can be determined through expert testimony and consumer surveys on a class-wide basis using an objective standard. *See* Declaration of Elizabeth Howlett ("Howlett Decl."), concurrently filed herewith, ¶¶ 20, 26-36; *see also supra* III(B)(2)(a)(1) (the applicable laws only require Plaintiffs to prove that a reasonable consumer would be deceived).[16]

Defendant's Powder Products have uniform labels as to their L-Glutamine claims. A number of the Class Products list L-Glutamine as one of the most prominent ingredients within the products' ingredient list. Kashima Decl. ¶¶ 13-15, Appendix B; *see also* 21 C.F.R. § 101.4(a)(1) (Ingredient must be listed by their common name in descending order of predominance by weight.) These products also advertise that the products contain a substantial amount of "L-Glutamine & Precursors" in the product. Kashima Decl. ¶¶ 13-15, Appendix B. Yet, whatever the amount of L-Glutamine in the L-Glutamine Supplements, it is less than the amount that can be detected by scientific means. *Id.*, ¶ 29, Ex. MM, at p. 11 (Defendant

---

[16] Alternatively, the Court can adopt the standards established in FDA regulations to determine the Lean claims. 21 C.F.R. § 101.62(a), (e) (Federal regulations specifically prohibit the use of the word "lean" unless Defendant uses such term in accordance with its definition as set out in 21 C.F.R. § 101.62(e).)

- 27 -

admits the amount may be below the level of detection). The presence of such a small amount of L-Glutamine is akin to adding nothing because it is far below the amount that would have a physiological effect on the body. Campbell Decl. ¶ 9; *see also* Kashima Decl., Ex. R (Defendant recommends that L-Glutamine be supplemented in five-gram doses, multiple times a day). As with Defendant's "Lean" label claims, the misleading nature of the L-Glutamine label claims can be determined on a class-wide basis through expert testimony and consumer surveys. *See* Howlett Decl. ¶¶ 34, 36.[17]

The manufacturing process of the Class Products was also uniform during the Class Period. Defendant maintains strict controls over the formulation and production of the Class Products. Kashima Decl., ¶¶ 31-34. This includes establishing uniform product formulas, operating procedures, mixing instructions, and product specifications to ensure that the individual lots produced in the same product line are identical. *Id.,* Exs. pp. 162:10-164:1; 166:1-167:22; KK, LL. Thus, Defendant has stipulated that there is no variation from one of its Powder Products to the next that would have an effect on any of its label claims. Joint Motion for Stipulation [Dkt. No. 104].[18] Accordingly, the common evidence in this case allows for determination of the factual and legal issues on a class-wide basis.

(4) <u>The Class's restitution, damages, and other relief may be determined on a class-wide basis.</u>

Generally, potential manageability problems during the damages phase of a class action do not defeat certification. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[T]here is a big difference from the standpoint of manageability between the liability and remedy phases of a class action."); *Keegan*, 284 F.R.D. at 550 (certifying class even though there was "no practicable way" to

---

[17] Defendant includes L-Glutamine as part of its "Protein Blend" in the Product's ingredient lists. Kashima Decl., ¶¶ 13-14. L-Glutamine, however, is not a protein and there is no standardized definition for the term "Protein Blend." *Id.* n. 9 .

[18] Additionally, there have been a small number of changes to the recipes used to create the Class Products. To the extent that these changes may have altered the amount of protein (or any other ingredient) in the Class Products during the Class Period, such changes can be taken into account when testing the retained samples.

identify the class members entitled to payment). Nevertheless, as Plaintiffs' experts have opined, damages/restitution can also be calculated and proven in this case on a class-wide basis using both a regression analysis where appropriate, and a conjoint analysis. An extended discussion of the standards and typical methods used to calculate damages in consumer labeling cases can be found in *Werdebaugh v. Blue Diamond Growers* (2014 WL 2191901 (N.D. Cal. May 23, 2014)). "So long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat class certification." *Id*. at 22. "According to the Ninth Circuit, 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id*. (*quoting Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013)).

