1  FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
2  jrk@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
3  trk@classactionlaw.com
550 West C St., Suite 1760
4  San Diego, California 92101
Telephone: (619) 238-1333
5  Facsimile:  (619) 238-5425

6  Attorneys for Plaintiffs
and the Putative Classes
7
[Additional Counsel Listed On Signature Page]
8
## UNITED STATES DISTRICT COURT
9
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  CHAYLA CLAY, ERICA EHRLICHMAN, and LOGAN REICHERT, individually and on behalf 12  of all others similarly situated, | Case No: 3:15-cv-00165-L-DHB |
| 13                  Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS** |
| v. | **CERTIFICATION AND APPOINTMENT OF CLASS** |
| 14 | **REPRESENTATIVES AND CLASS** |
| CYTOSPORT, INC., a California 15  corporation, | **COUNSEL; OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE CERTAIN OPINIONS OF** |
| 16                  Defendant. | **ELIZABETH HOWLETT; and OPPOSITION TO DEFENDANT'S** |
| 17 | **MOTION FOR SUMMARY JUDGMENT** |
| 18 | **_*SPECIAL BRIEFING SCHEDULE*_** |
| 19 | |
| 20 | **[No Oral Arguments Unless Requested by the Court]** |
| 21 | |
| 22 | Judge:     M. James Lorenz |
| | Ctrm:      Courtroom 5B |

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................. i

**TABLE OF AUTHORITIES** ........................................................................ iii

**REPLY IN SUPPORT OF CLASS CERTIFICATION** ......................................... 1

I.   COMMON QUESTIONS OF LAW AND FACT PREDOMINATE ................ 1

  A.   Plaintiffs' State Consumer Law Claims Do Not Require the Court to Conduct Individual Inquires .................................................................. 2

    1.   The Reasonable Consumer Standard Applies to Plaintiffs' Claims 2

    2.   No Uniform Understanding of Defendant's Lean and L-glutamine Misrepresentations Is Required ...................................................... 5

    3.   Defendant argues that a reasonable consumer would not understand the challenged representations in the manner alleged by Plaintiffs 6

    4.   Defendant claims that no reasonable consumer would find these representations material ................................................................ 8

    5.   Individual issues will not predominate Plaintiffs' Protein Claims 10

  B.   Plaintiffs' MMWA Claims Do Not Require the Court to Conduct any Individual Inquires .................................................................................. 12

  C.   Variability in Pricing and Consumers' Reasons for Buying Muscle Milk Are No Impediment to Computing Damages ......................................... 15

    1.   Plaintiffs' Proffered Damages Methodologies Fully Comply with the Supreme Court's *Comcast* Decision ...................................... 16

    2.   The Retail Prices of Consumer Products Always Exhibit Variability ................................................................................................. 16

    3.   "Unsupported" and proposed models are two different things ..... 17

  D.   Dr. Harris' proposed regression, like Dr. Weir's regression in *Conagra*, is workable and satisfies *Comcast* ............................................................. 18

  E.   Dr. Howlett and her proposed choice-based conjoint methodology have been accepted by other courts in labeling cases .................................... 19

II.  THE PROPOSED CLASS IS ASCERTAINABLE ...................................... 21

III. CALIFORNIA LAW PROTECTS OUT-OF-STATE PURCHASERS ........... 24

**OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. ELIZABETH HOWLETT** ................................................... 26

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** 28

I.   LEGAL STANDARD ........................................................................... 28

Case No. 3:15-cv-00165-L-DHB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II.    ARGUMENT .................................................................................... 29

A.    The Challenged Protein and L-glutamine Representations Are Promises of Performance Directly Related to Product Efficacy and Are Written Warranties Under the MMWA ............................................................. 29

B.    Defendant Had Actual Notice of *All* Claims .......................................... 31

C.    The Named Plaintiffs Have All Lost Money as a Result of Defendant's Violations of the Relevant Statutes, and They Have Standing to Sue .... 31

1.    Only California's UCL, FAL, and CLRA require some showing of reliance ...................................................................................... 31

a.    Standing Under the UCL, FAL, and CLRA ...................... 31

b.    The MCPA Does Not Require Proof of Individual Reliance ........................................................................................ 32

c.    The State Warranty Statutes Do Not Require Individual Reliance ........................................................................... 32

2.    The Named Plaintiffs' Testimony Shows Sufficient Reliance to Survive Summary Judgment ....................................................... 33

a.    Plaintiff Clay Purchased RTDs for Their Protein .............. 33

b.    Mr. Roman Relied on the RTD's Stated Protein Content .. 33

c.    Plaintiff Ehrlichman Relied on the Lean Representations.. 34

d.    Plaintiff Reichert Relied on the Powder Products to Provide Amino Acids, Including L-glutamine ................................ 35

CONCLUSION ..................................................................................... 35

Case No. 3:15-cv-00165-L-DHB

1

## TABLE OF AUTHORITIES

2

**State Cases**

3

*Clothesrigger, Inc. v. GTE Corp.*,
 191 Cal.App.3d 605 (1987) ..............................................................24, 25

*Evans v. Ameriquest Mortg. Co.*,
 2003 WL 734169 (Mich. Ct. App. Mar. 4, 2003)................................... 32

*Hill v. Roll Internat. Corp.*,
 195 Cal.App.4th 1295 (2011) ............................................................... 6

*In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*,
 880 F.Supp.2d 801(S.D. Ohio 2012)...................................................... 14

*In re Steroid Hormone Prod. Cases*,
 181 Cal.App.4th 145 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) ........ 3, 5

*In re Tobacco II Cases*,
 46 Cal.4th 298 (2009).......................................................................3, 31

*In re Vioxx Class Cases*,
 180 Cal.App.4th 116 (2009) ....................................................4, 10, 22

*Kwikset Corp. v. Sup. Ct.*,
 51 Cal.4th 310 (2011).......................................................................... 8

*Linear Technology Corp. v. Applied Materials, Inc.*,
 152 Cal.App.4th 115 (2007) ................................................................. 6

*McAdams v. Monier, Inc.*,
 182 Cal.App.4th 174 (2010) ................................................................. 3

*Norwest Mortg., Inc. v. Sup. Ct.*,
 72 Cal.App.4th 214 (1999) ................................................................. 24

*Rutledge v. Hewlett-Packard Co.*, 2
 38 Cal.App.4th 1164 (2015), *as modified on denial of reh'g* (Aug. 21, 2015), *review
 denied* (Nov. 10, 2015) ...................................................................... 24

*Washington Mut. Bank, FA v. Sup. Ct.*,
 24 Cal.4th 906 (2001)......................................................................... 24

*Wershba v. Apple Computer, Inc.*,
 91 Cal.App.4th 224 (2001) ..............................................................24, 25

**Federal Cases**

*Abraham v. Volkswagen of Am., Inc.*,
 795 F.2d 238 (2d Cir. 1986)................................................................. 13

*Allen v. Hyland's Inc.*,
 No. 12-cv-01150, 2013 WL 1748408 (C.D. Cal. Apr. 11, 2013)......................29, 30

Case No. 3:15-cv-00165-L-DHB

*Amchem Prods. v. Windsor*,
 117 S.Ct. 2231 (1997)............................................................................. 2

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
 133 S.Ct. 1184, 1194–95 (2013) ............................................................. 1

*Anderson v. Jamba Juice Co.*,
 888 F.Supp.2d 1000 (N.D. Cal. 2012).................................................... 29

*Astiana v. Ben & Jerry's Homemade, Inc.*,
 No. 10-cv-4387, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ..................... 17

*Astiana v. Kashi Co.*,
 291 F.R.D. 493 (S.D. Cal., 2013)........................................................... 34

*Blackie v. Barrack*,
 524 F.2d 891 (9th Cir. 1974).................................................................. 16

*Brazil v. Dole Packaged Foods, LLC*,
 No. 12-cv-01831, 2014 WL 2466559 (N.D. Cal. May 30, 2014) ................6, 15, 17

*Brewer v. Gen. Nutrition Corp.*,
 No. 11-cv-3587, 2014 WL 5877695 (N.D. Cal. Nov. 12, 2014).............. 2

*Briseno v. ConAgra Foods, Inc.*,
 844 F.3d 1121 (9th Cir. 2017)..................................................2, 21, 23

*Carrerra v. Bayer Corp.*,
 727 F.3d 300 (3d Cir 2013).................................................................... 21

*Chavez v. Blue Sky Natural Bev. Co.*,
 268 F.R.D. 365 (9th Cir. 2010) ........................................................16, 17

*Clemens v. DaimlerChrysler Corp.*,
 534 F.3d 1017 (9th Cir. 2008)................................................................. 9

*Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*,
 332 Fed.Appx. 565 (11th Cir. 2009) ........................................................ 3

*Comcast Corp. v. Behrend*,
 133 S. Ct. 1426 (2013)........................................................................... 16

*Destiny Tool v. SGS Tools Co.*,
 344 F. App'x 320 (9th Cir. 2009)........................................................... 25

*Dorsey v. Rockhard Labs., LLC*,
 No. 13-cv-07557, 2014 WL 4678969 (C.D. Cal. Sept. 19, 2014)........... 30

*Ehret v. Uber Techs., Inc.*,
 148 F.Supp.3d 884 (N.D. Cal. 2015)...................................................... 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 131 S.Ct. 2179 (2011)............................................................................. 2

Case No. 3:15-cv-00165-L-DHB

*FTC v. Bronson Partners, LLC*,
   564 F.Supp.2d 119 (D. Conn. 2008) ....................................................... 26

*Galitski v. Samsung Telecommunications Am., LLC*,
   No. 3:12-cv-4782, 2015 WL 5319802 (N.D. Tex. Sept. 11, 2015)......................... 12

*Garrison v. Whole Foods Mkt. Grp., Inc.*,
   No. 13-cv-05222, 2014 WL 2451290 (N.D. Cal. June 2, 2014) ........................... 5, 6

*Guido v. L'Oreal, USA, Inc.*,
   No. 2:11–cv–01067, 2014 WL 6603730 (C.D. Cal. Jul. 24, 2014)......................... 15

*Guru Nanak Sikh Soc'y v. County of Sutter*,
   326 F.Supp.2d 1140 (E.D. Cal. 2003) ................................................... 28

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)............................................................ 2

*Harris v. Nortek Glob. HVAC LLC*,
   No. 14-cv-21884, 2016 WL 4543108 (S.D. Fla. Jan. 29, 2016) ............................. 3

*Haskell v. Time, Inc.*,
   857 F.Supp. 1392 (E.D. Cal. 1994) ....................................................... 5

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010)............................................................ 23

*Hinojos v. Kohl's Corp.*,
   718 F.3d 1098 (9th Cir. 2013)............................................................ 8

*In re ConAgra Foods, Inc.*,
   90 F.Supp.3d 919 (C.D. Cal. Feb. 23, 2015) ....................................15, 17, 18, 19

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   No. 2:11-CV-07166, 2012 WL 10731957 (C.D. Cal. June 29, 2012)..................... 24

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   No. 2:11-cv-07166, 2012 WL 10731957 (C.D. Cal. June 29, 2012)..................... 25

*In re Onstar Contract Litigation*,
   278 F.R.D. 352 (E.D. Mich. 2011)....................................................... 32

*In re POM Wonderful LLC*,
   No. 10- ML-02199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ....................... 19

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
   012 WL 1015806 (N.D.Ill. Mar. 22, 2012) ............................................ 14

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124-135 (2d Cir. 2001) ....................................................... 27

