# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**==REDACTED==**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**      **(IN CHAMBERS) REDACTED ORDER RE**

**PLAINTIFF'S MOTION FOR APPROVAL OF CLASS NOTICE (DKT. 189)**

**PLAINTIFF'S MOTION TO EXCLUDE EXPERT EVIDENCE, OPINIONS, AND TESTIMONY OF JAN BERNHISEL-BROADBENT AND RAVIDHAR (DKT. 194)**

**DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT ELIZABETH HOWLETT, PH.D. (DKT. 217, REDACTED, DKT. 218, SEALED)**

**DEFENDANTS' MOTION TO DECERTIFY THE RULE 23 DAMAGES CLASS (DKT. 220, REDACTED, DKT. 221, SEALED)**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 224, REDACTED, DKT. 225, SEALED)**

I.     <u>Introduction</u>

    A.     **In General**

Oula Zakaria ("Plaintiff") filed this putative class action on January 9, 2015, advancing claims against Gerber Products Co. ("Defendant"). Complaint, Dkt. 1. The First Amended Complaint ("FAC" (Dkt. 26)), which is operative, presents the following causes of action: (i) unlawful business acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); (ii) unfair and fraudulent business acts and practices in violation of the UCL; (iii) false advertising in violation of Cal. Bus. & Prof. Code §§ 17500 *et*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

*seq.* ("FAL"); (iv) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; (v) breach of express warranty in violation of Cal. Comm. Code § 2313; (vi) breach of the implied warranty of merchantability in violation of Cal. Comm. Code § 2314; (vii) negligent misrepresentation; and (viii) intentional misrepresentation. Dkt. 26 ¶¶ 82-155.

The claims are based on allegations that Defendant falsely advertised Gerber Good Start Gentle ("Good Start Gentle"), which is an infant formula. Specifically, the FAC challenges the following statements about Good Start Gentle: (i) it is the first and only infant formula that reduces the risk that an infant will develop allergies; (ii) it will reduce the risk of developing infant atopic dermatitis; (iii) it is the first and only infant formula endorsed by the federal Food and Drug Administration ("FDA") to reduce the risk of developing allergies; and (iv) the FDA term of art "Qualified Health Claim" indicates FDA approval for the health claims advertised. *Id.* ¶ 3.

On March 23, 2016, the following class ("Class") was certified:

> All persons who, between July 8, 2013 through April 23, 2016 ["Class Period"], purchased Good Start Gentle containers displaying the "1st and Only" seal in the State of California for personal use and not resale and who did so because Good Start Gentle was described as the "1st and only routine formula to reduce the risk of developing allergies."

Dkt. 148 at 23 ("Class Certification Order").

**B.     Present Motions**

On October 26, 2016, Plaintiff filed a motion for order approving class notice ("Motion for Approval of Class Notice" (Dkt. 189)). Defendant filed an opposition on November 16, 2016 (Dkt. 192), and Plaintiff replied on November 30, 2016. Dkt. 228.

On November 21, 2016, Plaintiff filed a motion pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude certain expert opinions and testimony proffered by Defendant through Jan Bernhisel-Broadbent and Ravi Dhar, and to strike their reports ("Plaintiff's Motion to Exclude" (Dkt. 194 (filed under seal in unredacted form at Dkt. 230))). Defendant opposed that motion on December 12, 2016 (Dkt. 238) and Plaintiff replied on December 27, 2016. Dkt. 256.

On November 29, 2016, Defendant filed three motions. The first is a motion seeking to exclude the expert opinions proffered by Plaintiff through Elizabeth Howlett ("Defendant's Motion to Exclude" (Dkt. 217 (filed under seal in unredacted form at Dkt. 218))). Plaintiff opposed that motion on December 19, 2016 (Dkt. 239), and Defendant replied on January 9, 2017. Dkt. 265. The second is a motion to decertify the Rule 23 Damages Class ("Motion to Decertify" (Dkt. 220 (filed under seal in unredacted form at Dkt. 221)). Plaintiff opposed that motion on December 20, 2016. Dkt. 243 (filed under seal in unredacted form at Dkt. 245), and Defendant replied on January 9, 2017. Dkt. 268 (filed under seal in unredacted form at Dkt. 269)). The third is a motion for summary judgment brought by Defendant ("Motion for Summary Judgment" (Dkt. 224 (filed under seal in unredacted form at Dkt. 225))). Plaintiff opposed that motion on

Declaration of Matthew I. Kaplan, Exhibit A, Page 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

December 21, 2016 (Dkt. 247 (filed under seal in unredacted form at Dkt. 249), and Defendant replied on January 9, 2017. Dkt. 262 (filed under seal in unredacted form at Dkt. 263).

A hearing on all of these motions was held on February 6, 2017, and they were taken under submission. Dkt. 278. Thereafter, in response to an order, Plaintiff filed supplemental briefing on certain issues identified in that order. Dkt. 282 (filed under seal in unredacted form at Dkt. 283). In compliance with the same order, Defendant responded. Dkt. 286 (filed under seal in unredacted form at Dkt. 287). Defendant filed additional supplemental briefing on June 19, 2017. Dkt. 291-1. Plaintiff filed additional supplemental briefing on July 7, 2017. Dkt. 294. The matters were then re-submitted.

For the reasons stated in this Order, Plaintiff's Motion to Exclude is **DENIED**; Defendants' Motion to Exclude is **GRANTED IN PART** and **DENIED IN PART**; Defendants' Motion to Decertify is **GRANTED**; Defendants' Motion for Summary Judgment is **GRANTED**; and Plaintiff's Motion for Approval of Class Notice is **MOOT**.

## II.  Factual and Procedural Background

The Allegations in the FAC are summarized in the Order on Defendant's Motion to Dismiss (Dkt. 51), which is incorporated by this reference. Certain portions of that summary are presented in this Order to facilitate the subsequent discussion of the motions that are at issue.

### A.  2005-2011: The FDA Rejects Two Qualified Health Claim Petitions by Defendant and Provides Guidance

The FDA reviews and authorizes health claims related to food products sold in the United States. FAC, Dkt. 26, ¶¶ 21, 24. The FDA permits a "qualified health claim" to be made about a food product. A qualified health claim is one that is "supported by scientific evidence, but does not meet the significant scientific agreement standard," *i.e.,* that most qualified experts agree the claim is "supported by the totality of publicly available scientific evidence for a substance/disease relationship." *Id.* ¶¶ 22, 23. The FDA requires that qualified health claims be "accompanied by a disclaimer or other qualifying language to accurately communicate the level of scientific evidence supporting the claim." *Id.* ¶ 23.

In June 2005, Defendant filed a petition with the FDA seeking its approval of the following qualified health claim:

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research in healthy infants with family history of allergy shows that feeding a 100% Whey-Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash, when used instead of whole-protein cow's milk formula from the initiation of formula feeding.

*Id.* ¶ 25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

On May 11, 2006, the FDA denied Defendant's petition. *Id.* ¶ 26. Based on a review of 36 studies, the FDA determined that there was "no credible evidence for a relationship between the consumption of 100 percent partially hydrolyzed whey protein in infant formula and a reduced risk of food allergy," and that "neither a disclaimer nor qualifying language would suffice to prevent consumer deception in this circumstance." *Id.* ¶¶ 26-27.

In May 2009, Defendant filed a second petition. It sought FDA approval of the following qualified health claim:

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula instead of a formula containing intact cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy -- atopic dermatitis -- throughout the 1st year of life and up to 3 years of age.

*Id.* ¶ 30.

On May 24, 2011, the FDA sent a "Letter of Enforcement Discretion," which made two determinations based on a review of publicly available scientific evidence. *First*, there was "very little credible evidence for a qualified health claim about the relationship between feeding a 100 percent whey-protein partially hydrolyzed infant formula for the first 4 months of life and a reduced risk of atopic dermatitis throughout the first year of life and up to 3 years of age." *Id.* ¶ 31. *Second*, there was "little credible evidence for a qualified health claim about the relationship between feeding 100 percent whey-protein partially hydrolyzed infant formula for the first four months of life and a reduced risk of atopic dermatitis throughout the first year of life." *Id.* The FDA determined that "the current scientific evidence is appropriate for consideration of a qualified health claim regarding the relationship between the consumption of 100 percent whey-protein partially hydrolyzed infant formula and a reduced risk of atopic dermatitis, provided that the qualified health claims are appropriately worded so as not to mislead consumers." Dkt. 28, Ex. B at 10. However, it rejected Defendant's proposed language as "mischaracteriz[ing] the strength of the evidence and . . . misleading." *Id.* The FDA suggested certain language for alternative qualified health claims that it would "consider [in] the exercise of its enforcement discretion." *Id.*

On the basis of the FDA's determinations that scientific evidence supported the consideration of a qualified health claim, Defendant included the words "meets FDA" and "qualified health claim" on a label affixed to packaging of Good Start Gentle ("'1st And Only' Label"), as well as the statement that Good Start Gentle "is the first and only formula brand . . . that meets the criteria for a FDA Qualified Health Claim for atopic dermatitis." FAC ¶ 45.