Here, consistent with their claims, legal theories, and sworn testimony, Plaintiffs primarily seek restitution (a.k.a. compensatory damages). Whether under California, Michigan, or Florida consumer protection laws, the measure of these damages is the same: it is "the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Id*. at *22 (*citing Colgan v. Leatherman Tool Group*, 135 Cal.App.4th 663, 700 (2006)); *Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So.2d 311, 314 (Fla. Dist. Ct. App. 1998) (The damages for a breach of the FDUTPA are measured by the difference between the market value of the product as it was promised and the market price as the product was actually delivered.); *Chambers v. Gen. Trailer Mfg*., No. 04-71066, 2006 WL 1851008, at *5 (E.D. Mich. July 5, 2006) ("[T]he measure of damages for unfulfilled expectations under the MCPA, is '[i]n general ... the difference between the actual value of the property when the contract was made and the value that it would have possessed if the representations had been true.'")[19]

---

[19] Damages under the MMWA also shares the same standard. *Romo*, 397 F.Supp.2d at 1241 (Courts "looked to state law for guidance on remedies under the Magnuson–Moss Act."); CAL. COM. CODE § 2714(2) ("The measure of damages for

Whether called damages or restitution, this "calculation contemplates the product of evidence that attaches a dollar value to the 'consumer impact or advantage' caused by the unlawful business practice." *Werdebaugh, surpa,* at *22. Damages and restitution "can then be determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practice. *Id.*[20]

As in *Werdebaugh*, Plaintiffs intend to perform a regression analysis with multiple variables to isolate and calculate the price/value difference for each alleged misrepresentation. *See* Declaration of Jeffrey E. Harris, concurrently filed herewith, ¶¶ 14, 21-25.[21] A regression analysis cannot be used to properly compute the value of the L-Glutamine/lean claim because, in part, L-Glutamine and L–Leucine almost always appear together on relevant Product labels, thus Plaintiffs will also perform and rely on a conjoint analysis. *See Id.*, ¶ 26-35. A similar approach, also by Dr. Howlett, was recently accepted in *In re Conagra Foods, Inc.*, 90 F.Supp.3d 919, 954 (C.D. Cal. Feb. 23, 2015) (FED. R. CIV. P. 23(f) appeal pending). "Howlett's conjoint analysis will be used to calculate a *percentage* of the price premium attributable to the '100% Natural' label that reflects consumers' belief it means the product contains no

---

breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."); FLA. STAT. § 672.714 (same); MICH. COMP. LAWS § 440.2714 (same).

[20] The court in *Werdebaugh* discussed the appropriateness of three different potential damages approaches, including: (1) the "Full Refund Model", (2) the "Price Premium Model", and (3) the use of a "Regression Model." The court found the first two approaches, as proffered, to be inconsistent with the liability theories asserted in the case, but the court approved use of a regression model finding that "Werdebaugh's proposed damages model provides a means of showing damages on a classwide basis through common proof…." *Werdebaugh.* 2014 WL 2191901 at *26. "In sum, while Dr. Capps has yet to run the model and determine what price differences, if any, are attributable to the alleged label misrepresentations, he sets forth what is in the Court's view a workable model of calculating damages, and which is tied to Werdebaugh's theory of liability as required by *Comcast*." *Id*, (*citing Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)).

[21] Regression analyses, often called hedonic regressions, are widely used in consumer class actions to establish class-wide injury and damages. *See Werdebaugh*, 2014 WL 2191901 at *24; *Werdebaugh v. Blue Diamond Growers* ("*Werdebaugh II*"), No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014); *Conagra*, 90 F.Supp.3d at 947-48.

GMOs." *Id.* "[T]he court concludes that Howlett's thorough explanation of her methodology and her background in performing similar conjoint analyses suffice to satisfy *Daubert* and Rule 702." *Id.*

Given the nature of the claims and the widespread acceptance and reliability of the damages methodologies proposed by Plaintiffs' experts, damages in this case will be able to be computed and proven on a class-wide basis.[22]

> b.     *A Class Action Is a Superior Method of Adjudication*

The second prong of Rule 23(b)(3) requires that class litigation is the superior method for adjudicating this dispute. Factors to be considered include: class members' interest in individually controlling litigation; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action. FED. R. CIV. P. 23(b)(3)(A)–(D) . The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

In the instant case, there are tens or hundreds of thousands of Class Members, and their individual damages will be relatively modest. Kashima Decl. ¶¶ 41-42, Ex. SS. Litigation of these claims will involve costly and extensive discovery, including the retention of expert witnesses and expensive product testing. It is unlikely that an individual plaintiff could or would bare such costs in light of the potential recovery. *See Astiana*, 291 F.R.D. at 507. But even if it were economically feasible for Class Members to assert their individual claims, it would greatly burden the courts if they

---

[22] In addition to the comprehensive sales data produced by Defendant (which breaks down sales of each Class Product by state and date), commercial services like Information Resources, Inc. ("IRI") also collect and sell scanner data from the hundreds of millions of consumer transactions that occur each year. *See* http://www.iriworldwide.com/en-US/solutions/consumer-and-shopper-intelligence /insights. IRI data is often used to establish retail pricing for specific UPCs or to fill in any gaps in the evidentiary record. *See Wederbaugh II*, 2014 WL 7148923, *9-10 (discussing use of IRI data to perform a regression analysis).