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011)............................................................ 27

- v -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*In the Matter of Ecm Biofilms, Inc.,*
  2015 WL 575402 (FTC Jan. 28, 2015) ...................................................................... 7

*Jones v. ConAgra,*
  No. 12-cv-01633, 2014 WL 2702726 (N.D. Cal., Jun. 13, 2014) ......................18, 22

*Keegan v. Am. Honda Motor Co.,*
  284 F.R.D. 504 (C.D. Cal. 2012) ............................................................................ 4

*Khoday v. Symantec Corp.,*
  No. 11-cv-180, 2014 WL 1281600 (D. Minn. Mar. 13, 2014) (same) ................... 15

*Krueger v. Wyeth, Inc.,*
  No. 03-cv-02496, 2011 WL 8971449 (S.D. Cal. Mar. 30, 2011) ........................... 10

*Krueger v. Wyeth, Inc.,*
  310 F.R.D. 468 (S.D. Cal. 2015) ............................................................................ 3

*Langan v. Johnson & Johnson Consumer Companies, Inc.,*
  No. 3:13-cv-1470, 2017 WL 985640 (D. Conn. Mar. 13, 2017) ......................20, 26

*Leyva v. Medline Indus., Inc.,*
  716 F.3d 510 (9th Cir. 2013) .................................................................................. 16

*Lintz v. Carey Manor Ltd.,*
  613 F.Supp.543 (W.D. Va. 1985) ........................................................................... 25

*Mazza v Am. Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) ..............................................................................22, 24

*Milicevic v. Fletcher Jones Imports, Ltd.,*
  402 F.3d 912 (9th Cir. 2005) .................................................................................. 12

*Moheb v. Nutramax Lab, Inc.,*
  No. 12-cv-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .............................. 21

*Mullins v. Direct Digital,*
  795 F.3d 654 (7th Cir. 2015) .................................................................................. 3

*Pella Corp. v. Saltzman,*
  606 F.3d 391 (7th Cir. 2010) .................................................................................. 2

*Plough, Inc. v. Johnson & Johnson Baby Products Co.,*
  532 F.Supp. 714 (D.D.C. 1982) ............................................................................. 18

*Probe v. State Teachers' Ret. Sys.,*
  780 F.2d 776 (9th Cir. 1986) .................................................................................. 21

*Richardson v. Palm Harbor Homes, Inc.,*
  254 F.3d 1321 (11th Cir. 2001) .............................................................................. 12

*Rickard v. Teynor's Homes, Inc.,*
  279 F.Supp.2d 910 (N.D. Ohio 2003) .................................................................... 13

Case No. 3:15-cv-00165-L-DHB

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ......................................................................10, 23

*Rikos v. Procter & Gamble*,
   799 F.3d 497 (6th Cir. 2015) ............................................................................... 3

*Romo v. FFG Ins. Co.*,
   397 F.Supp.2d 1237 (C.D. Cal. 2005) ................................................................ 12

*Shady Grove v. Allstate*,
   130 S. Ct. 1431 (2010) ....................................................................................... 15

*Simms Inv. Co. v. E.F. Hutton & Co. Inc.*,
   699 F.Supp. 543 (M.D.N.C. 1988) .................................................................... 24

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) .......................................................................... 4, 8

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ......................................................................22, 31

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ...............................................................6, 19, 26, 27

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) ....................................................................... 2

*Ticknor v. Choice Hotels Int'l, Inc.*,
   265 F.3d 931 (9th Cir. 2001) .............................................................................. 24

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. 2013) ....................................................................... 2

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................... 1

*Walsh v. Ford Motor Co.*,
   807 F.2d 1000 (D.C. Cir. 1986) ......................................................................... 14

*Walton v. Rose Mobile Homes LLC*,
   298 F.3d 470 (5th Cir. 2002) ............................................................................. 12

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-cv-2724, 2014 WL 2191901 (N.D. Cal. May 23, 2014) ......................... 5, 6

*Williams v. Boeing Co.*,
   517 F.3d 1120 (9th Cir. 2008) ........................................................................... 23

*Wolph v. Acer Am. Corp.*,
   272 F.R.D. 477 (N.D. Cal. 2011) ....................................................................... 21

*Zakaria v. Gerber Prod. Co.*,
   No. 15cv-00200, 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) ......................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 3:15-cv-00165-L-DHB

*Zlotnick v. Premier Sales Group,*
    480 F.3d 1281 (11th Cir. 2007) ............................................................................. 2

**Statutes**

15 U.S.C. § 2301 ...................................................................................... 13, 29

15 U.S.C. § 2310 ...................................................................................... 12, 13

CAL. BUS. & PROF. CODE § 17500 ........................................................... 24

CAL. HEALTH & SAF. CODE § 110100 ....................................................... 7

FLORIDA STATUTE § 500.11(1)(a) ............................................................. 7

M.C.L. § 445.903 ...................................................................................... 32

MICHIGAN FOOD LAW ACT 92 of 2000 ................................................... 7

UCC § 2–313 ............................................................................................ 13

**Regulations**

16 C.F.R. § 700.11 .................................................................................... 13

16 C.F.R. § 700.3 ..................................................................................... 13

21 C.F.R. § 101.100 ................................................................................... 8

21 C.F.R. § 101.62 ..................................................................................... 7

21 C.F.R. § 101.9(g)(4)(ii) ...................................................................... 27

**Rules**

FED. R. CIV. PRO. 23 ......................................................................... passim

FED. R. EVID. 702 .................................................................................... 27

**Other Authorities**

Manual for Complex Litigation (4th) ...................................................... 27

Merriam-Webster, Lean (adjective) ("containing little or no fat"), *Merriam-Webster.com*, retrieved April 25, 2017 .................................................. 7

Case No. 3:15-cv-00165-L-DHB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## REPLY IN SUPPORT OF CLASS CERTIFICATION

Defendant only opposes Plaintiffs' Motion for Class Certification ("Motion") on two grounds: (1) whether common questions predominate, and (2) whether the Class is ascertainable.[1] To do so, Defendant misconstrues the law underlying Plaintiffs' causes of action and conflates the legal standard at class certification with the Plaintiffs' burden at summary judgment. However, CytoSport cannot reasonably dispute that the common legal questions that can be answered using common evidence and a class action remains the most efficient method for adjudicating this case.[2]

When determining whether to certify a class, a court primarily examines whether the case involves common legal and factual questions that are "capable of classwide resolution—which means that determination of its truth or falsity will resolve… in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). This is "no license to engage in free-ranging merits inquiries." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. This is especially true in this case, where the parties agreed to bifurcate their discovery efforts and have not yet fully explored the merits. Declaration of Matt Kaplan ("Kaplan Decl.") [Dkt. 170-2], Ex. H at p. 17, ¶ G.1. Thus, the Court should focus on the requirements of Rule 23.

## I.    COMMON QUESTIONS OF LAW AND FACT PREDOMINATE

To satisfy Rule 23(a)(2) and (b)(3), claims alleged "must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349; FED. R. CIV. PRO. 23(a)(2). Rule 23 is not interpreted to mean that all questions of fact and law need be in common.

---

[1] Defendant also challenges superiority; however, this argument is predicated entirely on its challenge to predominance and commonality. Oppo. at 43:12-44:2. Thus, to the extent that, Plaintiffs' establishes predominance and commonality, they establish superiority.
[2] Defendant does not challenge, and thus concedes, numerosity, typicality, and adequacy requirements of Rule 23(a). *See Amcor Flexibles Inc v. Fresh Express Inc*, No. 14-cv-01025, 2014 WL 2967909, at *7 (N.D. Cal. July 1, 2014).

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Still, to certify a class, the common questions must predominate over any individual determinations, so that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 117 S.Ct. 2231, 2249 (1997). There is a "clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. Plaintiffs meet this standard.[3]

### A. Plaintiffs' State Consumer Law Claims Do Not Require the Court to Conduct Individual Inquires

#### 1. The Reasonable Consumer Standard Applies to Plaintiffs' Claims

Class certification begins and ends with the elements of the causes of action actually pled. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2181 (2011). Here, Plaintiffs' allegations under the UCL, FAL, CLRA, MCPA, FDUTPA, and MMWA are all ideally suited for class adjudication because they all rely on an *identical*, *objective* standard, *i.e.* whether Defendant's representations were *likely to deceive* a *reasonable consumer*. *See* Declaration of Trenton Kashima ("Kashima Decl.") [Dkt. No. 109-12], Ex. UU, *citing Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012); *Zlotnick v. Premier Sales Group*, 480 F.3d 1281, 1284 (11th Cir. 2007). Defendant does not and cannot dispute this since numerous circuit courts, including the Ninth Circuit, have approved multistate class certifications involving these exact statutes.[4]

---

[3] Cytosport's Opposition examines commonality and predominance collectively. Oppo. at pp. 22:3-41:20. While the nature of Defendant's challenge to commonality is not entirely clear, the predominance inquiry subsumes the commonality inquiry to a large degree. *Brewer v. Gen. Nutrition Corp.*, No. 11-cv-3587, 2014 WL 5877695, at *4 (N.D. Cal. Nov. 12, 2014); *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 482 (S.D. Cal. 2013). Consequently, to the extent that Plaintiffs satisfy Rule 23(b)(3), they also satisfy Rule 23(a)(2).

[4] *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (affirming multistate class certification under **California**, Colorado, **Florida**, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, and Texas' consumer protection acts); *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) (affirming

- 2 -

1   The UCL, FAL, and FDUTPA do not require *any* additional "individualized
2 proof of deception and reliance…to prevail on class claims." *Krueger v. Wyeth, Inc*.,
3 310 F.R.D. 468, 481 (S.D. Cal. 2015) *citing McAdams v. Monier, Inc.*, 182
4 Cal.App.4th 174, 191 (2010) ("Turning to the questions of reliance and damage
5 (injury), as *Tobacco II* emphasized, '[C]alifornia courts have repeatedly held that relief
6 under the UCL [including restitution] is available without individualized proof of
7 deception, reliance and injury.' […] This holds true in the post-Proposition 64 world
8 for non-representative class members.") and *In re Steroid Hormone Prod. Cases*, 181
9 Cal.App.4th 145, 154 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) ("[W]hile a
10 named plaintiff in a UCL class action now must show that he or she suffered injury in
11 fact… once the named plaintiff meets that burden, no further individualized proof of
12 injury or causation is required… absent class members"). Accordingly, Plaintiffs'
13 UCL, FAL, and FDUTPA claims require no individualized inquiries.[5]

14   Similarly, neither the CLRA nor the MCPA requires a showing of individual
15 reliance. Instead, as Defendant concedes, Plaintiffs are only required to demonstrate

17 multistate class certification and "explicitly finding that the consumer protection acts of [**California**, **Florida**, Illinois, **Michigan**, New Jersey and New York] have nearly
18 identical elements"); *Mullins v. Direct Digital*, 795 F.3d 654 (7th Cir. 2015) (affirming multistate class certification under 10 states' consumer protection laws, including: **California**, **Florida**, and **Michigan**.); *Rikos v. Procter & Gamble*, 799 F.3d 497 (6th
19 Cir. 2015) (affirming multistate class certification under **California**, Illinois, **Florida**, New Hampshire, and North Carolina consumer protection laws).
20
21 [5] Defendant claims that Plaintiffs mistake the holding of *Tobacco II*, which "does not stand for the proposition that causation and injury should be inferred on a class wide basis." Oppo. at p. 26 n.20. Defendant is mistaken. The California Supreme Court
22 specifically held that the standing provision added by Proposition 64 did not add an injury or causation requirement to the UCL. *In re Tobacco II Cases*, 46 Cal.4th 298,
23 310 (2009); *accord In re Steroid Hormone Prod. Cases*, 181 Cal.App.4th at 154. Once Plaintiffs establish their standing, no additional showing of causation is required by the
24 absent class members.
   Additionally, while Defendant argues that FDUTPA's causation requirement
25 requires proof of reliance, "the Eleventh Circuit has plainly resolved this issue, stating that 'FDUTPA does not require a plaintiff to prove actual reliance on the alleged
26 conduct.'" *Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *13 (S.D. Fla. Jan. 29, 2016) *citing Cold Stone Creamery, Inc. v. Lenora Foods I,*
27 *LLC*, 332 Fed.Appx. 565, 567 (11th Cir. 2009); Oppo. at p. 24:21-23. "Instead of actual reliance, a plaintiff must simply prove that 'the alleged practice was likely to
28 deceive a consumer acting reasonably in the same circumstances.'" *Id.*

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;      Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS

that a _reasonable person_ would have relied on or attached importance to the alleged misrepresentations. Defendant's Opposition to Plaintiffs' Motion to Class Certification ("Oppo.") [Dkt. No. 170-1], at p. 24:21-25:5; *see also In re Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009) ("Causation [under the CLRA], on a class-wide basis, may be established by materiality."); *Keegan v. Am. Honda Motor Co*., 284 F.R.D. 504, 529 (C.D. Cal. 2012) ("A misrepresentation…is material under California law if a reasonable man would attach importance to its existence.") (internal citations omitted). If this standard is satisfied, an inference of reliance arises as to the entire Class.