Declaration of Matthew I. Kaplan, Exhibit A, Page 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

**B.     June 2011: The Lowe Study Finds No Evidence that Partially Hydrolyzed Whey Formula Reduces the Risk of Infant Allergic Disease**

In June 2011, a study by Adrian J. Lowe and others ("Lowe Study") was published in the Journal of Allergy & Clinical Immunology. Dkt. 26-2. The Lowe Study concluded that there was

> no evidence that introducing [partially hydrolyzed whey formula ('pHWF')] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema, asthma, and allergic rhinitis, in this study of high-risk infants. Our findings do not support the recommendation that pHWF should be used after breast-feeding as a preventive strategy for infants at high risk of allergic diseases.

*Id.* at 6.[1]

The FDA did not consider the Lowe Study, which was published after its Letter of Enforcement Discretion to Defendant in May 2011. Dkt. 35 at 10 n.2. The FAC alleges Defendant was on notice of the existence and results of this study because Nestec Ltd., a subsidiary of Nestle Australia, Ltd., is affiliated with Defendant and, "provided the Lowe Study with study formula and staff funding for the first 6 years of the study." Dkt. 26, ¶ 41.

**C.     2011-2014: Defendant Markets Good Start Gentle**

The FAC contends that "[s]ince at least 2011, Defendant knowingly disseminated or has caused to be disseminated advertisements, packaging, and promotional materials for Good Start Gentle in California containing false and misleading statements . . . ." FAC ¶ 43. These include, *inter alia,* the 1st and Only Label, which includes the statement that Good Start Gentle is "[t]he "1st and Only Routine Formula to Reduce the Risk of Developing Allergies.". *Id.* ¶ 44. The FAC also alleges that Plaintiff relied on these representations in making the decision to purchase Good Start Gentle. *Id.* ¶ 63. As noted, reliance on this language on this specific product label was a basis on which the Class was defined and certified.

**D.     October 29, 2014: The FTC Brings a Civil Action Against Defendant in Connection with Its Advertising, Marketing and Sale of Good Start Gentle**

On October 29, 2014, the Federal Trade Commission ("FTC") filed an action against Defendant in the District of New Jersey ("FTC Action"). *Federal Trade Comm'n v. Gerber Products Co.*, 2:14-cv-06771-SRC-CLW; FTC Compl., Dkt. 1. There, the FTC alleged that Defendant made the false, misleading and/or unsubstantiated representation that "feeding Gerber Good Start Gentle formula to infants with a family history of allergies prevents or reduces the risk that they will develop allergies." *Id.* ¶¶ 19-20. The FTC also claimed that Defendant made the false, misleading and/or unsubstantiated representation that "Gerber Good Start Gentle formula qualified for or received approval for a health claim from the Food and Drug Administration." *Id.* ¶ 22.

---

[1] The Lowe Study cited six other studies in support of the proposition that "[p]artially hydrolyzed whey formulas . . . have been widely recommended to prevent the development of allergic diseases in early childhood." Dkt. 26-2 at 2.

Declaration of Matthew I. Kaplan, Exhibit A, Page 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

In that action, the FTC sought the following remedies:

> preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the labeling, advertising, marketing, distribution, and sale of Gerber Good Start Gentle, an infant formula that purports to prevent or reduce the risk of the development of allergies.

*Id.* ¶ 1.

### E. The FDA Sends a Warning Letter to Defendant Regarding the Marketing and Branding of Good Start Gentle

On October 31, 2014, the FDA sent a "Warning Letter" addressed to Gary Tickle, the President and CEO of Defendant. Dkt. 39-2. It states that Good Start Gentle was misbranded within the meaning the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 343(a)(1), (r)(1)(B), because its labeling "bears health claims that were not authorized by FDA," and is "misleading." *Id.* at 2. The Warning Letter also states that the claims on the product label for Good Start Gentle and the corresponding claims on Defendant's website

> asserting the limited evidence linking the benefit between consumption of "100% whey partially hydrolyzed" and atopic dermatitis are generally consistent with the claims suggested in the 2011 letter announcing the claims for which FDA would consider the exercise of enforcement discretion.

*Id.* at 4. However, the letter states that the FDA had determined that Defendant had not made sufficiently clear the risk Good Start Gentle posed to infants with milk allergies. Nor did it disclose the need to consult with a physician regarding the care and food choices for an infant who is allergic to milk, or presents a substantial risk of developing such an allergy. *Id.* at 4-6.

The Warning Letter also stated that Defendant had made an unapproved health claim. Thus, the FDA's 2011 correspondence with Defendant considered only health claims about "an infant formula made with 100% whey-protein partially hydrolyzed." *Id.* at 4. However, the Good Start Gentle packaging claimed that "100% whey partially hydrolyzed . . . may reduce the risk of atopic dermatitis." *Id.* at 2, 4. Whey contains lactose, minerals, vitamins and fat as well as protein, and the FDA's 2011 analysis did not evaluate whey as opposed to whey protein. *Id.* at 4-5. The Warning Letter stated, "[t]he above violations are not intended to be an all-inclusive list of deficiencies associated with your products or their labeling." *Id.* at 6.

Declaration of Matthew I. Kaplan, Exhibit A, Page 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

### CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

### III.   Plaintiff's Motion to Exclude

#### A.   Background

The June 29, 2016 Order Modifying Scheduling Order (Dkt. 179) set July 11, 2016, as the deadline for the parties to exchange initial expert disclosures in this action. Prior to that date, Plaintiff served Defendant with the report prepared by its expert, Robert Boyle ("Boyle Report"). Dkt. 238-2. Boyle is a pediatric immunologist with extensive research experience relating to allergies in infants and children. *Id.* at 3. The Boyle Report included his opinions, which are based on a review and analysis of several studies, including a "systematic review and meta-analysis" of 37 intervention trials of hydrolyzed infant formula for preventing allergic or autoimmune disease or allergic sensitization. *Id.* at 13-14. This analysis was "published in one of the world's leading medical journals." *Id.* at 4. The Boyle Report includes his opinion that Good Start Gentle does not reduce the risk of allergies or atopic dermatitis. His opinion is based on his medical and scientific training, his review of studies and literature in the field, and his own studies on the subject.

September 22, 2016, was the deadline for the parties to disclose their respective rebuttal experts. On that date Defendant provided to Plaintiff three expert reports. They included the reports of Jan Berhisel-Broadbent ("Broadbent Report" (Dkt. 194-3)) and Ravi Dhar ("Dhar Report" (Dkt. 194-4 (filed under seal at Dkt. 230-1)).

Broadbent is a physician with experience in pediatric allergy and immunology. In her report, she states that she has 23 years of experience evaluating and treating patients who suffer from atopic dermatitis and food allergies, and has conducted academic research on the relationship between food allergies and atopic dermatitis. Her report also states that she was retained by Defendant to respond to the Boyle Report. Part of her assignment was to opine on the accuracy of the statements made on the 1st And Only Label. Dkt. 194-3 at 5. Broadbent then cites and discusses scientific studies that provide what she describes as "considerable scientific substantiation and support" for the claims made on the 1st And Only Label. *Id.* at 6-11. Broadbent also opines about Boyle's methods, stating that he "presents his opinions in an absolute manner that is inconsistent with the general approach that medical scientists typically take when analyzing scientific research and studies." *Id.* at 11. Broadbent considers some of the studies on which Boyle relied, and opines that they can be interpreted to support conclusions that vary from those reached by Boyle. Given these findings, Broadbent opines that Boyle's critique of the scientific accuracy of the 1st And Only Label is unsupported.

Dhar is a professor of management and marketing, with experience conducting research about consumer decision-making. In his report, he opines about what he regards as deficiencies in the survey conducted by Dr. Thomas Maronick ("Maronick") who was engaged by Plaintiff. The purpose of the survey was to assess consumer perceptions about the content of the 1st And Only Label.