1   were to do so. *McCrary*, 2014 WL 1779243, at \*16 ("It is more efficient to resolve
2   the common questions regarding materiality and scientific substantiation in a [single]
3   proceeding rather than to have individual courts separately hear these cases").

4            There are also substantial connections between the Southern District of
5   California and this case that justify litigating before this Court.  Plaintiff Clay resides
6   and Defendant sells the Class Products in this District.  Clay Decl., ¶ 3.  Defendant is
7   located in California (thus, the majority of witnesses are located in this state) and a
8   substantial portion of the proposed Class Members reside in California.  Kashima
9   Decl., Exs. A, at pp. 60:13-61:9, 74:7-75:9, SS.  And no other similar cases are
10  currently pending.  Finally, there is no evidence that this case will be more difficult to
11  manage than any other consumer class action.  "Given the large number of potential
12  class members and small amount of the claims, the Court [should] conclude[ ] that a
13  class action is a superior method of resolving this case." *McCrary*, *supra*, at \*16.

14       **C.    Plaintiffs May Assert a National Class Under the UCL and FAL**

15           California courts have long recognized that UCL and FAL allows out-of-state
16  consumers to sue companies operating in California for violations of California law.
17  *See Rutledge v. Hewlett-Packard Co.*, 238 Cal.App.4th 1164, 1186-89 (2015), *as*
18  *modified on denial of reh'g* (Aug. 21, 2015), *review denied* (Nov. 10, 2015); *see also*,
19  CAL. BUS. & PROF. CODE § 17500 (It is unlawful for any person "to make or
20  disseminate or cause to be made or disseminated before the public in this state, or to
21  make *or disseminate or cause to be made or disseminated from this state before the*
22  *public in any state*," false or misleading advertisements.) (Emphasis added).
23  California's laws stem from "California's interest in deterring fraudulent conduct by
24  businesses headquartered within its borders and protecting consumers from fraudulent
25  misrepresentations emanating from California." *Clothesrigger, Inc. v. GTE Corp.*, 191
26  Cal.App.3d 605, 614 (1987).  Thus, an out-of-state consumer (or a class of out-of-state
27  consumers) can sue a California based defendant if it has its principal place of
28  business in California, and the legal conduct emanated from its in-state conduct. *See*

- 32 -

*Rutledge*, 238 Cal.App.4th at 1187; *Clothesrigger*, 191 Cal.App.3d at 613. This case is no different. Defendant is incorporated *and* headquartered in California. All the label decisions were made in California, and many of the products were produced in this state. Kashima Decl., Ex. A, at pp. 60:13-61:9, 74:7-75:9. Thus, Defendant can and should be held accountable under California law.

Despite the expansive nature of California's consumer protection laws, the Ninth Circuit, in *Mazza v. American Honda Motor Co., Inc.*, directed that a conflict-of-laws analysis must be conducted to determine whether California law can be invoked by a class of out-of-state consumers. *See generally* 666 F.3d 581 (9th Cir. 2012). However, the *Mazza* court assumed, without holding, that the consumer protection laws of California and the foreign consumer's home state were in conflict. *Id.* Yet that is not the case here.[23]

Overlapping consumer protection laws actually "do not present a classic conflict of laws question." *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F.Supp. 543, 545 (M.D.N.C. 1988). The "laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question." *Id.*; *accord In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, No. 2:11-CV-07166, 2012 WL 10731957, at *14 (C.D. Cal. June 29, 2012). This is because the laws of California and other states govern different interests. The laws of California protect Californian businesses/market by punishing illegitimate actors operating within the state, and out-of-state residents are protected by their own state's consumer protection laws for purchases that occur within the state, without regard to the origin of the product. *Clothesrigger, Inc.*, *surpa,* at 614. The "states' efforts to advance these interests will always overlap when [ ] transactions cross state lines." *Id.* But, the "states' interests can be protected without preventing other states from protecting their own interests."

---

[23] It is important to note that the Ninth Circuit did not hold that California lacked sufficient constitutional contacts to the domestically headquartered corporate defendant to assert a claim under California law. *Mazza*, 666 F.3d at 590.

*Id*.  Indeed, all states prohibit false and misleading advertisements in some manner. *Forcellati*, 2015 WL 9685557, at *3 *citing* H.R. Conf. Rep. 105–399, 103.

   *Simms Inv. Co. v. E.F. Hutton & Co. Inc*, provides a pointed example of concurrently applicable state consumer protection laws (specifically, securities laws) in practice:

> Suppose a North Carolina resident brought an action against a defendant alleging fraud under state securities laws. The "offer to sell" the security was "made" in North Carolina and the security was bought in Colorado. Because jurisdictional requirements have been satisfied, the securities laws of both Colorado and North Carolina would apply. North Carolina is interested in protecting its defrauded citizen and Colorado is interested in eliminating a base of fraudulent operations located within its borders. Each state's interest is vindicated by permitting the plaintiff to pursue multiple theories, as long as he is limited to a single recovery based upon a finding of liability.