Defendant cannot escape that the identical and objective standards imposed by these statutes create two legal questions common to the Class: (1) whether a reasonable consumer would likely be deceived by the Lean, L-glutamine, and Protein label claims, and (2) whether the challenged claims are material to a reasonable consumer.

_Defendant also concedes that liability can be determined by common evidence: consumer surveys_. Oppo. at pp. 25:14-26:4 ("Usually, plaintiffs conduct a consumer survey to show materiality").[6] Stated differently, Defendant admits that consumer surveys are potentially dispositive and such evidence does not involve individual factual inquiries. These concessions are fatal to Defendant's opposition.

Instead of challenging the requirements of Rule 23(a)(2) and (b)(3), Defendant prematurely argues the merits underlying Plaintiffs' claims. *Staton v. Boeing Co*., 327 F.3d 938, 954 (9th Cir. 2003) ("Although some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage"). Namely, Defendant contends that: (1) a reasonable consumer would not have a single, common understanding of the Lean and L-glutamine misrepresentations, (2) a reasonable consumer would not understand the

---

[6] Defendant states that Plaintiffs have identified no "common evidence" to support their allegations. *See* Oppo. at p. 27:3-5. This is simply untrue. Plaintiffs have repeatedly asserted that they will offer consumer surveys, similar to those conducted by Defendant's expert Dr. Dhar, and similar to Defendant's own market research.

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;          Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS

1  challenged representations in the manner alleged by Plaintiffs, (3) no reasonable
2  consumer would find these representations material, and (4) Plaintiff cannot show a
3  "common shortfall" in the protein content of Liquid Products. *See* Oppo. at pp. 25:6-
4  34:16. Nonetheless, even if the Court were to examine these issues now, they would
5  not bar Plaintiffs' claims because there is evidence on both sides of these arguments
6  sufficient to warrant a trial. Moreover, merits discovery still needs to be completed.

7      2.   No Uniform Understanding of Defendant's Lean and L-glutamine
            Misrepresentations Is Required

8      Without clearly explaining its position, Defendant insists that Plaintiffs are
9  required to show that class members would have a common understanding of the
10 alleged Lean and L-glutamine representations to certify a class. Oppo. p. 26:10-25
11 ("individual issues predominate when 'consumers' understanding of those
12 representations [are not uniform]'"). Defendant misunderstands the law. The subjective
13 beliefs of individual consumers - *even Plaintiffs* - are irrelevant. *In re Steroid Hormone*
14 *Prod. Cases*, 181 Cal.App.4th at 156 ("In ruling that the materiality question depended
15 upon each class member's subjective belief regarding value, the trial court was led
16 astray by GNC's erroneous legal assumption"); *Werdebaugh v. Blue Diamond*
17 *Growers*, No. 12-cv-2724, 2014 WL 2191901, at *12 (N.D. Cal. May 23, 2014)
18 ("Whether Blue Diamond's label statements constitute material misrepresentations
19 does not depend on the subjective motivations of individual purchasers, and the
20 particular mix of motivations that compelled each class member to purchase the
21 products in the first place is irrelevant"). Liability is predicated on a "well ensconced"
22 *reasonable* consumer standard. *Haskell v. Time, Inc*., 857 F.Supp. 1392, 1398 (E.D.
23 Cal. 1994). Thus, no common or uniform understanding of an alleged
24 misrepresentation amongst class members is required. *Garrison v. Whole Foods Mkt.*
25 *Grp., Inc*., No. 13-cv-05222-VC, 2014 WL 2451290, at *2 (N.D. Cal. June 2, 2014).[7]

27 _____
[7] If Plaintiffs had to prove that all consumers had a common understanding of a
28 deceptive advertisement, the objective "reasonable consumer" standard would devolve
into a "lowest common denominator" test. This is not the interpretation adopted under

Courts applying the UCL, FAL, and CLRA in other food labeling cases have specifically rejected Defendant's argument. *Brazil v. Dole Packaged Foods, LLC*, No. 12-cv-01831, 2014 WL 2466559, at * 8 (N.D. Cal. May 30, 2014); *Werdebaugh*, 2014 WL 2191901, at *13-14; *Garrison*, 2014 WL 2451290, at *2.[8]

### 3. Defendant argues that a reasonable consumer would not understand the challenged representations in the manner alleged by Plaintiffs

Defendant next argues that no individual would understand the challenged Lean or L-glutamine representations in the same matter as alleged in the Complaint. Oppo. at pp. 27:1-31:24. This question goes to whether the labeling is deceptive, not whether this case is suitable for certification. The finder of fact will either adopt Plaintiffs' interpretation of the Lean or L-glutamine representations as that of a "reasonable consumer" or not. "Whether a practice is deceptive, fraudulent, or unfair [] generally… requires 'consideration and weighing of evidence from both sides,'" and thus should not be determined until discovery is complete and until Plaintiffs' expert, Dr. Howlett, has the opportunity conduct her surveys. *Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 134–35 (2007). Regardless, there is nothing to suggest that any individual inquires would be required. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) ("The question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member. …this is an objective question, not one that depends on each purchaser's subjective understanding of the package").

Defendant's arguments are further undercut by the relevant FDA regulations,

---

the applicable law. *See Hill v. Roll Internat. Corp.*, 195 Cal.App.4th 1295, 1304 (2011) (The courts should neither examine a UCL or CLRA claim through the eyes of most unwary or naïve nor should they focus on the overly suspicious or sophisticated).

[8] The cases cited by Defendant are inapposite for the same reasons they were rejected in *Brazil*. For example, in *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. 14-7242-), 2016 WL 5920345 (C.D. Cal. June 23, 2016), the court found that the packaging for the televisions at issue, including the presentation of the challenged claims, significantly changed during the class period such that no one common class could be identified. *Id.*, at *7. Similar complexities were found in *Jones v. ConAgra Foods, Inc.*, *Sandoval v. Pharmacare US, Inc.*, and *Randolph v. J.M. Smucker Co.* Here, there is no concern that the packaging or claims changed during the class period.

which have been incorporated into California, Florida, and Michigan law. CAL. HEALTH & SAF. CODE § 110100; FLORIDA STATUTE § 500.11(1)(a); and MICHIGAN FOOD LAW ACT 92 of 2000. Each of the Lean products conveyed the same core "lean" claims: (1) the front labels state that they contain "[XX] g LEAN PROTEIN"; (2) Defendant refers to these Products as "LEAN MUSCLE PROTEIN," "LEAN MUSCLE PROTEIN SUPPLEMENT," "LEAN MUSCLE PROTEIN POWDER," or "NEW LEANER FORMULA"; and (3) the vast majority of the products also advertise that they contain "Lean Lipids." Kashima Decl. at ¶¶ 7-9, App. A. Yet, Defendant suggests that a reasonable consumer would not understand these phrases to characterize the level or amount of fat in the relevant class products.[9] Oppo. 30:4-31:32. This contradicts the relevant FDA regulations, the dictionary definition of lean, and common sense. Merriam-Webster, Lean (adjective) ("containing little or no fat"), *Merriam-Webster.com*, retrieved April 25, 2017; *In the Matter of Ecm Biofilms, Inc.,* 2015 WL 575402, at *135 (FTC Jan. 28, 2015).

FDA regulations state that the terms "lean" and "extra lean" are regulated phrases that *may only be used* if the fat content in a product comports with 21 C.F.R. § 101.62(e). The FDA has made it clear that referring to a food product as "lean" is a representation regarding the amount of fat. And the FDA has determined that "[a]ny label or labeling containing any statement concerning fat, fatty acids, or cholesterol that is not in conformity with this section shall be deemed to be misbranded under sections 201(n), 403(a), and 403(r) of the [FDCA]." 21 C.F.R. § 101.62(f).[10]

---

[9] Defendant's analysis focuses only on "Lean Lipids," at the exclusion of the other "Lean" claims listed above. Oppo. at p. 30:4-18. This is improper. Plaintiffs expressly pled other misleading and unlawful uses of "lean" such as "lean muscle protein," "New Leaner Formula," and "Lean" in the Product names. FAC, [Dkt. 156], ¶¶ 46, 48. The Court already found that a reasonable consumer could read the Lean claims as alleged; Defendant has done nothing to displace that finding. Order on Motion to Dismiss [Dkt. 53], p. 10.

[10] Defendant previously argued, "21 U.S.C. Section 343-1(a)(4) preempts any state requirements regarding 'nutrition labeling of food that is not identical to the requirement of [the relevant FDA regulations].'" Motion to Dismiss [Dkt. 24-1], at p. 7:14-22.

Similarly, Plaintiffs assert that Defendant should not label its products as containing L-glutamine when the product contains either no or an imperceptible amount of unbonded L–Glutamine.[11] When an ingredient is added "present in a food at insignificant levels and do[es] not have any technical or functional effect in that food," it is questionable whether it should be listed as an ingredient under the FDA regulations.[12] To the extent that the FTC decided to prohibit a particular labeling practice, this is evidence such practices are material and misleading. *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013); *Kwikset Corp. v. Sup. Ct.*, 51 Cal.4th 310, 333 (2011) ("Here, the Legislature has by statute made clear that whether a product is manufactured in the United States or elsewhere is precisely the sort of consideration reasonable people can and do attach importance").

    4.   <u>Defendant claims that no reasonable consumer would find these representations material</u>

Defendant also argues that Plaintiffs are not entitled to the presumption of reliance because no reasonable consumer would find the L-glutamine and Lean representations material. Oppo. at pp. 27:13-32:14.[13] Again, this is a merits issue that should not be decided at class certification. *Staton*, 327 F.3d at 954. This determination also does not turn on individual inquiries; it will be resolved primarily by the surveys

---

[11] Defendant claims that Plaintiffs abandoned allegations that the Class Products contain no L-glutamine. Oppo. at p. 27:17-28:10. Plaintiffs have not. The testing conducted to date shows no detectible amount of L-glutamine in the Class Products. Kashima Decl., ¶ 28, Ex, II. Only Defendant's manufacturing records show any L-glutamine was added. *Id.*, ¶ 28, Exs. DD-HH. Nevertheless, the amount of L-glutamine added to these Products generally has a similar mass as a grain of sand and would have no effect on the human body. Declaration of William Campbell ("Campbell Decl.") [Dkt. 109-10], at ¶ 9. Defendant does not dispute either of these points.