Through the Motion to Exclude, Plaintiff seeks to bar the admission of the Broadbent Report, and to strike two paragraphs from the Dhar Report.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**==REDACTED==**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

### B.    Legal Standards

#### 1.    Federal Rule of Civil Procedure 37(c)

Fed. R. Civ. P. 37(c)(1) provides:

> (1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Under Rule 37, if an expert witness is disclosed after the required deadline set in a particular case, the witness may be excluded. Exclusion is not mandatory, and may not be imposed if the party presenting the witness was substantially justified in any delay, or the delay did not prejudice the other side. In determining whether exclusion is justified, a court has broad latitude in imposing sanctions under Rule 37(c)(1). *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

#### 2.    Federal Rule of Evidence 702

Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As the Ninth Circuit has explained:

> Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. The rule consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion.

*United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002).

District courts perform a "gatekeeping" function in determining the admissibility of expert testimony. *Daubert* , 509 U.S. at 597. A "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). In determining the reliability of a proffered expert,

Declaration of Matthew I. Kaplan, Exhibit A, Page 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

courts "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendment). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

An expert may not present testimony that merely "parrots" the opinions of others, without providing an independent evaluation of the matters at issue. *See Matter of James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir.1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him -- information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented. . . . [T]he judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.").

**C.  Application**

1.  Whether the Broadbent Report Exceeds the Scope of Rebuttal Evidence

Plaintiff argues that the Broadbent Report should be stricken under Fed. R. Civ. P. 37(c)(1), because it exceeds the scope of proper rebuttal testimony. Thus, Plaintiff contends that it goes beyond providing a response to the issues raised by Plaintiff's experts, and instead addresses the general question whether Good Start Gentle reduces the risk of allergies. Plaintiff contends that the Broadbent Report is in effect an "untimely initial report," rather than a timely rebuttal one. Plaintiff argues that this late filing was prejudicial and without substantial justification. At the February 6, 2017 hearing, counsel for Plaintiff argued that, had the opinions of Broadbent been submitted earlier, Plaintiff could have questioned her in a more complete and meaningful manner at her deposition.

In the Broadbent Report, opinions are presented as to the scientific support for the statements made on the 1st And Only Label. The premise for the claims in this action is that those statements are false and misleading and unsupported by scientific evidence. This could support a determination that the Broadbent Report should be deemed an untimely, initial expert report. However, Defendant argues that the Broadbent Report constitutes rebuttal testimony because it addresses scientific sources identified in the Boyle Report that were not previously disclosed by Plaintiff. Defendant argues that because the Boyle Report went beyond a discussion of the Lowe Study, it introduced a "new theory of falsity," requiring rebuttal. Dkt. 238 at 16. Defendant also notes that the matters discussed in the Broadbent Report are the same as those in the Boyle Report, and that Broadbent's analysis focuses on a rebuttal of Boyle's opinions.

Defendant also argues that, even if Broadbent Report were deemed an initial disclosure, barring its admission would be inappropriate. Defendant claims that it was substantially justified in providing the Broadbent Report based on the review of the Boyle Report, and there is no prejudice to Plaintiff. Thus, it contends that, because the scientific issues addressed in the competing reports have been at the center

Declaration of Matthew I. Kaplan, Exhibit A, Page 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

of this litigation since its inception, Plaintiff has had ample time to develop its position on them by conferring with scientific experts. Therefore, Defendant claims that Plaintiff will suffer no prejudice if the Broadbent Report is admitted.

The Broadbent Report is fairly characterized as a rebuttal to the Boyle Report. Although the matters discussed concern the scientific basis for the statements included in the 1st And Only Label, that issue is addressed by the Boyle Report. It is also the issue that has been front and center in this litigation from the start. Thus, a central question has always been whether the challenged statements on the label are supported by science. Both because the Broadbent Report is rebuttal, and because its admission will not prejudice Plaintiff, there is no basis to exclude it under Fed. R. Civ. P. 37(c).

2.    Whether the Broadbent Report Meets the Standards of Rule 702

Plaintiff next argues that the Broadbent Report is inadmissible under Rule 702 because Broadbent did not conduct any new analysis, and her report merely "parrots" the results and conclusions in the studies by others that she cites. Broadbent did not independently evaluate the scientific data in any of the cited materials. Although Broadbent disagrees with the Boyle Report on certain matters, she does not expressly critique its systemic review and meta-analysis.

Plaintiff also argues that, because Broadbent is a treating physician without substantial experience in research or statistical analysis, she lacks expertise to provide the opinions in her report. At her deposition, Broadbent testified that she did not independently evaluate the relevant studies or conduct a meta-analysis on whether Good Start Gentle could reduce the risk of allergies or atopic dermatitis. Dkt. 194-5 at 4, 6-7 (Broadbent Depo.). Broadbent also testified that she engaged in "very basic research" in this scientific area as a fellow 23 years ago, and has not performed "any active research" since that time. *Id.* at 7, 10. Broadbent has not published any articles concerning Good Start Gentle, 100% partially hydrolyzed whey protein infant formula, or their relationship, if any, to allergies or atopic dermatitis. Plaintiff also notes that Broadbent never has performed a statistical analysis, and testified that such analyses are not in her "area of expertise." *Id.* at 26-27.

Plaintiff's arguments are unpersuasive. Broadbent has a substantial academic and professional background in the relevant areas. She has substantial clinical experience in treating patients who suffer from atopic dermatitis and food allergies. Dkt. 238 at 25. Further, her opinions do not merely parrot those of others. Instead, they rely on her experience, her review of peer-reviewed studies and medical authorities, and her assessment of the methodology and conclusions in the Boyle Report. An expert on such scientific matters need not perform independent studies as a prerequisite to providing admissible opinions. If that were the rule, the scope of permitted testimony would be severely limited across the entire spectrum of scientific issues. For example, a physician who testifies as an expert in a medical malpractice case about the administration of a drug to a patient, can rely on the scientific literature about the circumstances under which the drug should be used, as well as anticipated side effects, without conducting independent studies on these issues. In short, those with expertise on scientific matters, and who typically review the available literature, may be qualified to opine on the corresponding issues.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

Based on her background, including her experience in treating patients that is described above, Broadbent meets these standards, and is qualified under *Daubert*. *See United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999) (rebuttal witnesses' role is "to expose flaws" in the affirmative expert's use of data). Therefore, Plaintiff's Motion to Exclude is **DENIED** as to the Broadbent Report.

   3.   Whether Paragraphs 65 and 66 of the Dhar Report Satisfy Rule 702

The Dhar Report presents opinions about the deficiencies of a consumer survey conducted by Plaintiff's expert. Dkt. 230-1. Plaintiff objects to the admission of paragraphs 65 and 66 of the Dhar Report. They summarize marketing research by third parties. *Id* ¶¶ 65-66.[2] Plaintiff argues that they should not be admitted because Dhar played no role in conducting, authoring, participating in, or independently evaluating these studies. Instead, Plaintiff argues that "Dhar merely passes the questionable opinions of others on as his own."

These paragraphs may be admitted under Rule 702. Although these studies are hearsay, an expert witness is permitted to rely on hearsay evidence as the basis for an opinion. Dhar did so. Thus, the third party analysis is provided as support for Dhar's conclusion that alternative methods could have been applied by Maronick that would have reduced the risk of bias. Dkt. 230-1 ¶ 65. Therefore, Plaintiff's Motion to Exclude is **DENIED** as to paragraphs 65 and 66 of the Dhar Report.

**IV.   Defendant's Motion to Exclude**

   **A.   Background**

Defendants seek to exclude two reports by Howlett, a professor in the Department of Marketing at Sam M. Walton College of Business, University of Arkansas, Fayetteville ("Howlett Decl."). Dkt. 220-2. Following the certification of the Class, Howlett conducted a "choice-based conjoint analysis" to ascertain the amount of any premium that members of the Class would be willing to pay for Good Start Gentle based on the statements on the 1st and Only Label. In support of the motion for class certification, a declaration from Howlett was filed. *Id.* There, she stated that a conjoint analysis is "a widely used and accepted form of quantitative consumer preference measurement, often used in marketing research to determine how much each feature of a product contributes to overall preferences." Dkt. 220-2 ¶ 23. She also stated that "[t]he most commonly used form of conjoint analysis for marketing research is Choice-based Conjoint ("CBC"), in which consumers are shown sets of products ("choice sets") and are asked to select one in response to a question posed by the survey." *Id.* ¶ 29. For example, a choice based conjoint analysis of car options may include cars in choice sets with the following attributes and levels: sunroof (with levels of "with" and "without") and color (with levels of "red," "white," and "blue"). *Id.* Howlett has also stated that she has expertise in conjoint analysis. *Id.* ¶ 19.