> The situation created when two state securities law apply to a transaction should be viewed **more as an election of remedies, rather than a potential conflict of laws problem**. This characterization serves several public policy goals. First, the decision obviates the need to enter the labyrinth of ever-shifting conflict of laws jurisprudence. Second, the decision comports with legislative directives to apply state securities statutes in prescribed situations. Third, the "territorial nexus" requirement eliminates any threat of forum shopping. Finally, the decision provides a logical and coherent analysis which will provide both issuers and purchasers of securities notice of which state(s) law is applicable to a given transaction.

699 F.Supp. at 545-46. (emphasis added).  The above reasoning has been applied to securities transactions by both the California Supreme Court and California federal courts.  *See Diamond Multimedia Sys., Inc. v. Sup. Ct.*, 19 Cal.4th 1036, 1061-62 (1999); *In re Countrywide Fin. Corp.*, 2012 WL 1322884, at *2 (*citing Simms Inv. Co.* with approval).  There is no reason that consumer interests protected in securities laws should be different from those of nonfinancial products.  *Chavez*, 268 F.R.D. at 379 (citing *Diamond Multimedia Sys., Inc*. in a UCL case).

   If consumer protection laws are "additive rather than exclusive," it should "not be the role of the Court to reconcile differences between them, but rather to give full effect to each."  *In re Countrywide Sec. Litig*., 2012 WL 1322884, at *2.  A plaintiff is free to choose what law to sue under and elect a remedy – so long as he or she can satisfy the elements of the cause of action.  *Id*.; *Simms Inv. Co.,* 699 F.Supp. at 546;

| | |
|---|---|
| 1 | *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 551 (W.D. Va. 1985) ("There is nothing |
| 2 | inconsistent in trying a securities case on multiple theories, and determining liability |
| 3 | under each statute that is applicable, so long as the plaintiff is prevented from multiple |
| 4 | recoveries"); *see also Clothesrigger, Inc.*, 191 Cal.App.3d at 616 ("California's more |
| 5 | favorable laws may properly apply to benefit nonresident plaintiffs when their home |
| 6 | states have no identifiable interest in denying such persons full recovery.")  There is |
| 7 | no reason that residents of other states should not be able to elect for application of |
| 8 | California law, if such a choice exists.  Indeed, "California's consumer protection laws |
| 9 | are among the strongest in the country," and where California law allows non- |
| 10 | residents to assert claims against a California-based business, plaintiffs should be free |
| 11 | to avail themselves of that right.  *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th |
| 12 | 224, 242 (2001).  Accordingly, the Court should certify a nationwide class under the |
| 13 | FAL and UCL.  *Id.* |

**IV.  <u>CONCLUSION</u>**

The Plaintiffs have challenged three relatively straightforward representations on Defendant's Powder Products and Liquid Products.  They have standing and are typical of the Class as to these three claims.  They have retained experienced class counsel.  Furthermore, the legal claims share several common issues of fact and law, all of which easily predominate over individual issues, if there are any.  And clearly, there are numerous Class Members who share the same claims and interest in resolving this case.

Moreover, all the evidence to test the merits of Plaintiffs' claims is uniform and common to the Class Members.  The labels, manufacturing and packaging are all materially the same.  The parties' experts will all rely on the same evidence and facts.  Therefore, there is no reason why Class claims would not rise, or fall, together at trial.

And lastly, certification of this case as a class action provides the superior method for resolving parties' dispute.  For all of the reasons outlined above Plaintiffs' have met their burden for class certification as mandated by Rule 23.

DATED: September 9, 2016

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By: /s/ Trenton R. Kashima
Trenton R. Kashima

Jeffrey R. Krinsk, Esq.
Trenton R. Kashima, Esq.
William R. Restis, Esq.
550 West C St., Suite 1760
San Diego, CA 92101-3593
Telephone: (619) 238-1333
Facsimile:   (619) 238-5425

BARBAT, MANSOUR & SUCIU PLLC
Nick Suciu III, Esq. (*Pro Hac Vice*)
nicksuciu@bmslawyers.com
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472

SOMMERS SCHWARTZ P.C.
Jason J. Thompson, Esq. (*Pro Hac Vice*)
jthompson@sommerspc.com
One Towne Square, 17th Floor
Southfield, MI 48076
Telephone: (248) 355-0300

*Attorneys for Plaintiffs*
*and the Putative Classes*