[12] 21 C.F.R. § 101.100(a)(3)(i) ("Incidental additives that are present in a food at insignificant levels and do not have any technical or functional effect in that food" are exempt from requirements of section 403(i)(2) include ingredients "that have no technical or functional effect but are present in a food by reason of having been incorporated into the food as an ingredient of another food, in which the substance did have a functional or technical effect."); Kashima Decl. App. B (L-glutamine is added as part of the "protein blend."); Campbell Decl., at ¶ 9 (L-glutamine in an amount less than 100 mg would have no physiological effect.).

[13] Defendant concedes that the amount of protein in a protein supplement is material.

conducted by the parties' experts.  However, to the extent that Plaintiff must show some *prima facie* showing of materiality at class certification, "[s]urveys and expert testimony regarding consumer assumptions and expectations may be offered but are not required; anecdotal evidence may suffice." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008).

For present purposes, Defendant's own pre-litigation marketing research shows that the amount of fat in the Class Products, or limiting fat intake in general, is a factor considered by a significant number of consumers when purchasing a protein supplement. Kashima Decl., at ¶ 12, Ex. M. at 034847-48 (a third of Defendant's Powdered Product users try to limit fat intake); Exs. N at 034910-11 & O at 034303 (a majority of Defendant's customers purchase protein powders for weight management or weight loss).  Accordingly, there is ample evidence that the "lean" claims are material.

Defendant's pre-litigation marketing research also shows that most consumers purchased Muscle Milk products as a "nutritional supplement" and that "complete nutrition" was a primary driver of consumer sales. *Id.*, Exs. N at 0349111 & O at 034303. This "complete" nutritional profile includes L-Glutamine.  Defendant's own employee, Dr. Kimball, stated that L-glutamine is considered "exciting" in the "sports world." *Id.*, Ex. H, at pp. 87:12-88:7. Defendant also testified that L-glutamine is "important for -- a depletion of immunity can be detrimental to immune health, and it's important for the recovery process… because when you -- athletes work out, they exercise, they break down their muscle tissue, and then they need to basically rebuild that muscle tissue in order to maintain or to net out in a position of more muscle." *Id.*, Ex. G, at pp. 123:1-124:9.[14]

---

[14] Plaintiff Roman similarly testified that he valued L-glutamine for "strengthening tendons . . . . that's really good for the tendons and recovery," and it helps him recover from "really intense exercise." Roman Dep. at p. 53:2-15. He further testified that he read about L-glutamine's benefits in popular magazines such as Men's Health, Men's Fitness, and other body building magazines. *Id.*, at p. 54:6-16

- 9 -

Indeed, L-Glutamine intake is so important to some of Defendant's consumers that Defendant previously sold a standalone L-Glutamine supplement (*Id.*, Exs. H, at pp. 88:20-90:22 & R) and specifically advertises the L-Glutamine content in the higher-end Powdered Products. *Id.*, Ex. K, at p. 29-36 (each of the Monster Milk product labels specifically the amount of L-Glutamine contained within and statement that L-Glutamine "ENHANCE[S] MUSCLE TISSUE RECOVERY/REPAIR" and highlights above its Supplement Facts panel that a serving contains a specific amount of "L-Glutamine and Glutamine Precursors."). If L-Glutamine was such an unimportant ingredient to consumers, it is doubtful that Defendant would have so heavily advertised its benefits to its consumers and sold it as a supplement.

As the above-cited *evidence* demonstrates, the presumption of materiality is warranted and appropriate. While Defendant may offer some conflicting evidence, "at this stage in the litigation, the issue is not whether the alleged misrepresentations were in fact material. The proper inquiry for class certification purposes is whether plaintiff can use common proof to prove whether a misrepresentation or nondisclosure is material." *Krueger v. Wyeth, Inc.*, No. 03-cv-02496, 2011 WL 8971449, at *6 (S.D. Cal. Mar. 30, 2011) (*distinguishing In re Vioxx Class Cases*, 180 Cal.App.4th 116).[15] Thus, Defendant's self-serving, post-dispute expert reports do not foreclose certification of the proposed Class.

### 5.  Individual issues will not predominate Plaintiffs' Protein Claims

Defendant also asserts that the RTDs contain the stated amounts of protein and Plaintiffs have not conducted sufficiently reliable testing to support their claims. *See* Oppo. at p. 33:3-4, 14-22. Again, this is a merits question that is inappropriate to

---

[15] For the same reasons, Defendant's expert opinions do not foreclose class certification. That individuals may have purchased Class Products for many reasons, including "to gain energy," "lose weight or gain muscle," "taste," sponsorship by individuals such as Stephen Curry or Clay Matthews, etc. (Oppo at pp. 3:16-25), is irrelevant to class certification. *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("[V]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase... does not defeat the relatively 'minimal' showing required to establish commonality").

resolve at class certification. And while Defendant argues that the protein claims are incapable of class-wide determination because variations among formulas would devolve into individual inquires, Oppo. at pp. 32:17-34:16, the evidence belies this.

Defendant uses a highly-controlled production process, and its formulas were followed consistently for all Class Products. Kashima Decl., ¶¶ 31-33, Exs. G at pp. 182:6-184:8, 187:16-188:4, II, JJ, KK. Co-packers test the RTDs' total solid content and pH to ensure uniformity. *Id.*, Exs. G at pp. 156:15-24, 157:13-160:8 & MM. Moreover, Defendant admitted that the protein content of its products does not vary. Stipulation Regarding Discovery [Dkt. 104].

Additionally, products within the same product line share the same base formula; only the flavorings vary. *Id.*, Kashima Decl., Ex. H, at pp. 49:10-51:6. Therefore, the protein content should not differ within a product line. *Id.*, Ex. H, at pp. 51:7-52:5. Defendant also retains samples of the RTD Products and has made a list of these retains available to Plaintiffs. *See* Exhibit OO. Determining the amount of protein within the Liquid Products during the Class Period should be a simple matter of testing the Products. And these tests, which themselves are common evidence, should not vary between different production lots produced using the same formula.

The only RTD formula change potentially affecting the protein content during the Class Period occurred in October 2009, when the stated protein content in the chocolate-flavored Muscle Milk Genuine (14 oz.) shake was reduced from 28 grams to 25 grams. Declaration of Elizabeth Kimball ("Kimball Decl.") [Dkt. 170-11], ¶ 6.[16] This change occurred before the Class Period for the National, California, and Florida Subclasses and relatively early in the Class Period for the Michigan Subclasses.[17] If needed after testing, the Court can split the Michigan Class into two subclasses.

---

[16] Defendant keeps records sufficient to identify when a certain version of a formula was used to produce the class products. Kashima Decl. Ex. G, at p. 95:11-96:14.
[17] The Class Period for the National, California, and Florida Subclasses was January 23, 2011 to present and for the Michigan Subclasses was January 23, 2009 to present.

### B.   Plaintiffs' MMWA Claims Do Not Require the Court to Conduct any Individual Inquires

For similar reasons, Plaintiffs' MMWA claims are also well suited for class-wide adjudication. The Ninth Circuit has explained that the MMWA "creates a federal private cause of action for a warrantor's failure to comply with the terms of a written warranty: '[A] consumer who is damaged by the failure of a ... warrantor ... to comply with any obligation ... under a written warranty.'" *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 917 (9th Cir. 2005) *citing* 15 U.S.C. § 2310(d)(1)(B); *see also Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 474 (5th Cir. 2002) ("MMWA creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty'"); *Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325 (11th Cir. 2001) ("The Act's consumer-suit provision, for instance, supplies a federal remedy for breach of written and implied warranties, but not for oral express warranties, which remain the domain of state law"). This federal cause of action is independent of any state law protections, and it protects consumers even if the state law is less expansive. *See Romo v. FFG Ins. Co.*, 397 F.Supp.2d 1237, 1241 (C.D. Cal. 2005); *also see* Oppo. at p. 11:12-13 ("The MMWA provides a cause of action only for a supplier's failure 'to comply with' an obligation 'under a written warranty.'").

That is not to say that the MMWA supplants the application of all state law regarding written warranties. However, where the parties' rights and obligations are expressly established under MMWA, federal law displaces state law. *Galitski v. Samsung Telecommunications Am., LLC*, No. 3:12-cv-4782, 2015 WL 5319802, at *11 (N.D. Tex. Sept. 11, 2015) (The MMWA "'calls for the application of state written and implied warranty law, not the creation of additional federal law,' except in specific instances in which it expressly prescribes a regulating rule.").[18]

---

[18] Defendant's citation to *Clemens* offers no refuge. Oppo. at p. 23:21-24. In

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;        Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS

The MMWA, by way of example, eliminates the traditional contract requirement of privity – a requirement Defendant argues is still found in Florida and Michigan law. Oppo. at pp. 34:20-35:10. To support this position, Plaintiffs cited *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 248 (2d Cir. 1986). Motion at p. 23:13-22. While Defendant dismisses *Abraham's* holding as *dicta*, Defendant does nothing to challenge the Second Circuit's analysis of the issue. Oppo. p. 24:9-10. Section 2310(d)(1)(B) allows any "consumer" to bring action against the "warrantor" for breach of warranty. Neither section 2310(d)(1)(B) or the MMWA's definitions of "consumer," "supplier," or "warrantor" require privity between the parties. Thus, Defendant's argument that question of privity would predominate is misplaced.

The MMWA also provides its own definition of "written warranty," which differs from the more expansive "express warranty" under state law. *Compare* 15 U.S.C. § 2301(6) with UCC § 2–313; 16 C.F.R. § 700.3 (a) (written warranties covered under the MMWA do not coincide with the definition of express warranties under the UCC). A point expressly recognized by Defendant. Oppo. at p. 11:5-6, 12-19.

According to Section 2301(6), a written warranty only need form "part of the basis of the bargain." 15 U.S.C. § 2301(6). The Federal Trade Commission ("FTC") has not read the requirement that a written warranty "form the part of the basis of the bargain" to be a prerequisite of reliance. *Rickard v. Teynor's Homes, Inc.*, 279 F.Supp.2d 910, 919-20 (N.D. Ohio 2003) (the FTC is the "agency to which Congress entrusted the task of implementing and elaborating the provisions of the MMWA"). Instead, FTC regulations clarify that this language is only meant to prohibit post-sale disclosures and exclude traditional repair contracts:

> "Written warranty" and "service contract" are defined in sections 101(6) and 101(8) of the Act, 15 U.S.C. 2301(6) and 15 U.S.C. 2301(8), respectively. A written warranty must be "part of the basis of the bargain." This means that it must be *conveyed at the time of sale of the consumer product* and the

---

*Clemens* the dispositive question was whether a warranty was breached by a defect that allegedly existed before the warranty expired, but did manifest until after the warranty had run. *Id.*, at 1022-23. Because the MMWA does not directly address this issue, the Court correctly looked to California law.

consumer *must not give any consideration* beyond the purchase price of the consumer product in order to benefit from the agreement.