---

2



Declaration of Matthew I. Kaplan, Exhibit A, Page 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**REDACTED**
CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | | Date | August 9, 2017 |
|---|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | | |

Howlett prepared a report in which the procedures used in her analysis, and its results, are described ("Howlett Report"). Dkt. 220-3. The Howlett Report states that she designed a survey that was administered to 400 participants. All 400 reported using Good Start Gentle during the prior three months. *Id.* at 8. As part of the survey, the respondents were directed to review images of several brands of infant formula. They were presented with images of 12 choice sets that showed various permutations of the packaging used for Good Start Gentle. These choice sets were based on variations in four factors: (i) different container types, *i.e.,* plastic or metal; (ii) the different labels actually used by Defendant during the Class Period; (iii) various price points calculated on a per ounce basis; and (iv) whether the 1st And Only Label was used. *Id.* at 8-10.

Based on the responses of those surveyed, Howlett opined that "consumers are willing to pay $0.4186 per ounce more for a product that is the 1st and only formula to reduce an infant's risk of developing allergies compared to an identical product that does not reduce an infant's allergy risk." *Id.* at 13 (emphasis omitted). Defendant states that this premium represents approximately 40% of the common retail price for Good Start Gentle. Dkt. 218 at 20.

On August 29, 2016, Plaintiff lodged a supplemental report by Howlett ("Howlett Supplemental Report"). Dkt. 218-7. It is based on her review of several documents produced by Defendant in discovery. They refer to Defendant's pricing strategies with respect to the text of the claims on the 1st And Only Label.

*Id.* ¶10.

Howlett concluded that "this review supports my initial conclusion that Good Start Gentle's positioning in the market as the first and only formula that reduced an infant's risk of developing allergies permitted Gerber to place a price premium on the product consumers otherwise would not have been willing to pay." *Id.* ¶ 6.



3

Declaration of Matthew I. Kaplan, Exhibit A, Page 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

### B.   Legal Standards

The general standards governing the Motion to Exclude under Fed. R. Evid. 702 are stated above. Further, as a general matter, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 949 (C.D. Cal. 2015). Thus, "as long as they are conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.2 (9th Cir. 1997) (internal citations omitted).

### C.   Application

#### 1.   Objections to Howlett Report

##### a)   Assumptions Regarding Pricing.

The Howlett Report reflects an attempt to determine "the percentage of the price premium paid by consumers that is attributable" the 1st And Only Label. For purposes of the analysis, Howlett "assume[d] that the Defendant identified a specific segment of the infant formula market that is willing to pay a premium price for a product that allegedly reduces an infant's risk of developing allergies." Dkt. 220-3 at 5. The conjoint analysis presented respondents with several hypothetical product packages, with corresponding, hypothetical prices, including "$.50, $.65, $.80, $.95, and $1.10 per ounce." *Id.* at 10. These prices do not directly correlate to actual market prices for the product at issue. Using these hypothetical prices, and the responses of those surveyed, Howlett determined that consumers presented with competing products in this segment would be willing to pay $.42 more if a product label contained the challenged language about allergies that appeared on the label of Good Start Gentle containers displaying the "1st and Only" seal. *Id.* at 13. Howlett did not evaluate empirical marketplace data to determine whether customers actually paid a premium in this or any other amount.

Defendant objects to the survey because the pricing data generated by Howlett is hypothetical. It is not tethered to the actual prices charged for products created by Defendant or its competitors. Defendant argues that as a result, this pricing data has little value in determining what consumers actually paid. Defendant argues that rather than a conjoint analysis, Howlett should have conducted a hedonic regression analysis. Such an analysis would have accounted for the actual prices of goods sold in the infant formula market. Howlett declared that such an analysis is an alternative and viable means of measuring any premium that might have been paid by consumers. Dkt. 220-2 ¶ 22. She also declared that the data necessary to perform such an analysis was available "from sources such as Symphony IRI or Nielsen." *Id.* ¶ 26. At her deposition, Howlett testified that she does not have expertise in regression analysis methodology. Dkt. 218-4 at 10 (filed under seal). Defendant also challenges the use of price-per-ounce questions in the survey. It contends that this would cause unreliable results because consumers do not typically consider pricing on this basis in selecting the products in this market area.

Plaintiff argues that the prices in Howlett's survey closely resemble the actual retail price of Defendant's products. The highest price used in the survey, which was $1.10 per ounce, is close to the common price

Declaration of Matthew I. Kaplan, Exhibit A, Page 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

### CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

of $1.08 per ounce that has been cited by Defendant. *See* Dkt. 220 at 14. Plaintiff also submitted information under seal to support the relevance of the pricing information.[4] Plaintiff argues that "generic" infant formulas, which compete with Good Start Gentle, often sell at lower prices. Dkt. 245 at 21.

Plaintiff also argues that it would not be useful to compare the actual price of Good Start Gentle featuring the 1st And Only Label with Defendant's other products, because they include "unique and compelling claims," some of which are unrelated to allergies. Dkt. 245 at 24. "For example, Defendant maintains that Good Start Soothe has "L. reuteri -- a probiotic clinically shown to reduce crying by up to 50%." Bolton Decl., Dkt. 245-11. Using such products to perform a price comparison would require accounting for any value added by such claims. Further, Howlett stated in her declaration submitted in support of the motion for class certification that the only way to determine the value added by the 1st And Only Label is to compare the price of a container with the challenged claim with the same container, without the challenged claim. Dkt. 220-2. That declaration explained that the premium over a neutral product -- not the premium over any specific product on the market -- is the appropriate method to use in determining what premium was paid by members of the Class.

Plaintiff next argues that price per ounce is commonly considered by consumers in selecting products while shopping.[5] Therefore, Plaintiff contends that Howlett's decision to conduct the survey on a price-per-ounce basis was appropriate. Plaintiff also contends that the use of a price-per-ounce measurement was necessary given the practical difficulty of assessing premiums paid on powder containers of Good Start Gentle, which were sold in 23.2, 27.8, 32 and 36 ounce containers. Dkt. 245 at 22. In light of these considerations, Howlett's failure to consider market prices and comparable products available for sale does not make the Howlett Report inadmissible. To the extent that this objection is relevant to the calculation of damages, it is addressed below in connection with the Motion to Decertify and Motion for Summary Judgment.

"The *Daubert* duty is to judge the reasoning used in forming an expert conclusion." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Id.* (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). In light of the evidence presented, any dispute as to Howlett's use of conjoint analysis goes to its weight, not its admissibility.

---

4



Declaration of Matthew I. Kaplan, Exhibit A, Page 15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

> b)   Absence of Control

Defendant next objects that Howlett did not test the 1st And Only Label against a control label bearing a comparable health claim. Howlett asked respondents to compare "a product that is the 1st and only formula to reduce an infant's risk of developing allergies compared to an identical product that **does not reduce** an infant's allergy risk." Dkt. 220-3 at 13 (emphasis in original). Defendant argues that rather than comparing a product that does not claim to reduce the risk of allergy, products bearing the 1st And Only Label should have been compared to other products bearing a different claim regarding the allergy-related benefits of the product, which could then have served as a control.[6] Defendant argues that without comparing the 1st And Only Label to such a control, it is impossible to determine what premium, if any, customers might have paid for products with the 1st And Only Label over other products with purported allergy-related benefits.

The absence of a control does not make Howlett's study inadmissible. Plaintiff argues that the use of a control is inappropriate in a choice-based conjoint analysis. Such an analysis is designed to provide a range of consumer choices, and to identify consumer preferences for each of those choices. Dkt. 243 at 20. Further, Howlett's study was designed to ascertain the premium that customers would pay for products including the 1st And Only Label as opposed to similar products that did not include that label. The failure to determine the premium over products bearing alternative health representations, or other features, does not invalidate the study as a measure of the premium that consumers were willing to pay. For these reasons, Defendant's objections go to the weight, not the admissibility of this evidence.

> c)   Alleged Bias

Defendant has submitted the report of John Hauser, Sc.D, a researcher and professor of marketing ("Hauser Report"). Dkt. 218-6. The Hauser Report explains that, in a conjoint analysis, it is typical to present respondents with a selection of images of products in a form that differs from the way they are actually sold. Thus, some of the features have been altered. That is what Howlett did in creating her survey. Id. ¶ 19. The Hauser Report further explains that when conducting such a survey, it is important that the alternative products be presented in the same manner to avoid creating a "demand artifact." Such an effect can occur when respondents can infer what question the survey is considering and what answer the party making the survey would like to receive from respondents. Id. ¶¶ 35-38. Hauser contends that, because Howlett failed to place the images on equal footing, the survey results were biased and unreliable.