16 C.F.R. § 700.11 (emphasis added).[19] Here, this standard is satisfied for the Protein and L-glutamine warranties.[20]

Similarly, despite Defendant's contrary position, notice is not required under the MMWA until after the class is certified. Oppo. at pp. 34:20-35:10. "The plain language of the [MMWA] imposes different requirements on individual plaintiffs and class action plaintiffs regarding the time at which they must satisfy the opportunity to cure requirement." *In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F.Supp.2d 801, 824 (S.D. Ohio 2012). Section 2310(e), in its entirety, states:

> *...a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs,* unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply. *In the case of such a class action* (other than a class action respecting a warranty to which subsection (a)(3) of this section applies) brought under subsection (d) of this section for breach of any written or implied warranty or service contract, *such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure.*

15 U.S.C. § 2310(e) (emphasis added).

Section 2310(e) states that, in a class action, the obligation to provide an opportunity to cure arises only after Plaintiffs' "representative capacity" has been determined under Rule 23. *In re Porsche*, 880 F.Supp.2d 801, 824-25 (*citing* 15 U.S.C. § 2310(e)); *see also Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1004 (D.C. Cir. 1986)

---

[19] The "court should accord particular deference to the FTC's regulatory interpretation of the MMWA because the regulations represent a longstanding, consistent interpretation of the statute." *Walton*, 298 F.3d at 490; *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (defendants may not use state law to place additional requirements on federal statutes that would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

[20] Plaintiffs also maintain that reliance is not required under the warranty laws of California, Florida, and Michigan. Motion at p. 24 n. 15; Kashima Decl. Ex. UU.

(interpreting Section 2310(e) as indicating that "a plaintiff may file a class action, but may not proceed with that action, until she has afforded the defendant a reasonable opportunity to cure its alleged breach"); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, 2012 WL 1015806, at *5 (N.D.Ill. Mar. 22, 2012) ("[T]he statute allows a Magnuson–Moss class action to be brought before the defendant is given an opportunity to cure (only to the point of establishing the named plaintiffs' representative capacity)"). Clearly, an opportunity to cure is not a condition precedent to class litigation under the MMWA.

### C. Variability in Pricing and Consumers' Reasons for Buying Muscle Milk Are No Impediment to Computing Damages

Some variability in consumer cases is unavoidable. That is why the law uses an objective, reasonable person standard to determine liability. The same is true of causation and the materiality presumption previously discussed. Having lost those battles, Defendant next turns to the issue of damages with the aid of Dr. Ugone, arguing that this case is so unique and so complex that damages can never be proven here on a class-wide basis. Fortunately, the law is not so circumspect.[21]

The damages models Plaintiffs have proposed are reliable methods of computing damages in consumer products cases, and they have been accepted as such by numerous courts. *See*, *e.g.*, *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 1022-26 (C.D. Cal. Feb. 23, 2015) (accepting hybrid damages approach using conjoint analysis augmented with a regression analysis where appropriate ); *Guido v. L'Oreal, USA, Inc.*, No. 2:11–cv–01067, 2014 WL 6603730 at *8 (C.D. Cal. Jul. 24, 2014) (accepting conjoint analysis); *Khoday v. Symantec Corp.*, No. 11-cv-180, 2014 WL 1281600 at *33 (D. Minn. Mar. 13, 2014) (same); *Brazil*, 2014 WL 2466559 (accepting regression

---

[21] Conveniently, Defendant proposes no superior or even alternative method for proving damages in this case. Its goal, of course, is never to reach that stage. However, there has to be some way to prove damages in consumer labeling class actions, because any other result would obviate Section 23(b)(3) of the Federal Rules. *Cf. Shady Grove v. Allstate*, 130 S. Ct. 1431, 1437 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

analysis).[22]

### 1. Plaintiffs' Proffered Damages Methodologies Fully Comply with the Supreme Court's *Comcast* Decision

Defendant ubiquitously cites *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), hoping one of its arguments will stick. The Supreme Court's concern in *Comcast* was making sure plaintiffs present a damages model that (1) identifies damages that stem from the defendant's alleged wrongdoing, and (2) is "susceptible of measurement across the entire class." 133 S. Ct. at 1433-34.

These requirements are important, but they do not displace other established class certification standards, like "[a]t class certification, plaintiff must present a likely method for determining class damages, ***though it is not necessary to show that this method will work with certainty at this time***." *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 379 (9th Cir. 2010) (emphasis added). Or that "***the amount of damages is invariably an individual question and does not defeat class action treatment***." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1974); *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

Here, as explained in Plaintiffs' experts' reports and depositions (Dkt Nos. 109-9, 109-11; Declaration of Amy Marino ("Marino Decl."), concurrently filed herewith, Exs. D & E), the proposed methodologies will focus on and measure only the damages stemming from Defendant's specific Protein, L-glutamine, and Lean label claims, and the results will be common and equally applicable to all class members. *Comcast* is therefore satisfied.

### 2. The Retail Prices of Consumer Products Always Exhibit Variability

Defendant and its expert Dr. Ugone point to the variability of retail prices for

---

[22] If the Court has concerns about Plaintiffs' proposed damages methodologies or would like Plaintiffs' experts to actually run the models, Plaintiffs respectfully ask the Court to certify the liability questions in this case pursuant FED. R. CIV. P. 23(c)(4) without prejudice to Plaintiffs' renewing their request for certification of a Rule 23(b)(3) damages class again after further development of the damages models. Several courts have allowed this, including *Conagra* and *Guido*, *supra*.

1  Muscle Milk and argue there is no common way to compute damages using this data.

2  The same argument can be made in every consumer product case, yet economists and

3  marketing experts have developed methods to deal with it. Marino Decl., Ex. D, at

4  64:22-65:4 ("In any market it's an axiom ... that consumers will have different

5  willingness to pay for the product, but the relevant issue, is not their willingness to pay

6  for a particular retail price but rather how much based on plaintiff's allegations they

7  overpaid as a result of what plaintiff says was a misrepresentation of protein

8  content").[23] This exact argument was rejected in *In re Conagra Foods, Inc.*, 90

9  F.Supp.2d at 1028:

10  > Conagra next argues that, even if a viable damages methodology has been
proposed, individualized inquiries will be necessary and will predominate

11  > due to variations in the "number, price, size, location, discount, or promotion,
and time period" of each class member's purchase(s) of Wesson Oils. It notes

12  > that Wesson Oils are sold by retailers, who set the price of the product, and
thus that the price paid will have varied among consumers. At this stage, the

13  > court is not persuaded that this precludes class certification.

14  The entire damages discussion in *Conagra* is worth reading because the court

15  discussed *and rejected* every one of the arguments Defendant and Dr. Ugone are

16  attempting to recycle.[24] *See also Brazil*, 2014 WL 2466559 (explaining why retail

17  pricing variability does not affect a regression analysis).

18     3.   "Unsupported" and proposed models are two different things

19      Defendant also chides Plaintiffs and their experts for not running the damages

20  models they propose. This is unfair and inconsistent with the Ninth Circuit's holding in

21  *Chavez*, 268 F.R.D. at 379; *See also In re Conagra*, 90 F.Supp.2d at 1028 (accepting a

22  *proposed* conjoint study); *Brazil*, 2014 WL 2466559, at *19 (accepting a *proposed*

23  regression). More to the point, the parties agreed to bifurcate discovery to save

---

24
25  [23] *See also* Marino Decl., Ex. D at p. 66:20-67:10 (according to economic theory, "individuals overpay the same amount per unit sold even if the total price that they paid varied").

26  [24] *Conagra* also distinguished Defendant's principal case, *Astiana v. Ben & Jerry's*

27  *Homemade, Inc.,* No. 10-cv-4387, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014). In *Astiana*, the plaintiff proposed no method and introduced no expert testimony, which

28  the court found was inconsistent with *Comcast* and plaintiff's burden at class certification. *Id.*, at *12.

expenses; "[Defendant] cannot use damages discovery as both a sword and a shield." *Brazil*, at *18. Acquiring data and paying experts is expensive. While Plaintiffs and their counsel are prepared to run the models at the appropriate time, it makes no sense to purchase data, empanel focus groups, and design surveys until the Court decides this Motion. *In re Conagra*, 90 F. Supp.2d at 1028 ("Howlett's proposed use of future survey data does not make her methodology unsound or unable to satisfy *Comcast*").

### D. Dr. Harris' proposed regression, like Dr. Weir's regression in *Conagra*, is workable and satisfies *Comcast*

Defendant concedes that "hedonic regression analysis is a method for breaking down a good into its constituent characteristics and assigning a contributory value to each characteristic." Oppo. at p. 37. Defendant's other concerns are easily dispatched.

First, the data exists to run the necessary regressions in this case. Like other consumer product cases, sales data for Muscle Milk can be purchased from commercial resources like IRi and Nielsen;[25] thus, concerns over the availability of data are specious. Defendant also has already produced some sales data although the parties agreed to postpone exchange of most ESI until after class certification. And, if needed, data can also be subpoenaed from major retailers directly.

Second, Defendant's "collinearity" concerns are overblown. Collinearity may occur when two of the relevant regression variables always appear together, as is the case of L-glutamine, Lean Lipids, and creatine on many of Defendant's labels. Marino Decl., Ex. D at p. 71:10-72:23. The regression in those cases cannot determine the price premium associated with each misrepresentation individually because the premiums coalesce. However, Dr. Harris is not computing price premiums associated with L-glutamine or Lean Lipids in his regression because he already recognized that collinearity might be an issue for those claims. Marino Decl., Ex. D at p. 69:16-72:23. Instead, his regression applies only to Plaintiffs' protein claims, for which no

---

[25] *See, e.g.*, *In re ConAgra*, 90 F.Supp.3d at 946-47 (plaintiff's expert obtained sales register data from IRI); *Plough, Inc. v. Johnson & Johnson Baby Products Co.*, 532 F.Supp. 714 (D.D.C. 1982) (parties relied on sales register data by Nielsen).

collinearity problem exists. *Id*., 72:15-72:23 ("it's evident that protein does not vary collinearly with those other attributes").

Finally, Defendant cites a handful of cases which have rejected regression analyses for a variety of reasons not applicable here. For example, in Defendant's principal case, *Jones v. ConAgra*, No. 12-cv-01633, 2014 WL 2702726 (N.D. Cal., Jun. 13, 2014), the court found that the *full refund* price premium model was inappropriate under the facts of that case, because Hunt's canned goods, PAM cooking spray, and Swiss Miss cocoa products all had some value to consumers despite the allegedly deceptive label claim that these products were "all natural." *Id*. at *19 ("[r]eturn of the full retail or wholesale prices is not a proper measure of restitution, as it fails to take into account the value class members received by purchasing the products"). The same is true of *In re POM Wonderful LLC*, No. 10- ML-02199, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) ("[b]ecause the Full Refund model makes no attempt to account for benefits conferred on Plaintiffs, it cannot accurately measure class-wide damages"). This, however, is not a full refund case and Plaintiffs have never so argued. *Cf. Suchanek*, 311 F.R.D. at 258, n.16.[26]

Moreover, because Defendant agrees that a regression should work (at least for protein), any squabble over the minutiae should be saved until the model is run.

### E. Dr. Howlett and her proposed choice-based conjoint methodology have been accepted by other courts in labeling cases

Defendant also concedes, as it must, that the conjoint method is widely used in consumer products labeling cases to compute damages. Oppo. at 39 ("Conjoint analysis is a statistical technique used to determine a limited number of attributes that are most influential on consumers' purchase decisions").