---

[6]   Defendant states that such an alternative claim about the health benefits of the product could have been created based on language that has been approved by the FDA's determination. As noted above, the FDA determined that "the current scientific evidence is appropriate for considering the exercise of enforcement discretion with respect to a qualified health claim concerning the relationship between 100% whey protein partially hydrolyzed infant formula and reduced risk of atopic dermatitis for a specific infant population who is fed such formula during a specific period of time." Dkt. 28-2 at 2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

### CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | | Date | August 9, 2017 |
|----------|------------------------|--|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | | |

As noted, Howlett's survey considered four combinations of package containers and labels, some of which featured the representation that the product reduced the risk of developing allergies. Dkt. 220-3 at 9-10. These combinations were presented through the following images:







*Id.*

Among the products presented to the survey participants, some included the following sticker:



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

*Id.* Defendant argues that by using this label, Howlett gave the allergy-related representations undue prominence, which created bias. Hauser also states that Howlett failed to test the 1st And Only Label against certain other functional product attributes that are relevant to the value of an infant formula, including nutritional benefits, whether ingredients are all-natural or organic, and whether the formula is recommended by doctors. Dkt. 218-6 ¶¶ 44-45. Hauser argues that this likely inflated the importance of the 1st & Only Seal.

In response to these concerns, Hauser

> designed a study that invited respondents to take a replicated version of Dr. Howlett's survey, and observed and interviewed respondents to learn about to what extent -- if any -- they were affected by demand artifacts [(i.e. asking questions that allow respondents to guess the purpose of the survey), priming, an unrealistic purchase decision context, and the effects of not holding constant those features that mattered to their decisions.

*Id.* ¶ 61.

Based on the results of this study, Hauser concluded that Howlett's survey was biased because it implicitly encouraged participants to "recognize and make choices with the yellow sticker in mind." *Id.* ¶¶ 65-68. Hauser also identified other deficiencies, including "presenting price in a manner that consumers do not understand, and asking questions that enable respondents to infer the purpose of the survey . . . ." *Id.* ¶ 76.

Plaintiff responds that the labeling and container type were choices made by Defendant. This made it appropriate for Howlett to measure price premiums based on label design, container type and representations about health benefits. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████.[7] These facts support the admission of the challenged report.



[7] ██████████████████████████████████████████

Declaration of Matthew I. Kaplan, Exhibit A, Page 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

For these reasons, there is not a sufficient showing of bias to warrant the exclusion of the survey or the resulting opinions by Howlett. This is another matter in which the objection goes to the weight, not admissibility of the proffered evidence.

> d)   Failure to Account for Product Attributes

Defendant argues that Howlett's analysis failed to consider all attributes that might influence purchasing decisions. Dkt. 218 at 18. As noted, Howlett tested for only three attributes: (i) price; (ii) container/label type; and (iii) the allergy claim. Defendant argues that the decision by an actual consumer whether to purchase a particular product is influenced by factors including, "digestibility; nutritional benefits; whether ingredients are all-natural, not genetically modified, or organic; and whether the formula is recommended by doctors." *Id.* at 19. These were factors cited by respondents in Hauser's replica study as relevant to their purchasing decisions. Dkt. 218-6 ¶¶ 77-78. Defendant contends that Howlett's study was not appropriate, and it results unreliable, because respondents were presented with unrealistic choices, thereby skewing the results of the study to show an unrealistically high estimate of premium paid for the 1st And Only Label.

Defendant also argues that actual market pricing belies the claims made based on the survey. Thus, the typical retail price for Good Start Gentle has not changed since the 1st And Only Label was removed. Dkt. 218 at 20. Defendant's Associate Director of Customer Analytics, Russ Levitan, declares that Good Start Gentle's prices are normally set at parity with those of its competitors Similac ® and Enfamil ®. Levitan Decl., Dkt. 218-25 ¶ 19.

In response, Plaintiff has submitted circumstantial evidence suggesting that health claims related to allergies were a prominent element in Defendant's marketing and sales strategy. Plaintiff has also cited consumer research conducted by a retained expert, Maronick.

Once again, the evidence is sufficient to allow its consideration. The objections go to weight, not admissibility.

*          *          *

Defendant has not shown grounds to exclude the Howlett Report under Rule 702. Howlett's study is premised on sufficiently valid methods for surveying customers and determining potential price premiums. Howlett's professional qualifications have not been challenged. Consequently, as noted above, Defendant's objections go to weight and not admissibility of the Howlett Report. That it is admissible under Rule 702 does not, however, require accepting its conclusions in considering methods for calculating alleged class wide damages or whether the Class should be decertified. Those issues are addressed below. *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1074 (C.D. Cal. 2015). For these reasons and those stated above, the Motion to Exclude is **DENIED** as to the Howlett Report.

Declaration of Matthew I. Kaplan, Exhibit A, Page 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

2.       Objections to Supplemental Report

Defendant argues that Supplemental Report of Howlett is not based on any econometric analysis, but instead on a simple review of documents. Defendant argues that Howlett has no unique qualifications that make her more capable than a layperson to do this analysis. It also identifies an apparent error in her interpretation of a document produced by Defendant, and filed under seal.[8] Furthermore, Defendant argues that the documents Howlett analyzed in the Supplemental Report are irrelevant because none is directly related to the 1st And Only Label.

Defendant's arguments are unpersuasive. As noted, Howlett is a well-credentialed professor with expertise in marketing research, consumer behavior, integrated marketing communications and public policy. Her qualifications are directly relevant to the evaluation of internal marketing documents, like those assessed in the Supplemental Report. This conclusion is not changed by her apparent error in interpreting one of them.

For the foregoing reasons, the Motion to Exclude is **DENIED** as to the Howlett Supplemental Report; provided however, its Paragraph 10 is excluded from consideration in connection with the analysis in this Order.

**V.     Motion to Decertify**

**A.     Background**

Fed. R. Civ. P. 23(b)(3) provides that a class may be certified only if a "court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This predominance requirement includes the requirement that when damages are sought on a common basis, they must also be demonstrably calculable by common proof. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). At the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case . . . [and] courts must conduct a rigorous analysis to determine whether that is so." *Id.* at 1433 (internal quotation marks omitted).

In support of the motion for class certification, Plaintiff supported its argument as to predominance through a declaration of Howlett, and her testimony regarding the reliability of conjoint analysis. Howlett proposed several methods for a class-wide determination of any premium that members of the then

---
[8] ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

CV-90 (10/08)                          CIVIL MINUTES - GENERAL                          Page 19 of 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

putative class paid due to Defendant's allegedly misleading representations about Good Start Gentle. Dkt. 220-2. These included the following:

- *Conjoint Analysis*: "a widely used and accepted form of quantitative consumer preference measurement, often used in marketing research to determine how much each feature of a product contributes to overall preferences." *Id.* ¶ 23. Howlett stated that "[t]he most commonly used form of conjoint analysis for marketing research is Choice-based Conjoint ("CBC"), in which consumers are shown sets of products ("choice sets") and are asked to select one in response to a question posed by the survey." *Id.* ¶ 29. For example, a choice based conjoint analysis of car options may include cars in choice sets with the following attributes and levels: sunroof (with levels of "with" and "without") and color (with levels of "red," "white," and "blue"). *Id.* Howlett stated that she was an expert in conjoint analysis. *Id.* ¶ 19.

- *Hedonic Regression*, or "Regression Analysis": "an econometric tool that identifies and quantifies the relationship between two or more variables. Regression analysis seeks to identify the variation in the so-called 'dependent variable' (such as the price of formula) through its relationship with one or more 'independent' or 'explanatory' variables (such as whether or not an infant formula is organic)." *Id.* ¶ 51. "Hedonic regression is an application of standard regression techniques that measures the value of various product attributes. Hedonic regression is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility, i.e., consumers will pay a certain amount for each product attribute." *Id.* ¶ 53.

Howlett declared that each of these methods can be used to calculate the amount of any price premium paid for consumer goods. *Id.* ¶ 22. She also declared that the data necessary to conduct a Regression Analysis was readily available from sources including Symphony IRI or Nielsen. *Id.* ¶ 65. Once the price premium was determined through such analyses, Howlett stated that class damages could be calculated in a straightforward manner that could be applied to specific geographic areas and time periods. *Id.* ¶¶ 68-71.

In support of Defendant's opposition to the motion for class certification, its retained expert, Dov Rothman, opined that the methods for calculating damages proposed by Howlett were inadequate. Based on Rothman's opinions, Defendant argued that conjoint analysis fails because it measures "consumers' *willingness to pay* a premium for a particular attribute without any evaluation of whether, under marketplace conditions, consumers ever have an *opportunity to pay* such a premium." Dkt. 100 at 23 (emphasis in original). Defendant added that conjoint analysis fails "to account for many supply-side factors that determine what prices are available to consumers[.]" *Id.* at 23.