Defendant's other concerns are all hypothetical, because Dr. Howlett has not run

---

[26] The alternative damages method proposed in *POM Wonderful* was a "fraud on the market" method, which incorrectly assumed POM Wonderful would have sold at lower prices if consumers had known the truth. *POM Wonderful*, 2014 U.S. Dist LEXIS at *16-18. As the court correctly noted, there is no "authority applying a fraud on the market theory to a consumer action." *Id*., at *16.

her model, empaneled focus groups, or designed the needed surveys. First, Defendant's and Dr. Ugone's concerns that Dr. Howlett may not 'do it correctly' are belied by her years of experience as a marketing expert along with other courts' acceptance of her approach and finished work. *See In re Conagra*, 90 F.Supp.2d at 1023-1032 (accepting Howlett's proposed approach and concluding "[d]espite Conagra's arguments to the contrary, other district courts have concluded that translating a partworth, i.e., the 'relative importance' of a particular attribute into a price premium satisfies *Comcast*"). *See also Langan v. Johnson & Johnson Consumer Companies, Inc.,* No. 3:13-cv-1470, 2017 WL 985640, at *5 (D. Conn. Mar. 13, 2017) (accepting Dr. Howlett's completed surveys as evidence at summary judgment that seventy percent of consumers were misled by the defendant's labels). Defendant's unwillingness to accept these decisions is silly.

Second, Defendant baselessly argues that Dr. Howlett will skew her surveys to produce the result desired by Plaintiffs. This is absurd. Consumer survey responses are "objective facts," and statistics calculated therefrom show "whether or not you've got a good fit to the model." Marino Decl., Ex. E at pp. 43:24-45:17. If conjoint analysis were so easily manipulated, it would not be accepted practice.

Third, conjoint analysis by its nature is sufficiently focused to comply with *Comcast*. *See Conagra*, *supra*. No one would waste time and money surveying consumers regarding matters not of interest (except possibly as a control question). Moreover, the whole point of conjoint analysis is to isolate the specific "partworth" associated with specific representations or product attributes (Declaration of Dr. Elizabeth Howlett [Dkt. No. 109-9], at ¶ 46, 58-66; Marino Decl., Ex. E at p. 44:1-5). This is exactly what *Comcast* demands.

As for survey questions, Dr. Howlett intends to empanel focus groups if needed to refine the questions, and the conjoint process already includes rounds of preliminary surveys to ensure questions are understood. Marino Decl., Ex. E at pp. 47:6-8, 48:11-48:12.

Whether Dr. Howlett will break down her results by time period, product, or state depends on class certification, not trickery. *Id.* at 56:17-59:19 (explaining how she can use IRI or Nielsen data to tailor computations). If information about comparable products is needed, those products and sales data are also available. *Id.* at 59:20-61:17. And the key attributes to be tested, of course, are the Protein, L-glutamine, and Lean label claims. *Id.* at 61:18-64:3.

Finally, if the survey results show that consumers do not value L-glutamine at all, then that claim will fail for lack of materiality and damages. *Id.*at 52:15-56:1. The survey is still common evidence that will be applied class-wide. Defendant also criticizes Dr. Howlett for agreeing that more than one overcharge might be able to be computed, for example, one number for Michigan and a separate number for California. This is not a failure of the model, but a strength of it, since fine tuning can be performed depending on the complement of claims and classes certified by the Court. *Id.*at 109:4-110:14.

Because Dr. Harris and Dr. Howlett's approaches are well-accepted in the law and their respective fields, Plaintiffs have demonstrated that methods exist to compute damages in this case on a class-wide basis. Nothing more is required to sustain Plaintiffs' burden at class certification.

## II. THE PROPOSED CLASS IS ASCERTAINABLE

While not an express requirement of Rule 23, Defendant asserts that class membership must also be "ascertainable." Oppo. at pp. 41:21-23:11. This argument stems from the Third Circuit's controversial decision in *Carrerra v. Bayer Corp.*, 727 F.3d 300 (3d Cir 2013), which the Ninth Circuit explicitly rejected. *See Briseno*, 844 F.3d at 1125 n. 4. As long as the proposed class definition is objective and "sufficiently definite" to allow the Court to identify the Class, *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) (*citing Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986)), nothing else is required. *Cf. Briseno*, 844 F.3d at 1127. Plaintiffs' class definition meets the Rule 23 standard.

1    Defendant's attack on the proposed Class definition is threefold. First,
2    Defendant argues that it is impermissibly overbroad because it includes individuals
3    who did not read and/or did not care about the challenged claims.  Oppo. at 41:22-42:6
4    *citing Moheb v. Nutramax Lab, Inc.*, No. 12-cv-3633, 2012 WL 6951904 (C.D. Cal.
5    Sept. 4, 2012). This argument fails because "the Ninth Circuit has been clear that 'our
6    law keys on the representative party, not all of the class members, and has done so for
7    many years.'" *Ehret v. Uber Techs., Inc*., 148 F.Supp.3d 884, 903–04 (N.D. Cal. 2015)
8    *citing Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1021 (9th Cir. 2011). Standing of
9    absent class members is not an issue.

10    Defendant's other argument is better understood as one of "cohesion," or
11    whether class members were "*exposed* to quite disparate information from various
12    representatives of the defendant." *Stearns*, 655 F.3d at 1020 (emphasis added). Given
13    the relevant claims were made on the product labels themselves, it is indisputable that
14    consumers were exposed to them.  This is different than a case where a salesperson or
15    an intermediary, such as a physician misled consumers.  *See, e.g.*, *In re Vioxx Class*
16    *Cases*, 180 Cal.App.4th 116.

17    Disliking this standard, Defendant urges the Court to hold Plaintiffs to a higher
18    standard of proving that a significant number of consumers *read* and *individually*
19    *relied* on the alleged misleading claims. *See* Oppo. p. 32:2-15 n. 34.  This violates
20    *Stearns* and the reasonable consumer standard previously explained. Indeed, the cases
21    cited by Defendant do not even support its position. For example, *Zakaria v. Gerber*
22    *Prod. Co*., No. 15cv-00200, 2016 WL 6662723, at *7 (C.D. Cal. Mar. 23, 2016) (*citing*
23    *Mazza v Am. Honda Motor Co*., 666 F.3d 581, 596 (9th Cir. 2012)), supports Plaintiffs'
24    view that exposure is all that is required:  "[T]he relevant class must be defined in such
25    a way as to include only members who were exposed to advertising that is alleged to
26    be materially misleading."[27, 28]

27
28    ───────────────────────────────
[27] To the extent that the *Zakaria* court denied class certification, it was not because
class members were not exposed to the label, it was because the products at issue were

1    Second, Defendant claims that the settlement in *Delacruz v. CytoSport* released

2  the claims at issue here. This is simply untrue. *Delacruz v. CytoSport* alleged that

3  Defendant falsely represented its "Muscle Milk" branded Liquid Products and protein

4  bars as "Healthy," containing "Good" carbohydrates, and "0g Trans Fat" when these

5  claims were false and barred by several FDA regulations. *See generally*, Request for

6  Judicial Notice, concurrently filed herewith, Exs. A & B. No claims were asserted

7  against the Powdered Products. *Id.* And the complaint in *Delacruz* did not challenge

8  the protein content of the Liquid Products. Therefore, *Delacruz* and the release in that

9  case do not overlap with the issues *sub judice*.[29]

10    While class settlements are generally examined like any other contract, the Ninth

11  Circuit holds that the interpretation of a class release is subject to a specific limitation:

12    [a] settlement agreement [in a class action] may preclude a party from
     bringing a related claim in the future even though the claim was not
13    presented and might not have been presentable in the class action, *but only
     where the released claim is based on the identical factual predicate as that
14    underlying the claims in the settled class action*.

15  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010); *Williams v. Boeing Co*.,

16  517 F.3d 1120, 1134 (9th Cir. 2008) ("[T]he Ninth Circuit has cautioned that while a

17  defendant may have drafted the settlement agreement to include as broad a release as

18  possible, the release would have only been enforceable as to subsequent claims relying

19  upon a legal theory different from that relied upon in the class action complaint, but

20

21  sold with "different labels without the challenged language" during the class period.
    *Id.*, at *8; *also see Jones*, 2014 WL 2702726, at *14 (finding individual issues
22  predominate because the "label statements that varied by size, variety and time
    period")
23    [28] Defendant asserts that a minor label change in 2013, renders the class
    unascertainable. Oppo. at p. 42:4-6. Actually, Defendant removed the "Lean Lipids"
24  reference from Monster Milk earlier than 2013. Kashima Decl. App. A, at pp. 15-16;
    Ex. K pp. 29-36. Nevertheless, the Monster Milk labels retained other challenged
25  "Lean" representations, including "50g LEAN PROTEIN," "NEW LEANER
    FORMULA," and "LEAN MUSCLE PROTEIN SUPPLEMENT." *Id.* If anything,
26  removal of the "Lean Lipids" claim made it less likely that reasonable consumer would
    understand that Defendant was referring to the quality, and not quantity, of fat in the
27  product. The other label changes identified by Defendant are similarly insignificant.
    Kimball Decl. at ¶¶ 9, 11.
28    [29] Defendant did not assert *res judicata* or release as affirmative defenses.

- 23 -

1   depending upon the same set of facts.") (internal quotation omitted). Because *Delacruz*

2   did not challenge the Lean, L-glutamine, or Protein Claims, the release does not apply.

3          Finally, Defendant criticizes Plaintiffs' failure to identify each individual class

4   member. Oppo. at p. 42:16-43:11. Plaintiffs are not required do so. In the Ninth

5   Circuit, a plaintiff need not demonstrate an administratively feasible method to identify

6   class members. *See Briseno*, 844 F.3d 1121. Nor does Rule 23 require "that 'the

7   identity of the class members ... be known at the time of certification.'" *Ries v*, 287

8   F.R.D. at 536.

9   **III.   CALIFORNIA LAW PROTECTS OUT-OF-STATE PURCHASERS**

10         California law, as applied by California courts, is clear: out-of-state purchasers

11  can avail themselves of the UCL and FAL to sue companies operating in California.

12  *See Rutledge v. Hewlett-Packard Co*., 238 Cal.App.4th 1164, 1186-89 (2015), *as*

13  *modified on denial of reh'g* (Aug. 21, 2015), *review denied* (Nov. 10, 2015); Cal. Bus.

14  & Prof. Code § 17500 (it is unlawful for any person "to make or disseminate or cause

15  to be made or disseminated from this state ***before the public in any state***," false or

16  misleading advertisements) (emphasis added).[30] Similarly, out-of-state purchasers can

17  sue under their own state's consumer protection law, should a private right of action

18  exist. The existence of different causes of action, based on different states' law, does

19  not necessarily create a conflict of law. *Simms Inv. Co. v. E.F. Hutton & Co. Inc*., 699

20  F.Supp. 543, 545 (M.D.N.C. 1988); *In re Countrywide Fin. Corp. Mortgage-Backed*

21  *Sec. Litig*., No. 2:11-CV-07166, 2012 WL 10731957, at *14 (C.D. Cal. June 29, 2012).