The Class Certification Order considered these arguments as well as the related issue of predominance. It concluded that:

> Plaintiff has demonstrated that damages may be calculated on a class[-]wide basis. Further, . . . issues as to damages calculations do not bar class certification. Consistent with the requirements of *Comcast* Plaintiff has presented a method for calculating

Declaration of Matthew I. Kaplan, Exhibit A, Page 21

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

damages that is tied to the theory of liability. She contends that each class member paid more for Good Start Gentle because of the Allergy Misrepresentation. From this she argues that damages can be measured by applying the analytical methodology proffered by Howlett. This dollar amount can then be multiplied by the number of units purchased by each class member to determine both total and individual damages. Although Defendant presents the competing opinions of Rothman, "where a court is confronted with two opposing expert analyses or econometric models . . . the [c]ourt is not supposed to decide at the certification stage which expert analysis or model is better." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011). Further, even if individual issues as to damages were to arise, the case may be tried as to liability with a subsequent procedure used for the calculation of damages. *Jimenez*, 765 F.3d at 1168. Finally, as *in Brazil I* and *Guido*, Plaintiff here has not completed the damages calculations. But, this does not preclude a finding of predominance. The theories of liability and proposed methods for calculating damages are sufficient.

Dkt. 148 at 20.

Defendant argues that the Howlett Report conflicts with that finding of predominance.

**B.    Legal Standards**

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." *Ridgeway v. Wal-Mart Stores, Inc.*, 2016 WL 4529430, at *12 (N.D. Cal. Aug. 30, 2016). However, "[p]arties should be able to rely on a certification order and 'in the normal course of events it will not be altered except for good cause,' such as 'discovery of new facts or changes in the parties or in the substantive or procedural law.'" *Ramirez v. Trans Union, LLC,* No. 12-cv-00632, 2016 WL 6070490, at *2 (N.D. Cal. Oct. 17, 2016) (citing *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 409-10 (C.D. Cal. 2000)).

"The party seeking decertification bears the burden of demonstrating that the elements of Rule 23 have not been established." *Cole v. CRST, Inc.*, 317 F.R.D. 141, 144 (C.D. Cal. 2016) (citing *Weigele v. FedEx Ground Package Sys.,* 267 F.R.D. 614, 617 (S.D. Cal. 2010)); *Rosales v. El Rancho Farms, No. 09-cv-00707*, 2014 WL 321159, at *4 (E.D. Cal. Jan. 29, 2014) (This burden "'is relatively heavy' since any 'doubts regarding the propriety should be resolved in favor of certification'") (citing *Slaven v. BP America, Inc.*, 190 F.R.D. 649, 651 (C.D. Cal. 2000)). A court may consider evidence that goes to the requirements of Rule 23, but should not weigh competing evidence. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

Finally, as the Class Certification Order stated: "'damages calculations alone cannot defeat certification,' even if individual issues predominate." Dkt 148 at 18 (citing *Leyva v. Medline Indus.* Inc., 716 F.3d 510, 513 (9th Cir. 2013)).

---

Declaration of Matthew I. Kaplan, Exhibit A, Page 22

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

### C.    Application

#### 1.    Requirements of *Comcast*

Defendant argues that its objections to the Howlett Report, which are addressed above in connection with the Motion to Exclude, show why it cannot provide a basis for determining damages on a class-wide basis. Defendant argues that the absence of such a viable process requires decertification under *Comcast*. The Class Certification Order discussed this element of *Comcast*:

> Where damages are sought on a class-wide basis, it must be shown that their calculation is subject to common proof. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Such calculations "need not be exact." *Id.* However, at the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case . . . [and] courts must conduct a rigorous analysis to determine whether that is so." *Id.* at 1433 (internal quotation marks omitted). Still, "damage calculations alone cannot defeat certification," even if individual issues predominate. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167-68 (9th Cir. 2014); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir. 2010).

Dkt. 148 at 18.

In *Comcast*, the plaintiffs advanced four theories of antitrust liability based on the practice of "clustering," *i.e.,* concentrating operations within a particular region. They were as follows: (i) it made it profitable for Comcast to withhold local sports programming from its competitors, including direct broadcast satellite providers; (ii) it reduced the level of competition from "overbuilders," which are companies that build competing cable networks; (iii) it reduced the level of "benchmark" competition, which cable customers use to make price comparisons; and (iv) it increased Comcast's bargaining power with content providers. 133 S. Ct. at 1430-31. The district court accepted only the overbuilder theory of liability. *Id.* at 1431. However, the damages model at issue did not distinguish the claimed effect of any of the four theories of liability. *Id.* The Supreme Court concluded that the damages model did not "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *Id.* at 1435. Thus, it could not form the basis for certifying the overbuilding class under Rule 23(b)(3).

The present action is distinguishable from *Comcast*. Here, there is a single overarching theory of liability: the 1st And Only label on the Product misled consumers, causing them to pay an unwarranted premium for the products on which it appeared. Howlett's analysis was designed to calculate the amount of this premium by assessing the added value that consumers perceived as a result of the statements on the label.

Defendant contends that the study was poorly constructed. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015) ("The putative class's problem in Comcast was

Declaration of Matthew I. Kaplan, Exhibit A, Page 23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title | Oula Zakaria v. Gerber Products Co. | | |

that the damages model 'did not isolate damages resulting from any one theory of antitrust impact.'"). Even if it were determined that the Howlett Report presents an inaccurate calculation of the premium paid, this would affect the amount of damages. It would not necessarily warrant the decertification of a class for purposes of determining liability only, or a class seeking non-monetary relief. In such a context, the Howlett Report would remain relevant to show that consumers considered the alleged misrepresentations in the 1st And Only label in making purchasing decisions, which is relevant to whether that label was false or misleading.

This is consistent with the Class Certification Order, which concluded that Plaintiffs' damages model was not barred by *Comcast*, and acknowledged that such "[c]alculations need not be exact." Dkt. 148 at 18. The Ninth Circuit also applied *Comcast* in *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013), where it concluded: "unlike in Comcast, if putative class members prove [the defendant's] liability, damages will be calculated based on the wages each employee lost due to [the defendant's] unlawful practices." *Id.* at 514. The court noted that if an individualized inquiry into damages were held to preclude class certification, "it would effectively . . . sound the death-knell of the class action device." *Id.* (quoting *Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004 (2012)). Thus, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Id.*

2.   <u>Measure of Damages</u>

Although Plaintiff's proffered means of calculating damages is not barred by *Comcast*, it is still necessary to determine if the results of the conjoint analysis performed by Plaintiff provides an adequate basis to calculate damages. In the FAC, Plaintiff seeks relief on behalf of the class under the UCL and FAL for restitution and disgorgement (FAC at ¶¶ 94, 105, 115) and under the CLRA for actual, punitive and statutory damages. *Id.* at ¶ 124.

In their briefing, the parties use the terms "restitution" and "damages" interchangeably in discussing the quantifiable economic harm allegedly suffered by the class as a result of the purported misrepresentations. However, restitution is a distinct remedy that arises in equity.[9] Neither the FAL nor the UCL provides for an award of "actual damages." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 695 (2006). Rather, they provide for restitution, which is also called, "restitutionary damages." *Id.*

The CLRA provides for actual damages, equitable relief and punitive damages. *See* Cal. Civ. Code § 1780(a)(1), (3) and (4) ("Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following: (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000). . . . (3) Restitution of property. (4) Punitive damages."). The restitutionary remedies available under the UCL and the FAL "are

---

[9]  Because the parties refer to both the legal and equitable remedies available to members of the class as "damages," that term is used in this Order as any measurable economic harm. To the extent that it is necessary to distinguish between these two forms of relief, the legal remedy is referred to as "actual damages" and the equitable remedy is referred to as "restitution."