22         Defendant, nevertheless, presumes that a conflict of law would arise if California

23  law applied to out-of-state purchasers in this case. Oppo. at pp. 20:21-22:2. While

24  Defendant cites *Mazza v. Am. Honda Motor Co.* to support its position, California law

25

26  _____

27  [30] *See also Wershba v. Apple Computer, Inc*., 91 Cal.App.4th 224, 243 (2001) ("[The] remedies under the California unfair competition law "may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California.") *citing Clothesrigger, Inc. v. GTE Corp*., 191 Cal.App.3d 605 (1987) & *Norwest Mortg., Inc. v. Superior Court*, 72 Cal.App.4th 214 (1999).

28

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;       Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS

1   controls. Oppo. at p. 21:3-14, *citing Mazza*, 666 F.3d 581. "Federal courts sitting in

2   diversity look to the law of the forum state in making a choice of law determination."

3   *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir. 2001). Here, California

4   law applies. *Washington Mut. Bank, FA v. Sup. Ct.*, 24 Cal.4th 906, 916-17 (2001).

5        Under California law, "[s]o long as the requisite significant contacts with

6   California are shown to exist, sufficient to meet constitutional standards, the burden is

7   on the parties challenging the nationwide certification to demonstrate that 'foreign law,

8   rather than California law, should apply to class claims.'" *Wershba v. Apple Computer*,

9   *Inc.*, 91 Cal.App.4th 224, 244 (2001). Defendant does not dispute that out-of-state

10  purchasers may assert the UCL and FAL under these circumstances. Nor does it assert

11  that California lacks a constitutional basis for applying its laws to Defendant—a

12  California corporation residing in California. Defendant has not met its burden.

13       Instead, Defendant only argues that other states' interests in applying their own

14  laws outweigh California's interests in applying its law to out-of-state purchasers.

15  Oppo. at p. 21:3-14. Defendant, in doing so, has failed to analyze the first step in any

16  conflict of law analysis: whether a true conflict exists. *Destiny Tool v. SGS Tools Co.*,

17  344 F. App'x 320, 321 (9th Cir. 2009) ("[A] court first determines if there is a 'true

18  conflict' of law, and if so, proceeds to apply" a conflict of laws analysis). Citing

19  securities cases, Plaintiffs asserted that UCL and FAL are "additive rather than

20  exclusive" to the consumer protection law of other states. Motion at p. 34, *citing In re*

21  *Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, No. 2:11-cv-07166, 2012 WL

22  10731957, at *14 (C.D. Cal. June 29, 2012). It should "not be the role of the Court to

23  reconcile differences between them, but rather to give full effect to each." *Id*. Thus, a

24  plaintiff is free to choose what law to sue under and elect a remedy – so long as he or

25  she can satisfy the elements of the cause of action and is prevented from multiple

26  recoveries.[31] While Defendant attempts to distinguish these cases because they involve

27  _____

28  [31] *See* Motion at pp. 34:21-35:10 *citing Lintz v. Carey Manor Ltd.*, 613 F.Supp.543,
    551 (W.D. Va. 1985) ("There is nothing inconsistent in trying a securities case on

securities regulations, Defendant has not explained why the legal conclusion would differ for laws protecting consumers in the financial markets as opposed to the retail market. Here, out-of-state purchases have the right to assert UCL and FAL claims, and the Court should not constrain these individuals' access to California law.

## OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. ELIZABETH HOWLETT

Defendant does not challenge Dr. Harris or Dr. Howlett's credentials or that the methods they propose are generally accepted. Defendant's page-long *Daubert* attack is instead aimed at Dr. Howlett's opinion that the statements in question are material. This is an easy argument to respond to because common sense suggests that the amount of protein in a protein supplement is material. *Langan*, 2017 WL 985640, *9 ("an express or deliberately implied claim made by a company is presumptively material due to assumption that the willingness of a business to promote its products reflects a belief that the consumers are interested in the advertising"); *FTC v. Bronson Partners, LLC*, 564 F.Supp.2d 119, 135 (D. Conn. 2008) (same).

Defendant's claim that Dr. Howlett's materiality opinions "have no factual foundation" is also incorrect. Dr. Howlett cited California case law and academic research in her expert report establishing that "labels matter," especially in the area of consumer products. Beyond that, Dr. Howlett cited and extensively quoted from Cytosport's *own marketing research*, which found that protein, L-glutamine, and leanness were all important to consumers. Marino Decl., Ex. E at p. 21:8-13 ("The primary source . . . is from CytoSport's own internal documents. ... their marketing research"). *See also* Kashima Decl., at ¶¶ 12 (citing Exs. M-O) & 16 (citing Exs. N).[32]

---

multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries"); *Clothesrigger, Inc.*, 191 Cal.App.3d at 616 ("California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.")

[32] Despite having commissioned these studies to help redefine its product labels, Defendant criticizes Dr. Howlett for relying on them, calling them "irrelevant documents." Oppo. at p. 44.

- 26 -

While Dr. Howlett has not yet performed the materiality surveys proposed in her report, the above-cited market research demonstrates that (1) choice-based consumer surveys can be done with these products, (2) major companies like Hormel and Cytosport already rely on these studies to refine marketing strategies and product labels, and (3) consumers find these product attributes to be material. Such evidence is adequate to support Dr. Howlett's conclusions. *Suchanek*, 311 F.R.D. at 245-46 (collecting cases).[33]

Defendant next argues, "Plaintiffs have been forced to modify their claims because their original allegations were baseless, and Dr. Howlett does not address the modified claims." According to Defendant, Dr. Howlett's opinions no longer "fit the case." This is incorrect. Plaintiffs' claims have not changed. The Court's explanation of Plaintiffs' claims and theories from the motion to dismiss in August 2015, as compared to several recent discovery orders confirms this.[34] *See also Suchanaek*, 311 F.R.D. at 248 ("Defendants argue that Ms. Preston's opinions should be excluded because her calculations do not fit Plaintiff's theory ... [however] it seems to the Court that these arguments ... are not a good fit for a *Daubert* motion").

Finally, Defendant is wrong in urging the strict application of *Daubert* and FRE 702 at class certification. As explained the Manual for Complex Litigation (4th):

> Expert witnesses play a limited role in class certification hearings; some courts admit testimony on whether Rule 23 standards, such as predominance and superiority, have been met. The judge need not decide at the certification stage whether such expert testimony satisfies standards for admissibility at trial. Courts have applied a high threshold for assessing the need for expert testimony at the class certification stage. A judge should not be drawn

---

[33]  As Plaintiffs' Counsel Trent Kashima explained in his supporting class certification Declaration, Defendant's witness Dr. Kimball also testified as to the importance of L-glutamine, including especially for workout recovery. *See* Kashima Decl. at Ex. H (Kimball dep. excerpts). Defendant also sold a stand-alone L-glutamine supplement at one point. Ex. H. at 88:20-90:22. And while some cases, like *Suchanek*, have also valued evidence of consumer complaints, this case is not complaint-laden because consumers could not learn the truth without conducting expensive laboratory testing. Additionally, the public had no way to know that Defendant has been systematically under-fortifying its products in reliance on the Class II nutrient safe-harbor provisions of 21 C.F.R. § 101.9(g)(4)(ii). *See* Motion to Dismiss [Dkt. No. 24-1], at pp. 10:8-11:4.

[34]  The recent amendment of the complaint was done only to add Chris Roman.

prematurely into a battle of competing experts.

*Id.*, at 267-68 (*citing In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001)). *See also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("It was after all [defendant] which sought bifurcated discovery which resulted in a limited record at the class certification stage, preventing the kind of full and conclusive *Daubert* inquiry [defendant] later requested").

Like other courts that have considered similar issues, this Court should reject Defendant's *Daubert* motion.

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment asks the Court to do three things: first, revisit legal arguments the Court already rejected; second, ignore that Defendant had actual pre-suit notice of all claims asserted; and third, impose a blanket individual-reliance requirement on putative class representatives, even when the applicable laws do not.  As to each, the Court should decline.

## I.   LEGAL STANDARD

Summary judgment should not be granted unless "it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Guru Nanak Sikh Soc'y v. County of Sutter*, 326 F.Supp.2d 1140, 1147 (E.D. Cal. 2003). After the moving party identifies its supporting evidence, the burden shifts to the non-moving party to establish that a question exists concerning a material fact. *Id.* "In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party." *Id.*, at 1148 (internal citations omitted).

## II.   ARGUMENT

### A.   The Challenged Protein and L-glutamine Representations Are Promises of Performance Directly Related to Product Efficacy and Are Written Warranties Under the MMWA

If Defendant's argument that the challenged representations are not "written warranties" under the MMWA sounds familiar, it is because the Court rejected them in the motion to dismiss:

> Finally, Defendant moves to dismiss Plaintiffs' MMWA claims because . . . (2) the MMWA does not apply because the label statements . . . do not consist of promises that the product is defect free or guarantees a level of performance over time. . . . [T]he motion on these grounds is DENIED.

Order on Motion to Dismiss [Dkt. No. 53], at p. 13. Nothing has surfaced to change this.

The MMWA defines a written warranty as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A).

While Defendant is correct that "[a] product description does not constitute a warranty under the MMWA," *Anderson v. Jamba Juice Co.,* 888 F.Supp.2d 1000, 1004 (N.D. Cal. 2012), "statements promising a product can effectively achieve a specific result have been considered written warranties under the MMWA." *Allen v. Hyland's Inc.*, No. 12-cv-01150, 2013 WL 1748408, at *5 (C.D. Cal. Apr. 11, 2013) (holding drug product labels such as "Sleep Aid," "For Stress, Nervousness or Nervous Headache," and "Relieves Stress to Help You Sleep" constituted written warranties because they guaranteed stress relief would be performed to some degree). Here, the Protein and L-glutamine statements at issue are more than mere product descriptions (*i.e.* "Protein Power Shake," "all-natural protein," or "good source of protein."). *See* Kashima Decl., Ex. S, at p. 1. These are objective, quantitative promises made on the Class Products using numbers and specific units of measure (*i.e.*, "25g PROTEIN" on

the Liquid Products, and "L-Glutamine & Precursors 6,445 mg" on the Powder Products). *See* Kashima Decl., Apps. B & C.   These factual statements are not subjective descriptions or puffery.   When combined with the multiple statements of efficacy and scientific validity made elsewhere on the package, and the expiration date, they promise a specific level of performance over a specific time period. 15 U.S.C. § 2301(6)(A).

Similarly, the Powder Products' label states that they contain specific milligrams of "L-Glutamine & Precursors" per serving. A depiction of a molecule of L-glutamine appears under the statement to give it additional prominence.  Defendant is aware that L-glutamine is an "interesting ingredient" to consumers in the sports world, and adding it and other amino acids to the Powder Products lends them a "luster."  Kashima Decl., Ex. H at 87:25-88:7.  Athletes value L-glutamine as an aid to recovery after exercise, Marino Decl., Exs. F, at p. 53:2-15 & G at pp. 62:2-17, 63:24-64:7, and Defendant emphasizes repeatedly on the label that its Powder Products do just that. The label states that Defendant has been "working with sports scientists" since its founding, and that its "efficacious" products help with "recovery."  *See, e.g.,* Kashima Decl., Ex. K, at p. 3.   The directions also state that the Product may help with "recovery from exercise."  *Id.*  Clearly, these claims guarantee Product performance and are not mere descriptions. *Dorsey v. Rockhard Labs., LLC*, No. 13-cv-07557, 2014 WL 4678969, at *9 (C.D. Cal. Sept. 19, 2014); *Allen*, 2013 WL 1748408, at *6.