Declaration of Matthew I. Kaplan, Exhibit A, Page 24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

identical and are construed in the same manner." *Colgan*, 135 Cal. App. 4th at 695. (quoting *Cortez v. Purolator Air Filtration Prod.* Co., 23 Cal. 4th 163, 177 n.10 (2000)). *Colgan* observed that the restitutionary remedy under the CLRA should be interpreted in the same manner. *Id.*[10]

The parties agree that the measure of any monetary remedy available to the class is the amount of the price premium, if any, that was actually paid by class members due to the 1st And Only label. *See* Dkt. 148 at 18-19. In mislabeling cases, "restitutionary damages" and/or "price premium" are often used to refer to the difference between the price paid for a mislabeled product and the value of that product. *See, e.g., Trazo v. Nestle USA, Inc.*, 113 F. Supp. 3d 1047, 1052 (N.D. Cal. 2015) (citing *Brazil v. Dole Packaged Foods, LLC*, Case No. 5:12-cv-01831-LHK, 2014 WL 5794873, at \*5 (N.D. Cal. Nov. 6, 2014) ("[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received"); *Ivie v. Kraft Foods Glob., Inc.*, Case No. 5:12-cv-02554-RMW, 2015 WL 183910, at \*2 (N.D. Cal. Jan. 14, 2015) ("restitutionary damages [in a mislabeling case should] be the price premium attributable to the offending labels, and no more"); *Rahman v. Mott's LLP*, Case No. 3:13-cv-03482-SI, 2014 WL 6815779, at \*8 (N.D. Cal. Dec. 3, 2014) (the appropriate amount of restitution under a quasi-contract claim "will likely involve demonstrating what portion of the sale price was attributable to the value consumers placed on the" allegedly misleading labels).

Defendant argues that the results of Howlett's study cannot be used to calculate a monetary remedy. Thus, it contends that the study did not determine the price premium that Defendant charged for the 1st And Only label. Instead, Defendant contends that Howlett only evaluated consumers' subjective willingness to pay as an abstract concept. Defendant argues that because the study did not measure the actual price premium paid, it cannot be used as an accurate measure of damages.

Defendant cites several district court decisions to support its position. *In re NJOY, Inc. Consumer Class Litigation II*, 2016 WL 787415, at \*5-9 (C.D. Cal. Feb. 2, 2016), declined to certify a class of individuals who had purchased e-cigarettes whose packaging misrepresented information about certain health risks. *Id.* The plaintiff's expert proposed that damages could be calculated using a modified conjoint analysis. It was to focus on consumers' perceived valuation of a product, rather than the actual price paid in any given market. *Id.* The court found this method inadequate. *Id.* It stated that "[a] consumer's subjective valuation of the purported safety message, measured by their relative willingness to pay for products with or without the message is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the *true market price* of N-JOY e-cigarettes absent the purported misrepresentations." *Id.* at \*7 (emphasis in original);[11] *see also see also Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at \*12 (N.D. Cal. Mar. 6, 2014) (conjoint analysis could not be used to show a causal nexus between a particular characteristic and consumer demand because it "measures only demand for the patented features" in the hypothetical market created by the study and "does not account

---

[10] Although Plaintiff requests statutory damages under the CLRA, that relief is not available. *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 593 (C.D. Cal. 2011).
[11] In *NJOY II*, the court also rejected the plaintiff's proposed use of a hedonic regression model, finding, *inter alia*, that "the available products have not been sufficiently standardized to make reliable price comparisons across different brands." *NJOY II*, No. 2016 WL 787415, at \*8.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

### CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

for supply at all, much less the real-world intersection of market demand and market supply, which sets the real-world market price for the devices").

Defendant also cites *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014). There, the proposed class was comprised of consumers who had purchased an antidepressant with a label that allegedly misstated the risk of withdrawal symptoms. *Id.* The plaintiffs asserted that damages could be calculated by determining the subjective lost value to each consumer from purchasing a product that was less valuable than expected based on the labelling. *Id.* This lost value was to be calculated using conjoint analysis. *Id.* The court found that plaintiffs had not shown that damages could reasonably be calculated using this method, and declined to certify the proposed class:

> [The m]odel looks only to the demand side of the market equation. By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell).

*Id.* at *5. The court added that, because the prescription drug market was highly regulated, it was not an efficient one. Thus, it was not one in which the price paid by consumers would be expected to yield an approximation of the value they subjectively attributed to the challenged product. *Id.*

Other district courts have reached similar results. *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009) ("a proper measure of restitution" is the "difference between what the plaintiff paid and the value of what the plaintiff received"); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) (restitution in false advertising cases is properly calculated by "taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices"); *Lanovaz v. Twinings N. Am., Inc.*, No. C-12-02646-RMW, 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (proper measure of restitution is "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices").

Some district courts have certified classes in false advertising and similar cases where the plaintiffs used conjoint analyses to calculate the amount of a monetary remedy. *Guido v. L'Oreal, USA, Inc.* held that a proposed conjoint analysis was an appropriate method for determining whether a premium was paid for a product with an allegedly deficient warning about risk of flammability. No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *11-13 (C.D. Cal. July 24, 2014). As a result, the class was certified. *Id.*; *see also In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *16 (N.D. Cal. Sept. 14, 2016) (conjoint analysis "will allow the fact finder to calculate the diminution in value of Plaintiffs' vehicles" as a result of a faulty "infotainment" system); *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735-H-RBB, 2016 WL 7474790, at *9 (S.D. Cal. Sept. 14, 2016) ("[A] conjoint analysis is a generally accepted method for valuing the individual characteristics of a product.").

Declaration of Matthew I. Kaplan, Exhibit A, Page 26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

Some of the cases that have accepted the use of conjoint analysis explained that the specific, proposed analysis considered market factors. For this reason, it could reasonably be used to assess the actual value of the mislabeled product in the actual market, rather than in an abstract study environment. For example, *In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016), relied on a conjoint analysis model of damages in certifying a class of purchasers of Lenovo laptop computers that allegedly contained faulty software. It distinguished *NJOY* and *Saavedra* because the expert in *Lenovo* "consulted pricing of the Lenovo models at issue, as well as comparable PC laptops" to ensure that the results would "reflect the market." *Id.* at *21. The expert also "addressed 'the supply side' of the market, determining that it was not at issue 'because all sales of the laptop models at issue have occurred in the past.'" *Id.*

Another district court observed that "[m]arketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences." *ConAgra*, 90 F. Supp. 3d at 1026; *see also Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("numerous courts, including this one, have accepted both [Choice-Based Conjoint Analysis] and [Contingent Valuation Method] as reliable methodologies for calculating price premiums on a class[-]wide basis in consumer class actions."). *ConAgra* held that the amount of the claimed price premium for the attribute at issue could be used to calculate damages. *Id.* However, *NJOY I* distinguished *ConAgra* as having approved "the use of conjoint analysis *in conjunction with* a proposed hedonic regression that accounted for 'supply and market factors.'" *NJOY I*, 120 F. Supp. 3d at 1121 (emphasis in the original). Thus, the conjoint analysis was tethered to actual market values.

These issues were also addressed in the Class Certification Order. It concluded, based on Howlett's declaration, that a conjoint analysis had the potential to provide a measure of the amount of the premium paid for the product due to the 1st And Only Label. This would be a basis for a calculation of a remedy on a class-wide basis. Dkt. 148 at 20. That Order also stated that, even if the analysis did not generate a reliable measure of damages, the matter could be tried as to liability on a class-wide basis, with a subsequent procedure used for calculation of damages. *Id.*

Based on Howlett's completed analysis, and Defendant's objections, it does not present a reliable method for determination of the price premium. It does not reflect the actual difference, if any, between the amount paid for Good Start Gentle and its value in the market. Specifically, Plaintiff has failed to show that the methodology employed by Howlett sufficiently accounted for the actual price of Good Start Gentle, or the market conditions in which that product was sold. The conjoint analysis is not sufficiently tethered to actual market conditions, including pricing and premiums.

Although Howlett's model does not directly address actual pricing or sales factors in the market, Plaintiff has presented other evidence to address this issue. This includes Defendant's market share before and after the removal of the 1st And Only Label, and discussions of pricing and marketing presented in Howlett's Supplemental Report. Furthermore, Plaintiff asserts that the label, packaging and prices used in Howlett's survey closely approximated those in the market at the relevant time. However, Howlett did

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*REDACTED\*\***

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

not consider the actual prices paid by consumers for the product, or the preferences that consumers might have had for competing products that were available. The issues identified earlier in connection with the Motion to Exclude -- limited sample size and lack of market data or additional studies confirming the results, including a hedonic regression analysis -- also raise concerns about the reliability of the results for calculating restitution based on a premium paid.

Taking these factors into consideration, Plaintiff has not provided a means sufficient to calculate either actual damages or restitution. Actual damages have a specific definition under the CLRA. They are "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." *Colgan*, 135 Cal. App. 4th at 675. "The term 'actual value' . . . means market value." *Id.* For the reasons discussed above, market value has not been demonstrated adequately.