Defendant's labels also contain an NSF Certification, which signifies to purchasers that Defendant has independently "verif[ied] the label claims against product contents." *See, e.g.,* Kashima Decl., Ex. K, at p. 3; Marino Decl., Ex. A.  This guarantee is there to show the Products are defect free in all the ways important to athletes, including being free of banned substances and living up to label claims. *See* Marino Decl., Ex. A.  The label also states, "Our products are among the very few that are manufactured in a **NSF International GMP for Sport$^{TM}$ Registered** facility. Our facilities are also inspected and regulated by the FDA." Kashima Decl., Ex. K, at p. 4

1   (emphasis in original). As defense counsel summarized it at Plaintiff Ehrlichman's

2   deposition, such language should "suggest to you that these products are probably

3   pretty accurately tested for what's in them[.]" Marino Decl., Ex. G, at p. 66:12-21.

4   Together, this collection of guarantees constitutes written warranties under the

5   MMWA. *See Dorsey*, 2014 WL 4678969, at *9; *Allen*, 2013 WL 1748408, at *6.

6   ### B.   Defendant Had Actual Notice of *All* Claims

7   Additionally, Defendant claims that it did not receive any pre-suit notice of

8   Plaintiffs' warranty claims.  Oppo. at pp. 15:9-16:21  However, it is undisputed that

9   Plaintiffs sent Defendant a demand letter requesting that Defendant take corrective

10   action.  Marino Decl., Ex. B.  The pre-suit letter, sent on behalf of the three original

11   named Plaintiffs, *enclosed a copy of the draft complaint* detailing *all of the named*

12   *Plaintiffs' claims, allegations, and causes of action*.  *Id*.  Furthermore, notice under the

13   MMWA is not required until a class is certified.  *See supra*, pp. 14:2-15:3.

14   ### C.   The Named Plaintiffs Have All Lost Money as a Result of Defendant's Violations of the Relevant Statutes, and They Have Standing to Sue

15

16   The Court previously rejected Defendant's standing argument against the named

17   Plaintiffs, but indicated it would take up the issue again at class certification with as

18   part of the typicality and commonality assessment. Instead, Defendant challenges the

19   standing of the named Plaintiffs again. Nothing has changed for them; they purchased

20   Defendant's Products and were misled by at least one of the representations at issue.

21   They accordingly have standing to sue.

22   #### 1.   Only California's UCL, FAL, and CLRA require some showing of reliance

23   ##### a.   *Standing Under the UCL, FAL, and CLRA*

24   Since Proposition 64, the UCL and FAL required that a plaintiff suffered an

25   actual injury caused by the unlawful practice.  *In re Tobacco II Cases*, 46 Cal.4th at

26   326.  The CLRA has a similar standing requirement.  *Stearns*, 655 F.3d at 1022. ("A

27   CLRA claim ... requires each class member to have an actual injury caused by the

28

unlawful practice.")[35]   However, standing under the UCL, FAL, and CLRA is not an

insurmountable obstacle:

> While a plaintiff must show that the misrepresentation was an *immediate cause* of the injury-producing conduct, the *plaintiff need not demonstrate it was the only cause*. " 'It is not ... necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct.... *It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision*.' [Citation.]   *327 [¶] *Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material*. [Citations.]
>
> \* \* \*
>
> *Nor does a plaintiff need to demonstrate individualized reliance on specific misrepresentations* to satisfy the reliance requirement.

*In re Tobacco II Cases*, 46 Cal.4th at 326–27 (emphasis added).[36]   Accordingly,

Plaintiffs only have to show the Protein, L-Glutamine, and Lean claims were a factor

in their purchasing decision.

> b.   *The MCPA Does Not Require Proof of Individual Reliance*

On the other hand, there is no similar reliance requirement under the MCPA.

"Only two of the MCPA's thirty-three 'unfair, unconscionable, or deceptive methods,

acts or practices' expressly require some form of reasonable reliance by the consumer,"

subsections (1)(s) and (1)(bb).   *Evans v. Ameriquest Mortg. Co.*, 2003 WL 734169, at

\*3 (Mich. Ct. App. Mar. 4, 2003).   At this point, Plaintiff Ehrlichman seeks to litigate

her MCPA claim arising under M.C.L. § 445.903(1)(c).   Motion, at p. 19 n. 8.

Defendant's argument is inapposite.[37]

> c.   *The State Warranty Statutes Do Not Require Individual Reliance*

As demonstrated in the choice-of-law summary attached to Plaintiff's moving

brief, a showing of individual reliance also is not required for Plaintiffs' warranty

claims.   *See* Kashima Decl., Ex. UU, at pp. 4-6.   Again, Defendant's attempt to graft an

---

[35] As noted above, this standing requirement only applies to the named plaintiffs.
[36] For a more detailed discussion of the CLRA's presumption of reliance arising through materiality, *see supra*, p. 3:1-13.
[37] The two cases cited by Defendant (*Evans*, 2003 WL 734169, and *In re Onstar Contract Litigation*, 278 F.R.D. 352, 378 (E.D. Mich. 2011)) relate only to subsection (1)(s) of the MCPA. Oppo., at p. 15.

1  individual reliance requirement onto every one of Plaintiffs' claims is misplaced.

2          2.     The Named Plaintiffs' Testimony Shows Sufficient Reliance to Survive
                   Summary Judgment

3

4      To the extent that reliance is required, the record is not as one-side as Defendant

5  would make it appear.

6                  a.     *Plaintiff Clay Purchased RTDs for Their Protein*

7      Defendant argues that Ms. Clay did not read the RTD label as proof that she

8  could not have relied on claimed amount of protein. Oppo. at p. 17.  But this testimony

9  responded to a specific question about when she "***first*** bought" an RTD shake. Marino

10 Ex. H, at p. 127:23-25 (emphasis added). Ms. Clay purchased RTD Products from

11 2009 to 2014, *id.*, at p. 156:19-22, so testimony about her first purchase is only of

12 limited value.

13     Ms. Clay also testified generally about protein's role in her purchase decisions as

14 follows: "Q. When you first bought these products, both the powder and the ready-to-

15 drink, you understood that they had protein; right? A. Yes, ma'am. I thought they were

16 high in protein." *Id.*, at p. 130:17-21. "Q. But part of the reasons you use these to

17 replace or supplement a meal is because they have a high protein content; is that right?

18 A. Yep." *Id.*, at p. 160:20-23. Clearly, protein content was a factor in some of Ms.

19 Clay's purchase decisions.

20                 b.     *Mr. Roman Relied on the RTD's Stated Protein Content*

21     As it did with Ms. Clay, Defendant argues that Mr. Roman's reliance should be

22 measured by his very first RTD purchase, or not at all. Oppo. at p. 10. This is not the

23 law, and the trier of fact will weigh all the evidence, not just the point Defendant

24 wishes to make.

25     As a professional MMA fighter, Mr. Roman carefully tracked his protein intake

26 during training season, aiming for over 500 grams per day. Marino Decl., Ex. C,

27 ROMAN_00000028-31. Mr. Roman did not read the RTD label *before his first*

28 *purchase*, but rather, he checked the protein content later and was satisfied with what

he read. Marino Decl., Ex. F at p. 135:24-136:9. He purchased more RTDs after that, infrequently, to meet his protein needs on the run. *Id.*, at pp. 134:18-135:2. In making later purchases, he relied on the stated amount of protein and he believed in the legitimacy of the brand. *Id.*, at pp. 135:18-23; 136:14-15. He need not have read the entire label before each purchase to have relied on Defendant's protein representations.

c.   *Plaintiff Ehrlichman Relied on the Lean Representations[38]*

Although Plaintiff Ehrlichman testified that she did not specifically seek out a "lean" or "diet" product, she also testified that Defendant's "lean" Products spoke to her desire to build lean muscle:

> A. . . . it's right out there really big, "lean muscle protein powder" and I think, yeah, I want lean muscles.
> Q. Right. You're not thinking the product is lean, you're thinking you want lean muscles?
> A. That's what I'm thinking. But I'm also thinking it has a lower fat content because you can't get lean muscles if you're eating something fattening.

Marino Decl., Ex. G at p. 112:19-113:2. She went on to testify about her confusion resulting from Defendant's illegal use of the term "lean" on a relatively high-fat product:

> Q. You're telling me just the statement 'lean muscle protein powder' is inherently misleading?
> A. Yes. Because it makes it look like it's a diet product. . . . Lean muscle means you have to have low fat, period, the end.

*Id.* at pp. 122:25-123:12. "'[L]ean' and 'diet' are synonymous. . . . Because to have lean, you have to have a low body fat content." *Id.* at p. 125:2. "[W]hen I see 'lean,' I'm thinking that it is going to help you with regard to keeping a low fat content." *Id.* at p. 127:18-24.   A jury could well find on the basis of this testimony that Ms. Ehrlichman relied on "lean" in the product name in believing that the Product would help her build lean muscle by "keeping a low fat content." *Id.*

---

[38] Defendant again narrows the basis of the Lean claim to only the "Lean Lipids" language (Oppo. at 18), and then attacks its strawman. *See supra*, p. 7, n. 9.

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;      Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS

d.    *Plaintiff Reichert Relied on the Powder Products to Provide Amino Acids, Including L-glutamine*

Mr. Reichert learned in biology class and boot camp that amino acids are important to the body. Marino Decl., Ex. I at p. 61:18-22. Although he did not have a scientific understanding of each amino acid or how it functions, he knew "that you're supposed to use them…you need them for your body and your muscles," so he included them in his regimen. *Id.*, 61:23-62:3. He further testified that he saw the amino acid chart on the Powder Products (where L-glutamine is highlighted) and that it factored into his purchase decision: "I would have looked and saw [it] had amino acids, and I would have said okay."[39] *Id.*, 64:10-11. He did not read the specific names of the amino acids on the chart because he "wouldn't have understood it," *id.*, 64:12-16, but class representatives need not be experts. *Astiana v. Kashi Co.*, 291 F.R.D. 493, 503 (S.D. Cal., 2013).

In light of this testimony by each of the four named Plaintiffs, the granting of summary judgment would be improper.

## CONCLUSION

For the reasons set forth above, Defendant's Class opposition, *Daubert* Motion, and Motion for Partial Summary Judgment should be denied. Even if the Court were to grant both of Defendant's Motions in their entirety, a substantial portion of the case would still survive and be appropriate for class certification.  This is the only thing the parties seem to agree on.

DATED: April 26, 2017                    Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By: /s/ Trenton R. Kashima

---

[39] Perhaps this is what Dr. Kimball meant when she referred to the "luster" of amino acids. Kashima Decl., Ex. H, 87:25-88:7.   Even consumers who do not fully understand a label or performance claim can be induced to rely upon it.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey R. Krinsk, Esq.
Trenton R. Kashima, Esq.
550 West C St., Suite 1760
San Diego, CA 92101-3593
Telephone: (619) 238-1333
Facsimile:    (619) 238-5425

BARBAT, MANSOUR & SUCIU PLLC
Nick Suciu III, Esq. (*Pro Hac Vice*)
nicksuciu@bmslawyers.com
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472

SOMMERS SCHWARTZ P.C.
Jason J. Thompson, Esq. (*Pro Hac Vice*)
jthompson@sommerspc.com
Amy L. Marino, Esq. (*Pro Hac Vice*)
amarino@sommerspc.com
One Towne Square, 17th Floor
Southfield, MI 48076
Telephone: (248) 355-0300

*Attorneys for Plaintiffs
and the Putative Classes*

PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION;          Case No. 3:15-cv-00165-L-DHB
OPPOSITION TO DEFENDANT'S MOTIONS