In contrast to actual damages, the discretion of courts to award restitution under the UCL, FAL and CLRA "is very broad." *Id.* at 695 (quoting *Cortez*, 23 Cal. 4th at 177). As a result, a trial court "could, when assessing *damages* under the CLRA, apply standards different from those the trial court might use when ordering *restitution* under the False Advertising or Unfair Competition Laws." *Id.* at 696 (emphasis in original). Generally, "[r]estitution is 'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (quoting *Cortez*, 23 Cal. 4th at 177). Further, the purpose of restitution is not limited to "returning to the plaintiff monies in which he or she has an interest." *Colgan*, 135 Cal. App. 4th at 675. Restitution may also serve to deter[] the offender from future violations." *Id.* However, the overarching "object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.* at 697. Thus, it "operates only to return to a person those *measurable amounts* which are *wrongfully taken* by means of an unfair business practice. *Id.* at 698 (emphasis in the original). Restitution must be supported by "substantial evidence." *Id.* at 700.

In *Pulaski & Middleman*, advertisers sought restitution from an internet search engine, which had sold the rights to place advertisements on websites. 802 F.3d. at 981-82. They argued that the defendant had misled them as to the types of websites on which the advertisements would appear. *Id.* The Ninth Circuit explained restitution as follows:

> Where a defendant has wrongfully obtained a plaintiff's property, "the measure of recovery for the benefit received . . . is the value of the property at the time of its improper acquisition . . . or a higher value if this is required to avoid injustice" where the property has changed in value. [*Colgan*, 135 Cal. App. 4th at 698] (quoting the Restatement of Restitution). Where plaintiffs are "deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." [*Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 329 (2011)] (emphasis in original). As the California Supreme Court explained while discussing economic harm in the context of standing, this measure "is the same whether or not a court might objectively view the products as functionally equivalent[. *Id.*]"

---

Declaration of Matthew I. Kaplan, Exhibit A, Page 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

*Id.* at 988-89.

The Ninth Circuit then concluded that "UCL and FAL restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Id.* at 989; *see also id.* ("the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information").

Under California law, restitution cannot be based solely on the money lost by the plaintiff if there is no showing of any corresponding gain by the defendant. In *Kwikset*, the California Supreme Court addressed claims for restitution by a consumer who purchased locksets that were allegedly falsely labeled as made in the USA. 51 Cal. 4th at 336. *Kwikset* held:

> Restitution under section 17203 is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.

*Id.* at 336. *Kwikset* added that "economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses." *Id.* Under those circumstances, plaintiffs could "seek an injunction against the offending business practice even in the absence of any basis for restitution." *Id.*

Howlett's conjoint analysis does not show what amount of money, if any, Defendant received as a result of its alleged misrepresentations. Rather, at most it bears only on the claimed loss to Plaintiffs. Thus, the evidence provided by Plaintiffs about their potential willingness to pay a premium due to the use of the 1st And Only Label is insufficient to establish a basis for calculating either restitution or actual damages.[12] Because predominance has not been shown with respect to remedies, the Motion for Decertification as to the damages class is **GRANTED**.

       3.    <u>Liability</u>

Plaintiff argues that even if the class is decertified as to damages, the class is appropriate for determining liability under Fed. R. Civ. P. 23(c)(4), with damages to be assessed in subsequent individualized

---

[12] In recent supplemental briefing (Dkt. 291-1), Plaintiff argues that, even if monetary relief is not available under the UCL, FAL and CLRA, it is appropriate as a remedy for the breach of express and implied warranties. *Id.* at 4-5. Plaintiff argues that unlike restitution, which is based on the amount that Defendant received due to false advertising, the measure of actual damages is the difference between "the value of the goods accepted and the value they would have had if they had been as warranted." *See Martin v. Monsanto Co.*, No. 16-cv-2168-JFW, 2017 WL 1115194, at *8 (C.D. Cal. Mar. 24, 2017). However, this Order discussed the availability of both actual damages and restitution.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | |

proceedings. This possibility was contemplated in the Class Certification Order, which stated that "even if individual issues as to damages were to arise, the case may be tried as to liability with a subsequent procedure used for the calculation of damages." Dkt. 148 at 20.

In the Ninth Circuit, "damage calculations alone cannot defeat certification." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). *Levya* noted that, in wage and hour class actions, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Id.* at 514 (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)). Accordingly, courts sometimes exercise their discretion under Fed. R. Civ. P. 23(c)(4) to bifurcate the liability and damages phase of a class action. This is true in non-wage and hour cases as well. For example, in *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231 (N.D. Cal. 2014), the court determined that it would certify a consumer class action based on an allegedly misleading "all natural" label as to liability only. *Id.* at 244. Damages were reserved for individual determination because Plaintiff had not shown that their proposed damages models were feasible. *Id.*; *see also Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 533 (C.D. Cal. 2015) ("[I]n a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.").

These cases are all distinguishable. Each contemplated a means to calculate individualized damages, albeit not one that allowed for damages to be calculated on a class-wide basis. In this action the barrier to certification is not the need for individualized inquiries into the *amount* of damages. Rather, it is failure of Plaintiff to provide reliable evidence of *any* damages suffered by herself or members of the class. Thus, even if the class were to prevail on liability, there would be no means to calculate damages either individually or for the class.

For the foregoing reasons, the class is decertified as to liability as well as damages.

**VI.     Motion for Summary Judgment**[13]

      **A.     Legal Standards**

A motion for summary judgment will be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with declarations, if any, show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Where the nonmoving party will have

---

[13] Defendant notes that courts ordinarily require that notice of class certification be given before adjudicating a motion for summary judgment, *See Schwarzchild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). Class notice has not yet been provided in this matter. Furthermore, as stated above, the class has been decertified. Therefore, the analysis that follows applies only to Plaintiff's individual claims, not to those of any members of the class previously certified.

Declaration of Matthew I. Kaplan, Exhibit A, Page 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**REDACTED**

### CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | Date | August 9, 2017 |
|----------|------------------------|------|----------------|
| Title    | Oula Zakaria v. Gerber Products Co. | | |

the burden of proof on an issue, however, the movant need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. Proc. 56(e).

Only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(c). However, in considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. All inferences are to be drawn in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). However, conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

    **B.**    **Application**

Defendant argues that summary judgment is appropriate as to all claims because, among other reasons, Plaintiff has not presented evidence sufficient to create an issue of material fact with respect to whether she paid a price premium. Plaintiff argues that the Howlett report provides such evidence on that topic. As noted, Howlett performed a choice-based conjoint analysis which, Plaintiff argues, establishes a price premium paid for the 1st and Only Label. Plaintiff argues that the Howlett report is further supported by the contents of certain of Defendant's internal documents that mention related pricing issues and may show that a premium was desired and may have been paid. These matters were discussed earlier. For the reasons stated above, the Howlett report does not provide a basis for calculating damages.

Plaintiff has also requested punitive and injunctive relief. "An injunction is unavailable when there is no threat that the misconduct is likely to be repeated in the future." *See In re Vioxx*, 180 Cal. App. 4th at 135. The Class Certification Order concluded that "the latest date that containers with the '1st and Only' seal could be found on shelves in California stores is April 23, 2016." Dkt. 148 at 11. Thus, there is no evidence that Plaintiff will or could be misled by such label in the future because there is no evidence that it is presently in use.

Finally, "[i]t is a well-settled rule that there can be no award of punitive damages without a finding of actual damages." *Contento v. Mitchell*, 28 Cal. App. 3d 356, 357 (Ct. App. 1972).

Therefore, because no relief is available to Plaintiff under either the FAL, the UCL or the CLRA, the Motion for Summary Judgment is **GRANTED**.

### VII.   Motion to Approve Class Notice

Because the Class has been decertified, the Motion to Approve Class Notice is **MOOT**.

Declaration of Matthew I. Kaplan, Exhibit A, Page 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**REDACTED**

CIVIL MINUTES - GENERAL

| Case No. | LA CV15-00200 JAK (Ex) | | Date | August 9, 2017 |
|---|---|---|---|---|
| Title | Oula Zakaria v. Gerber Products Co. | | | |

VIII. **Conclusion**

For the reasons stated in this Order:

1.   Plaintiff's Motion to Exclude is **DENIED**;

2.   Defendants' Motion to Exclude is **GRANTED IN PART** and **DENIED IN PART;**

3.   Defendant's Motion to Decertify is **GRANTED**;

4.   The Motion for Summary Judgment is **GRANTED**; and

5.   The Motion for Approval of Class Notice is **MOOT**.

On or before August 18, 2017, after meeting and conferring with Plaintiff's counsel to determine if the parties can agree as to the form of a judgment, Defendant shall lodge a proposed judgment that is consistent with the terms of this Order . The notice of lodging shall include whether the parties agree to the form of judgment or whether Plaintiff will be filing objections by August 25, 2017 in conformance with the Local Rules.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer   ak

Declaration of Matthew I. Kaplan, Exhibit A, Page 32