1
2
3
4
5
6
7                  **UNITED STATES DISTRICT COURT**
8            **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
9
10  CHAYLA CLAY *et al.*,                    Case No: 3:15-cv-00165-L- AGS
11                          Plaintiffs,      **<u>CLASS ACTION</u>**
        v.
12                                           **ORDER (1) GRANTING IN PART
    CYTOSPORT, INC.,                         AND DENYING IN PART
13                                           PLAINTIFFS' MOTION FOR
                                             CLASS CERTIFICATION; AND
14                          Defendant.       (2) GRANTING IN PART AND
                                             DENYING IN PART
15                                           DEFENDANT'S MOTION TO
                                             EXCLUDE EXPERT TESTIMONY**
16
17
18          Pending before the Court is Plaintiffs' motion for class action certification.

19  Defendant filed an opposition, and Plaintiffs replied.  As part of opposition to

20  Plaintiffs' motion, Defendant filed a motion to exclude the testimony of Plaintiffs'

21  expert Elizabeth Howlett, Ph.D.  Plaintiffs opposed the motion and Defendant

22  replied. [1]  This matter is submitted on the briefs pursuant to Civil Local Rule

23  7.1.d.1.  For the reasons which follow, Plaintiffs' motion for class certification is

24  granted in part.  Defendant's motion to exclude Dr. Howlett's testimony is granted

25  in part for purposes of class certification only.

26  _____
27  [1]      Not counting exhibits which were filed non-electronically and several
    motions to file documents under seal, the parties filed in excess of 4,000 pages of
28  briefing and exhibits.

# I.   BACKGROUND

Plaintiffs are consumers who purchased Defendant's protein shake and/or protein powder products.  They allege that (1) the Nutrition Facts panel and packaging of some of Defendant's ready-to-drink protein shake products overstated the amount of protein content; (2) the Ingredients section on the labels of their Muscle Milk protein powder products included amino acid L-glutamine, L-glutamine was also listed as an ingredient of the "Precision Protein Blend" elsewhere on the labels, and an L-glutamine molecule was shown on a chart of the amino acid profile for some of the products, implying that L-glutamine was included in its unbonded form, when none was included; and (3) prominently displaying on its Muscle Milk protein powder packaging that the product was "lean" or contained a special blend of "Lean Lipids," when the products contained oils and were no leaner than other protein powders on the market which were not marketed as "lean."

Plaintiffs contend that Defendant's product labeling is false and misleading in violation of California, Florida and Michigan state consumer protection laws. After Defendant's summary judgment motion was granted in part, the following claims remain: violation of California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* ("FAL"); violation of California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 ("CLRA"); violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* ("FDUTPA"); violation of Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1)(c) ("MCPA"); and breach of express warranty under California Uniform Commercial Code - Sales, Cal. Com. Code § 2313.  Plaintiffs seek, among other remedies, injunctive relief and restitution.

/ / / / /

Plaintiffs move for class action certification under Federal Rule of Civil Procedure 23(b)(3). They seek to certify two nationwide classes, one for the purchasers of Defendant's liquid shakes, and the other for protein powder purchasers defined as follows:

> All persons in the United States who, within four (4) years of the filing of this Complaint, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake.

> All persons in the United States who, within four (4) years of the filing of this Complaint, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; and High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); and the [sic] size Monster Milk: Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products).

(Doc. no. 157 (notice of mot.) at 2.)[2] Plaintiffs request that the nationwide classes be certified for UCL and FAL violations. (*Id.*)

Plaintiffs also move for certification of subclasses for California, Florida and Michigan residents under each state's consumer protection statutes, as well as the Magnuson-Moss Warranty Act, 15 U.S.C. §§2301 *et seq.* ("MMWA"). (Doc. no. 157 at 2-4.) Like the nationwide classes, there are two subclasses for each state, one for the liquid shake purchasers and the other for protein powder purchasers. The respective lists of relevant products are the same as for the nationwide classes. (*See id.* at 3-4.)

/ / / / /

---

[2] With the exception of deposition transcripts, all page references in citations to docketed documents are to the page numbers assigned by the ECF system.

## II.   DISCUSSION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks and citation omitted). A party seeking class certification must be prepared to prove that it meets the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The district court must conduct a rigorous analysis to determine whether these prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). The moving party "must . . . satisfy through evidentiary proof" Rule 23 requirements. *Comcast*, 569 U.S. at 33. Accordingly, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (internal quotation marks and citation omitted), and it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Falcon*, 457 U.S. at 160, which may "entail some overlap with the merits of the plaintiff's underlying claim," *Dukes*, 564 U.S. at 351. If a court is not fully satisfied that the requirements of Rules 23(a) and (b) are met, certification should be denied. *Id.* at 161. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S 455, 466 (2013).

/ / / / /

- 4 -

## A.     Rule 23(a) Requirements

"Rule 23(a) ensures that the named plaintiff is an appropriate representative of the class whose claims he or she wishes to litigate.  The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (internal quotation marks and citations omitted).  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, she or he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id*. at 350 (emphasis in original).

### 1.     Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003).  The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required.  *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994).  Rather, whether joinder is impracticable depends on the facts and circumstances of each case.  *Id.*  Plaintiff has shown that several million of Defendant's products were sold in California alone during the relevant time.  Defendant does not dispute that this is sufficient to meet the numerosity requirement, and the Court finds that this requirement is met.

Defendant claims, however, that the putative class members are not "ascertainable."  It makes four arguments.  First, Defendant argues that Plaintiffs' proposed "class definitions embrace many consumers who do not have valid claims" in that some putative members have no standing because they suffered no injury, and would therefore have to be individually screened out of the class.  (Doc. no. 170-1 (opp'n) at 56.)  To the extent the argument is directed at the class

definition, it was rejected in *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017). At class certification stage, it is sufficient that the class be defined by an objective criterion, *i.e.,* whether the class members purchased the relevant products. *See id.* at 1124 (affirming decision to the same effect). This is met here, because Plaintiffs list the relevant products in the definition of each proposed class.

To the extent the argument is directed to standing specifically, it is also rejected. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). Defendant attacked each class representative's standing in its summary judgment motion. The Court concluded that all class representatives had standing at least as to some of their claims. (Doc. no. 209 (order) at 4-8.)

To the extent Defendant suggests that the class definition is overbroad because it may potentially contain some members who were not injured, the issue is better addressed in terms of the predominance requirement under Rule 23(b)(3). *Briseno*, 844 F.3d at 1125 n.4 (citing *Torres v. Mercer Canyon, Inc.,* 835 F.3d 1125, 1136-39 (9th Cir. 2016)). Moreover, as a practical matter, overinclusiveness in class actions involving low-cost consumer goods presents a low risk of fraudulent or mistaken claims, "perhaps to the point of being negligible" because they generate "consistently low participation rates," which makes it "very unlikely that non-deserving claimants would diminish the recovery of participating, bona fide class members." *Id.* at 1130 (internal quotation marks, citation and footnote omitted).

Second, Defendant contends that "Plaintiffs' class definitions are unworkable because the members cannot be reliably identified," as "[m]ost customers do not remember the specific types of products they bought or when they purchased them." (Doc. no. 170-1 at 57.) Defendant concedes that this argument was rejected in *Briseno* (*id.* at 58 n.51), which held that Rule 23 does not require the

class representative to prove an "administratively feasible" way to identify each putative class member.  844 F.3d at 1128-29.  "[N]either Rule 23 nor the Due Process Clause requires actual notice to each individual class member," but allow for "notice by publication . . ., or even at an appropriate physical location," *id.* at 1128-29, to the members who cannot "be identified through *reasonable* effort," Fed. R. Civ. Proc. 23(c)(2)(B) (emphasis added).

Third, Defendant maintains that the class settlement in *Delacruz v. CytoSport,* U.S. Distr. Ct. N.D. Cal. case no. 11cv3532, "released any claims based on the protein present in Muscle Milk shakes sold between July 18, 2007 and December 31, 2012."  (Doc. no. 170-1 at 57.)  The settlement agreement and the order granting final approval of settlement each include a broad release clause, which apparently intended to preclude claims such as the claims asserted in this action.  (*See Delacruz,* doc. no. 67-1 (first am. settlement agreement) at 6-7 & 16-17; doc. no. 91 (order) at 13-15.)  However, a class action settlement's "bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so."  *Hesse v. Spring Corp.,* 598 F.3d 581, 590 (9th Cir. 2010).

> A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action.

*Id.* (internal quotation marks and citations omitted).  The claims asserted in this action are not based on the "identical factual predicate" as *Delacruz*.  *Delacruz* was not directed at any representations made with respect to Defendant's protein powders, and to the extent it was directed at the liquid shakes, it did not attack representations regarding the quantity of protein.  (*See Delacruz,* doc. no. 185-14

/////

(second am. compl.); doc. no. 67-1 at 2, 11-12; doc. no. 91 at 4, 7-8.)  Accordingly, *Delacruz* does not limit the scope of the class proposed in this action.

Fourth, Defendant argues that the label for Monster Milk: Lean Muscle Protein Supplement, a protein powder, was changed during the proposed class period to exclude the reference to "Lean Lipids."  Defendant argues that individuals who purchased this product after the label change "cannot be included in any class."  (Doc. no. 170-1 at 57.)  Although Defendant is correct that the reference to "Lean Lipids" was removed, other allegedly misleading references to "lean" remained.  (Doc. no. 157-22 (Kashima Decl. App'x A); *cf id.* at 2-15 (referencing "Lean Lipids") & *id.* at 16-17 (no longer referencing "Lean Lipids," but including the claims "new leaner formula," "lean protein," and "lean muscle protein supplement").)  Accordingly, the removal of "Lean Lipids" from some of the labels has no effect on class certification in this action.

### 2. Commonality Under Rule 23(a) and Predominance Under Rule 23(b)(3)

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To meet this requirement, the putative class members' claims must depend on a common contention, which must be of such nature that it is capable of class-wide resolution.  Decision on the contention must

> resolve an issue that is central to the validity of each one of the claims in one stroke.  [¶]  What matters to class certification is not the raising of common "questions" . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted).

/ / / / /

- 8 -

Similarly, the predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). Unlike Rule 23(a)(2), which is met when there is "even a single common question," *Dukes*, 564 U.S. at 359 (quotation marks and brackets omitted), Rule 23(b)(3) requires that "common questions *predominate* over any questions affecting only individual class members." *Amgen*, 568 U.S. at 469 (internal quotation marks and citation omitted, emphasis in original).

Because "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions[,]" *Amchem*, 521 U.S. at 609, *see also id*. at 623, the Court considers these requirements – commonality and predominance – together. The predominance inquiry begins "with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 809 (2011).

Defendant argues that certification should be denied because the alleged claims are "idiosyncratic individual claims." (Doc. no. 170-1 at 37.) With respect to the protein powder products, "no one cared about" the L-glutamine and "lean" representations, and each consumer purchased the products for his or her own individual reasons. (*Id.*) With respect to the protein shake products, according to Defendant, Plaintiffs cannot prove a "common shortfall" for the protein content statement, because any such shortfall differs among the various protein shake formulations. For all products Defendant attacks Plaintiffs' proposed method of calculating damages on a class-wide basis. (*Id.* at 50.) Finally, Defendant argues that a nationwide class cannot be certified because of individual choice of law questions. (*Id.* at 35-37.) These arguments are addressed below.

/ / / / /

### a. Warranty Claims

Plaintiff seeks certification of the MMWA claim for the California, Florida and Michigan subclasses. (Doc. no. 157 at 2-3.) This claim was dismissed in the order granting in part Defendant's summary judgment motion. (Doc. no. 209 at 10-12.) Accordingly, the request to certify the MMWA claim is denied as moot.

Plaintiffs' intent with respect to the state law claims for breach of express warranty is unclear. In the notice of motion, Plaintiffs state that if their MMWA claim is not certified, they seek to certify the state law warranty claims. (Doc. no. 157 at 3 n.2.) However, Plaintiffs do not brief certification of these state law claims, although they refer to them in two footnotes. (Doc. no. 157-1 at 32-33 n. 14 & 15.) They also state that they "only move for certification of their MMWA claims at this time." (*Id.* at 34 n.16.) Their intent regarding certification of the state law breach of express warranty claims is therefore unclear.

To the extent Plaintiffs may have intended to certify these claims, the issue is moot as to the Florida and Michigan claims, which were dismissed at summary judgment. (*See* doc. no. 209 at 8-10.) As to the California claim, Plaintiffs do not meet their burden.

Defendant argues that Plaintiffs cannot meet the predominance requirement because breach of express warranty requires individual proof of reliance and causation. On summary judgment, the Court determined that California law does not require proof of reliance. (Doc. no. 209 at 10 (citing Jud. Council of Cal. Civ. Jury Instr. ("CACI") no. 1230 cmt (2017) (quoting *Hauter v. Zogarts*, 14 Cal.3d 104, 115 (1975)); Cal. Comm. Code § 2313(1) & Cal. Code Cmt. 2).) However, it requires proof of causation. CACI no. 1230 ¶6 ("That the failure of the [product] to be as represented was a substantial factor in causing [plainitff]'s harm."). Plaintiffs do not address causation for this cause of action. (*See* docs. no. 157-1, 185.) Accordingly, to the extent Plaintiffs request that the California subclass

include a claim for breach of express warranty, their motion is denied for failure to properly support it.

b.   <u>California Consumer Protection Claims</u>

i.   *Elements*

Plaintiffs allege false or misleading statements on Defendant's product labels in violation of the UCL,[3] FAL[4] and CLRA, Cal. Civ. Code § 1770(a)(5).[5]

> The standard for determining whether a defendant misrepresented the characteristics, uses or benefits of goods and services under Civil Code section 1770, subdivision (a)(5) is the same as that for determining whether there was false advertising under the UCL and false advertising law.

---

[3]   The UCL provides in pertinent part:

unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

Cal. Bus. & Prof. Code § 17200.

[4]   The FAL provides in pertinent part:

It is unlawful . . . to make or disseminate . . . in any . . . advertising . . . or in any other manner or means whatever . . . any statement, concerning . . . personal property . . ., which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . ..

Cal. Bus. & Prof. Code § 17500.

[5]   The pertinent CLRA provision reads,

The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: . . .

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

Cal. Civ. Code § 1770(a)(5).

- 11 -

*Chapman v. Skype, Inc.,* 220 Cal. App. 4th 217, 230 (2013); *see also Williams v. Gerber Prods Co.,* 553 F.3d 934, 938 (9th Cir. 2008) (am. Dec. 22, 2008). In this regard, "it is necessary only to show that members of the public are likely to be deceived." *Tobacco II Cases*, 46 Cal.4th 298, 312 (2009) (internal quotation marks, brackets, ellipsis and citation omitted). The "focus is on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Id.* at 312; *see also id.* at 324. Accordingly, no individualized proof is required to show deceptiveness.

In class actions alleging UCL and FAL violations, once a class representative establishes statutory standing,[6] injunctive relief and restitution are "available without individualized proof of deception, reliance and injury." *Tobacco II Cases*, 46 Cal.4th at 319-20.

The CLRA claim requires the additional "showing of actual injury as to each class member." *Steroid Hormone Prod. Cases,* 181 Cal. App. 4th 145, 155 (2010); *see also id.* at 156 (discussing Cal. Civ. Code § 1780(a) ("Any consumer who suffers any damage as a result of the use . . . of a . . . practice declared to be unlawful by Section 1770 may bring an action . . . .")). However, injury, as well as reliance and causation, can be proved "by showing that the alleged misleading statement was material, even if [Defendant] might be able to show that some class members would have bought the products even if they had known [the representation was false]." *Steroid Prod. Cases,* 181 Cal. App. 4th at 156-57. "Materiality of the alleged misrepresentation generally is judged by a 'reasonable man' standard. In other words, a misrepresentation is deemed material if a

---

[6]     Defendant's contention on summary judgment that Plaintiffs could not establish statutory standing because they did not rely on Defendant's representations was granted in part and denied in part. (Doc. no. 209 at 5-8.) Nevertheless, there remains a named Plaintiff with statutory standing for each consumer protection claim as to each allegedly misleading statement. (*Id.*)

reasonable man would attach importance to its existence in determining his choice of action in the transaction in question . . .." *Id.* at 157 (internal quotation marks, brackets and citation omitted).

ii.　*Class Member Reliance and Causation --
L-glutamine and "Lean" Statements on Protein
Powder Labels;* <u>Daubert</u> *Motion*

Defendant argues certification should be denied because Plaintiffs presented no proof that the L-glutamine and "lean" statements were deceptive. (Doc. no. 170-1 at 42, 45.) As discussed above, for all three California consumer protection claims, the issue is decided on a class-wide basis, regardless of each individual consumer's understanding. *See Tobacco II Cases*, 46 Cal.4th at 312 ("it is necessary only to show that members of the public are likely to be deceived"); *see also Chapman,* 220 Cal. App. 4th at 230 (same standard applies to UCL, FAL and CLRA claims); *Williams,* 553 F.3d at 938 (same). Moreover, it is not necessary to prove actual falsity, it is sufficient to prove that the representation, "although true, is either actually misleading or . . . has a capacity, likelihood or tendency to deceive or confuse the public." *Chapman*, 220 Cal. App. 4th at 226 (internal quotation marks and citations omitted); *see also Tobacco II Cases*, 46 Cal.4th at 312. Whether Plaintiffs are successful in proving deceptiveness or not, the outcome of this issue affects the claims on a class-wide basis. The merits of this issue therefore do not preclude class certification. Accordingly, it is neither necessary nor appropriate for the Court to decide it at this stage. *See Amgen,* 568 U.S at 466.

Defendant next maintains that individual "proof of causation and thereby reliance" is required. (Doc. no. 170-1 at 39.) The argument is based on the premise that to avoid individual proof of causation, Plaintiffs must show that the "lean" and L-glutamine representations were material to the class members. This

is not required for the UCL and FAL claims, but is required for the CLRA claim. *See Steroid Prod. Cases,* 181 Cal. App. 4th at 156-57.

In support of their contention that the L-glutamine and "lean" representations are material, Plaintiffs primarily rely on their marketing expert Elizabeth Howlett, Ph.D. (Doc. no. 157-8 ("Howlett Report") at 8.) Defendant moves to exclude Dr. Howlett's opinions as inadmissible under Rule 702 of the Federal Rules of Evidence. (Doc. no. 170-1 at 59.) For the reasons stated below, Defendant's *Daubert* motion is granted in part.

The party offering evidence bears the burden of showing that the evidence is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). Accordingly, Plaintiffs bear the burden of showing that Dr. Howlett's materiality opinions are admissible. To be admissible, among other things, expert opinion must be based on sufficient facts or data. Fed. R. Evid. 702(b).

Dr. Howlett based her opinion on two factors -- role of L-glutamine in muscle recovery and immune system function, and Defendant's own marketing research. (Howlett Report at 8; *see* Videotaped Deposition of Dr. Elizabeth Howlett ("Howlett Depo.") at 30-35; *see also id.* at 21.)[7] Dr. Howlett did not cite any references for her opinions regarding the function of L-glutamine in the body, but relied on "common knowledge." (Howlett Depo. at 31-34; *see also* Howlett Report at 8.) However, she admitted that the effect of L-glutamine on the body was "out of [her] area of expertise." (Howlett Depo. at 37.) She also admitted that Defendant's marketing research materials referenced in her report were not referencing L-glutamine, but were more generally addressing protein content. (*Id.* at 32-35.)

/ / / / /

---

[7]    Excerpts from the Howlett Depo. were filed as doc. no. 170-4 (Kaplan Decl. Ex. F) and doc. no. 185-7 (Marino Decl. Ex. E). Throughout this Order, page references to deposition testimony are to the page numbers in the transcript.

Plaintiffs point to Dr. Howlett's deposition testimony that the primary source of the information she reviewed for her report was Defendant's own marketing research. (Doc. no. 185 at 26 (citing Howlett Depo. at 21).) The problem with this argument is that Dr. Howlett's report cites to only a few pages out of those documents (Howlett Report at 8), which do not address L-glutamine. (Howlett Depo. at 32-35). Based on the foregoing, Dr. Howlett's opinion that L-glutamine representations were material to the consumers is unsupported by sufficient facts or data. Defendant's motion to exclude this opinion is granted for purposes of the pending motion for class certification.

In addition to moving to exclude Dr. Howlett's opinions, Defendant offered the opinion of its marketing expert Ravi Dhar to argue that the L-glutamine representations were not material. (Doc. no. 170-1 at 43 (citing doc. no. 170-7 ("Dhar Report").) Dr. Dhar opined, based on a consumer survey he conducted, that "the overwhelming majority of the respondents do not even mention L-glutamine as a reason for buying the products." (Dhar Report at 10; *see also id.* at 10-13.)

Plaintiffs do not address Dr. Dhar's opinion. Instead, they offer evidence of their own independently of Dr. Howlett's opinion. They rely on, among other things, the deposition testimony of Adam Schrententhaler, Defendant's Director of Product Development (Transcript of the Testimony of Adam Schrententhaler ("Schrententhaler Depo.")),[8] and Defendant's own marketing research (doc. no. 170-38 through 40 (Kashima Decl. Exs. M-O)). (*See* doc. no. 185 at 19-20, 37.)

Adam Schrententhaler and his team formulated all Defendant's products, "created all the label content, [and] produced claim substantiation." (Schrententhaler Depo. at 13.) He testified it was Defendant's understanding that L-glutamine played a role for athletes in muscle maintenance or building. (*Id.* at

---

[8] Excerpts from the Schrententhaler Depo. were filed as doc. no. 157-26 and 157-32 (Kashima Decl. Exs. A & G).

124.) Defendant's marketing research shows that muscle maintenance and building were important to consumers who purchased protein supplements. (*See, e.g.,* Ex. N at 034911; Ex. O at 034303.)[9] L-glutamine content was specified, and its function for athletes was highlighted, on some of Defendant's protein powder labels. (Kashima Decl. Ex. K at 29-36 ("5g L-glutamine to enhance muscle tissue recovery/repair").) This evidence tends to show, independent of Dr. Howlett's opinions, that L-glutamine representations were material.

Plaintiffs contend that their evidence is sufficient to prevail on the predominance issue with respect to the L-glutamine representations. (Doc. no. 185 at 20.) They argue that materiality is a merits issue that should not be decided at the class certification stage. (*Id.* at 18.) According to Plaintiffs, the relevant inquiry is whether materiality can be proven on a class-wide basis and not whether the alleged misrepresentations were in fact material. (*Id.* at 20.) Citing *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1026 (9th Cir. 2008), Plaintiffs allow that "to the extent [they] must show some *prima facie* showing of materiality at class certification, '[s]urveys and expert testimony regarding consumer assumptions and expectations may be offered but are not required; anecdotal evidence may suffice.'" (Doc. no. 185 at 19 (emphasis in original) (quoting *Clemens*, 534 F.3d at 1026).)

*Clemens* did not address class certification. It held that to prevail on the issue of materiality at summary judgment, evidence of consumer assumptions and expectations may be sufficient to raise a genuine issue of fact. 534 F.3d at 1026.[10] Unlike summary judgment, prevailing on a motion for class certification requires the court to resolve any factual disputes necessary to determine whether class certification requirements are met. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). In *Ellis*, the district court decision was vacated because the

---

[9]     Page references are to the page numbers assigned by the parties in discovery.

[10]     The plaintiff's showing in *Clemens* did not suffice, however, and summary judgment was granted for the defendant. *Id.*

court did not resolve the factual dispute, presented through conflicting expert opinions, whether there was a nationwide common pattern and practice of alleged employment discrimination that could affect the class as a whole. This was required before the court could decide whether there was commonality of issues of fact or law for purposes of class certification. *Id.* at 98-84. *Ellis* expressly rejected the reasoning, relied upon by Plaintiffs here, that because both sides presented admissible evidence, a finding of commonality was appropriate. *Id.* at 984.

Materiality of the alleged misrepresentations is central to finding commonality and predominance, and therefore to class certification of the CLRA claim. If the alleged misrepresentations are material, individualized proof of reliance and causation is not required, and can be presumed on a class-wide basis. *Steroid Prod. Cases,* 181 Cal. App. 4th at 156-57. If they are not material, the claim does not necessarily fail, but individual proof of reliance and causation will be required for each would-be class member, thus precluding class certification.

Both parties presented admissible evidence tending to show that the L-glutamine representations were or were not material. *Ellis* requires the Court to resolve the factual dispute. Plaintiffs bear the burden to show that all requirements for class certification are met. This includes a showing of materiality. *See Comcast*, 569 U.S. at 33.

Plaintiffs do not address Dr. Dhar's opinion, but merely dismiss it as "some conflicting evidence" and argue that "Defendant's self-serving, post-dispute expert reports do not foreclose certification of the proposed Class." (Doc. no. 185 at 20.) Given admissible evidence on both sides of the materiality issue, which appears to be evenly balanced, Plaintiffs' arguments are insufficient to carry their burden of showing that the L-glutamine representations were material.

The parties also dispute whether Defendant's "lean" representations on the protein powder labels were material. Plaintiffs rely on Dr. Howlett's opinion that

"fat level of Lean Muscle Milk Products is material."  (Howlett Report at 8; *see also* Howlett Depo. at 37, 42-43.)  In this regard, Dr. Howlett's opinion was focused on the "Lean Lipids" representation on the product labels.  (Howlett Depo. at 42-43, 79.)  She based her materiality opinion on Defendant's marketing research which stated that weight loss management was important to consumers.  (Howlett Report at 8 (citing Ex. O at 34303); Howlett Depo. at 38, 42-43.)

Defendant criticizes this basis because the document considered by Dr. Howlett does not reference "Lean Lipids" and addresses a whole category of protein products on the market, not only Muscle Milk products.  (Doc. no. 170-1 at 46.)  This argument is rejected.  Defendant's research concluded that weight loss management was important to consumers.  (*See, e.g.,* Ex. O at 34303.)  It is therefore not a stretch to opine that consumers find fat content representations material.  It is undisputed that "Lean Lipids" refers to the fat in Defendant's product.  Defendant's motion to exclude Dr. Howlett's materiality opinion regarding "Lean Lipids" representation is denied.

In addition to attacking the admissibility of Dr. Howlett's opinion, Defendant relies on Dr. Dhar's report.  (Doc. no. 170-1 at 46.)  Based on a consumer survey, Dr. Dhar opined that the "lean" statements on the labels did not have an impact on the purchase decision.  (Dhar Report at 15-17.)

In response, in addition to Dr. Howlett's report, Plaintiffs point to Defendant's marketing research showing that a significant portions of consumers purchase protein powder for weight loss and weight management.  (*See, e.g.,* Ex. M. at 34847-48; Ex. N. at 34911.)  They do not address Dr. Dhar's report, however, other than to dismiss it in a summary fashion outlined in the context of L-glutamine representations above.  As noted, where both sides have come forward with admissible evidence of materiality, which appears to be evenly balanced, this

/ / / / /

is insufficient for Plaintiffs to meet their burden of showing, for purposes of class certification, that the "lean" representations were material.

For the foregoing reasons, Defendant's motion to exclude Dr. Howlett's opinion is granted insofar as she opined that the L-glutamine representations were material. This opinion is excluded for purposes of the pending class certification motion only. Defendant's *Daubert* motion is denied in all other respects. Plaintiffs failed to meet their burden, with respect to the CLRA claim only, that the L-glutamine and "lean" representations were material, and that causation can be proved on a class-wide basis. This precludes certification of the CLRA claim to the extent it is based on L-glutamine and "lean" statements on protein powder labels.

*iii.     Class Member Injury -- Protein Content Statements on Protein Shake Labels*

With respect to the protein shakes, Defendant argues that Plaintiffs cannot meet the predominance requirement because they "failed to offer any common evidence of injury," and because the parties would have to test each batch and bottle of the many formulations of protein shakes. (Doc. no. 170-1 at 49.) Individual proof of injury is not required for the class members to prevail on the UCL and FAL claims; however, it is required for the CLRA claim. *Steroid Prod. Cases,* 181 Cal. App. 4th at 155.

Defendant also argues that Plaintiffs used invalid methodology to test the protein content of the shakes. (Doc. no. 170-1 at 48-49.) Alternatively, it argues that protein content was not uniformly overstated, because in some instances it was accurately stated and in others it was actually greater than stated. (*Id.* at 49.) These arguments go to the issue whether Plaintiffs can prove deceptiveness of the protein content statement. As previously discussed, regardless of Plaintiffs'

/ / / / /

success or failure on this issue, the result applies to the class as a whole.[11]  *See Tobacco II Cases,* 46 Cal.4th at 312 ("members of the public are likely to be deceived"); *see also Chapman*, 220 Cal. App. 4th at 226 (not necessary to prove actual falsity).  As the issue does not preclude class certification, it need not, and should not, be decided at this stage.  *See Amgen*, 568 U.S at 466.

Defendant next contends that the claim should not be certified because Defendant offered many varieties of the protein shakes during the class period, and each variety had its own stated protein content and alleged shortfall.  (Doc. no. 170-1 at 47-49.)  Defendant maintains that this shows there is no "common shortfall" for all protein shake varieties.  (*Id.* at 48.)  Accepting at face value the contention that the discrepancy varies among the various shake formulations, and considering that the standard is whether "members of the public are likely to be deceived," *Tobacco II Cases*, 46 Cal.4th at 312, it is not fatal to class certification if the shortfall is not the same for each variety.

Although different products may have to be tested for protein content, Defendant's argument that each batch and bottle of each variety of the shake will have to be tested to determine whether the class members were injured (doc. no. 170-1 at 49) is rejected.  The parties stipulated for purposes of class certification that the amount of protein did not vary materially between different batches of the same product during the class period.  (Doc. no. 104 at 1.)  Further, Elizabeth Kimball, Defendant's nutritional scientist and compliance manager (Deposition of Elizabeth Willard Kimball, Ph.D. ("Kimball Depo.") at 45-46),[12] admitted that there were no variations with respect to the base product formula between various flavors of the same product.  (*See* Kimball Depo. at 45-46, 48-52.)

---

[11]      Defendant acknowledges this is a merits issue.  (Doc. no. 170-1 at 49 ("Plaintiffs' claims fail on the merits.").)

[12]      Excerpts from the Kimball Depo. were filed as doc. no. 157-33 (Kashima Decl. Ex. H.)

As Defendant itself suggests, a proper sampling method is sufficient to determine whether the actual protein content varies from the statements on the labels. (*See* doc. no. 170-1 at 49 n.38.) There is no dispute whether the alleged shortfall can be proved or disproved by sampling, but only as to the validity of the chosen sampling method. Methodology is relevant to the sufficiency, and potentially admissibility, of the evidence to prove deceptiveness, and need not be resolved for purposes of class certification. Defendant's argument that certification should be denied because Plaintiffs would have to make an individualized showing of protein content is rejected.

### iv.  Calculation of Damages

Defendant next contends that class certification should be denied based on *Comcast v. Behrend*, 569 U.S. 27 (2013), which held that "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir. 2013)(citing *Comcast,* 569 U.S. at 37-38). In *Comcast* the plaintiffs advanced four theories of antitrust liability, only one of which was approved for class treatment. *Comcast,* 569 U.S. at 35. The plaintiffs' proposed damage calculation would include damages caused by all four theories of liability combined. *Id.* at 36. The holding of *Comcast* is based on the "unremarkable premise" that if the plaintiffs prevailed, they would be entitled only to damages resulting from one theory of liability. *Id*. at 35. The Court concluded,

> It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible to measurement across the entire class for purposes of Rule 23(b)(3).

*Id.*

/ / / / /

Plaintiffs seek restitution.  (Doc. no. 157-1 at 28.)  "The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution."  *In re Vioxx Class Cases,* 180 Cal. App. 4th 116, 131 (2009).  Plaintiffs propose two alternative models of calculating damages stemming specifically from Defendant's protein, L-glutamine and "lean" representations.  To the extent these models attribute damages to each alleged misrepresentation separately, they comply with *Comcast.*

Defendant also argues that class certification should be denied because neither of the proposed damages models has been performed.  Defendant cites no binding authority holding that class certification should be denied unless the experts have already calculated damages,[13] especially when, as here, the parties bifurcated class certification and merits discovery.  (Doc. no. 170-4 (Kaplan Decl. Ex. H (Joint Rule 26(f) Report and Discovery Plan)) at 78.)  Plaintiffs filed expert declarations explaining their proposed models.

Plaintiffs propose conjoint analysis to calculate class-wide damages attributable to protein content statements on the protein shake labels, and L-glutamine and "lean" statements on the protein powder labels.[14]  Conjoint analysis is a quantitative consumer preference analysis used to measure the relative value of various product attributes.  (Doc. no. 157-8 ("Howlett Report") at 9.)  It has been used in marketing research since the 1970s.  (*Id.* at 10.)  Dr. Howlett opined that it is possible "to use the conjoint analysis to quantify the Price Premium associated with the allegedly false 'Protein, L-Glutamine, and Lean Claims' on a class-wide basis."  (*Id.* at 6.)

---

[13]    This issue was not an impediment to class certification in *In re Conagra Foods*, which considered at length proposed expert opinions regarding class-wide proof of damages.  90 F. Supp. 3d 945, 1025-32. 945 (C.D. Cal. 2015); *aff'd Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017).

[14]    Although class certification was denied for the CLRA claim based on the L-glutamine and "lean" statements, damages analysis is relevant to the UCL and FAL claims based on the same statements.

Dr. Howlett proposes to use the choice-based variant of the conjoint analysis. (*Id.* at 11.) In a choice-based conjoint analysis, the study respondents are presented with a product that has multiple options for each studied attribute, such as a specific number of car color options and whether the car has a sunroof. (*Id.* at 9.) The choices presented to the respondents have all combinations of the studied attributes. By analyzing the respondents' choices, it is possible to quantify the relative impact of each attribute on product preference, *i.e.*, the value of each attribute. (*Id.*) With statistical analysis, it is possible to derive the distribution of preferences across all respondents. (*Id.* at 11.) If one of the studied attributes is price or premium over average market price, the analysis can determine the dollar value of each attribute or the percentage of the average market price associated with each attribute. (*Id.* at 9, 12.)

For the pending case, Dr. Howlett proposes to use a national online survey directed to a sample of consumers who purchased one or more of relevant protein shake or powder products. (*Id.* at 12.) Defendant's shake products are to be used to study the importance of the protein amount, and the protein powder products to study L-glutamine and "lean" representations. (*Id.* at 13.) The study would ensure that the product attributes of the highest importance to the sampled consumers are included. (*Id.*) The responses will be statistically analyzed to determine the value of each of the three attributes, for example an additional gram of protein, presence or absence of L-glutamine and presence or absence of "Lean Lipids" statements. (*Id.* at 14-15.) The value of each additional increment of protein or presence of L-glutamine or "Lean Lipids" will be separately multiplied by total product purchases to arrive at class-wide damages. (*Id.* at 16.)

Defendant criticizes Dr. Howlett's proposed study by arguing that she "assumes the ultimate conclusion that consumers cared about and paid a price premium for the L-glutamine or Lean Lipids statements," because she intends to

include them in the conjoint analysis.  (Doc. no. 170-1 at 55.)  These attributes must be included, because they are the attributes studied by her analysis.  Dr. Howlett testified that if consumers are indifferent to these attributes, the result of the analysis would show it.  (*See* Howlett Depo. at 51-53.)  Defendant's argument omits the pertinent part of Dr. Howlett's testimony.  (*See* doc. no. 170-1 at 55 (citing Howlett Depo. at 51:24-52:14).)

Defendant further contends Dr. Howlett "does not know if she could obtain pricing data she needs."  (Doc. no. 170-1 at 56.)  Defendant misconstrues Dr. Howlett's deposition testimony about pricing data.  (*See* doc. no. 170-1 at 56 (citing Harris Depo. at 57-58).)  She testified she would use data from market research firms such as Information Resources, Inc. and Nielsen, which "almost certainly" is available.  (Howlett Depo. at 57-58.)  Nowhere in the cited deposition testimony did Dr. Howlett indicate she could not obtain the pricing data.  Furthermore, Defendants produced their sales data for each product relevant to this action by state and date.  (Doc. no. 157-1 at 41 n.25.)

Finally, Defendant argues that Dr. Howlett's analysis does not meet the *Comcast* requirement that damages be tied only to the liability theory at issue for class treatment.  Plaintiffs' L-glutamine claim is based on the contention that the protein powder products did not contain any appreciable amount of unbonded L-glutamine, as opposed to bonded L-glutamine.  Defendant contends Dr. Howlett does not explain how she will determine the value of the unbonded, as opposed to bonded, L-glutamine.  (Doc. no. 170-1 at 55.)  Plaintiffs' do not address this argument.  (*See* doc. no. 185 at 26, 29-31.)  Because damages must be based on the specific theory of liability, certification is denied as to the consumer protection claims based on L-glutamine statements.

As an alternative method of calculating damages attributable to protein content statements on protein shake products, Plaintiffs propose hedonic regression

- 24 -

analysis to be conducted by Jeffrey E. Harris, M.D., Ph.D. (*See* doc. no. 157-7 ("Harris Report") at 6.) Because Dr. Howlett's proposed conjoint analysis of the same statements is sufficient to meet Plaintiffs' burden to show that damages can be calculated on a class-wide basis, the Court need not address Defendant's criticisms of the alternative method.

For the foregoing reasons, Plaintiffs met the commonality and predominance requirements for (1) the UCL, FAL and CLRA claims to the extent they are based on statements of protein content on protein shake labels; and (2) UCL and FAL claims to the extent they are based on "lean" statements on protein powder labels.

### d. Florida Consumer Protection Claims

Plaintiffs allege that the false or misleading statements on Defendant's product labels also violated the FDUTPA, Fla. Stat. §§ 501.201 *et seq.* To prevail on this claim, a plaintiff must show that that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Fla. Offc. of Atty Gen. v. Commerce Comm. Leasing, LLC,* 946 So.2d 1253, 1258 (Fla. D. Ct. App. 2007) (internal quotation marks and citation omitted.) The plaintiff "need not show actual reliance on the representation or omission at issue." *Id.* (citation omitted). Defendant does not disagree. (*See* doc. no. 170-1 at 24.) This standard is the same as for the UCL and FAL claims. The measure of damages under the FDUTPA is the difference in the market value of the product as sold and the product as promised. *Ft. Lauderdale Lincoln Mercury, Inc. v. Corgnati,* 715 So.2d 311, 313-14 (Fla. D. Ct. App. 1998). It is the same measure as restitution under the UCL and FAL. Accordingly, for the reasons stated in the context of California consumer protection claims, Plaintiffs meet the commonality and predominance requirements for a FDUTPA violation based on the protein content statements on protein shakes and "lean" statements on protein powders.

/ / / / /

- 25 -

### e. Michigan Consumer Protection Claims

Plaintiffs allege that Defendant also violated the MCPA, Mich. Comp. Laws § 445.903(1)(c). The statute prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" defined in pertinent part as "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." *Id.* This provision is identical to the CLRA, Cal. Civ. Code § 1770(a)(5). As with California consumer protection claims,

> members of a class proceeding under the [MCPA] need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations.

*Dix v. Am. Bankers Life Assur. Co.*, 415 N.W.2d 206, 209 (Mich. Supr. Ct. 1987) (footnote omitted). Plaintiffs concede that the analysis under the MCPA should be the same as under the CLRA. (Doc. no. 157-1 at 31 n.12.) The measure of damages under the MCPA is the same as restitution under California consumer protection statutes -- difference in value between the product as promised and product as sold. *See Mayhall v. A.H. Pond Co., Inc.*, 341 N.W.2d 268, 271-72 (Mich. Ct. App. 1983). Accordingly, for the reasons stated in the context of California consumer protection claims, Plaintiffs meet the commonality and predominance requirements for a Michigan subclass asserting an MCPA violation based on the protein content statements on protein shakes.

### f. Nationwide Class for FAL and UCL Violations

Finally, Plaintiffs seek certification of a nationwide class for the FAL and UCL claims. Defendant argues that a nationwide class cannot be certified because California law does not apply to out-of-state putative class members, and that each

/ / / / /

- 26 -

class member's own state law should apply, thus precluding a finding that common issues predominate for a nationwide class.

California state law applies to the conflict-of-law issue presented by Plaintiffs' motion to certify a nationwide class. *See Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 589 (9th Cir. 2012).

> California law[, rather than the law of a foreign state,] may be used on a classwide basis so long as its application is not [unconstitutionally] arbitrary or unfair with respect to nonresident class members, and so long as the interests of other states are not found to outweigh California's interest in having its law applied.

*Wash. Mut. Bank v. Super. Ct.,* 24 Cal.4th 906, 921 (2001) (citations omitted).

"Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza,* 666 F.3d at 589 (quoting *Wash. Mut. Bank,* 24 Cal.4th at 921). "Such a showing is necessary to ensure that application of California law is constitutional." *Id.* at 589-90 (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310–11 (1981)).

It is undisputed that Defendant is incorporated and headquartered in California, its principal place of business is in California, the final decisions regarding representations made on product labels were made in California, and many of the products were produced in California. (*Cf.* doc. no. 157-1 (mot.) at 41-42 (citing Kashima Decl. Ex. A (excerpts from depo. of Adam Schrententhaler)) *with* doc. no. 170-1 (opp'n) at 35-37.) This constitutes sufficient contacts between the claims of out-of-state putative class members and the state of California to meet the constitutional requirement. *See, e.g., Mazza,* 666 F.3d at 590 (corporate headquarters, advertising agency and large part of the putative class in California).

/ / / / /

When the class action proponent makes a showing of the requisite contacts,

> [g]enerally speaking[,] the forum will apply its own rule of decision
> unless a party litigant timely invokes the law of a foreign state.  In
> such event that party must demonstrate that the latter rule of decision
> will further the interest of the foreign state and therefore that it is an
> appropriate one for the forum to apply to the case before it.

*Wash. Mut. Bank*, 24 Cal.4th at 919 (internal quotation marks, brackets and citations omitted).  Defendant contends that the UCL and FAL should not apply to the out-of-state class members, and that their respective state laws should apply instead.  (*See* doc. no. 170-1 at 35-37.)  Defendant bears the burden to show that the "governmental interest approach," *i.e.,* the choice-of-law analysis under California law, favors foreign law.  *See Mazza,* 666 F.3d at 590 ("burden shifts to the other side to demonstrate that foreign law, rather than California law, should apply to class claims") (internal quotation marks and citation omitted).

> Under the first step of the governmental interest approach, the foreign
> law proponent must identify the applicable rule of law in each
> potentially concerned state and must show it materially differs from
> the law of California.  The fact that two or more states are involved
> does not in itself indicate there is a conflict of laws problem.

*Wash. Mut. Bank*, 24 Cal.4th at 919-20.  Defendant filed a chart titled "Material Differences in State Consumer Protection and Deceptive Trade Practices."  (Doc. no. 170-6 (Decl. of Matthew Kaplan Ex. T).)[15]  It contends that some, but not all, states require reliance or causation, some require intent to induce reliance, some have a shorter or longer statute of limitations than California, and some states do not authorize class actions under consumer protection laws.  (*Id*. at 2.)  Plaintiffs

---

[15]     Defendant's brief devotes only one sentence to this issue (doc. no. 170-1 at 36) and the entirety of the discussion is presented in a 58-page single spaced chart in 8-point print.  (Doc. no. 170-6 (Decl. of Matthew Kaplan Ex. T).)  This is a brazen run around the page limits, which were already extended by parties' request.  (*See* doc. no. 154 (Order Regarding Briefing Plaintiffs' Motion for Class Certification and Defendant's Summary Judgment and *Daubert* Motions).)  Failure to comply with orders of the Court is grounds for sanctions.  Civ. Loc. Rule 83.1.

counter that there is no material difference, because the UCL and FAL are "additive rather than exclusive" to the consumer protection laws of other states. (Doc. no. 157-1 at 43-44; doc. no. 185 at 35.)  Plaintiffs cite no binding authority for this proposition.  The California appellate cases they cite do not conclude there are no material differences.  *See Wershba v. Apple Computer, Inc.,* 91 Cal. App. 4th 224, 242 (2001) ("California consumer protection laws are among the strongest in the country."); *Clothesrigger, Inc. v. GTE Corp.,* 191 Cal. App. 3d 605, 616 (1987) ("California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.").  *Wershba* approved a class-wide settlement of a California unfair business practice claim across a nationwide class because, notwithstanding the differences in the consumer protection laws of various states, "this is not necessarily fatal to a finding that there is a predominance of common issues among a nationwide class."  91 Cal. App. 4th at 244.  *Clothesrigger* held that the trial court did not make the findings required by the governmental interest analysis and remanded for findings.  191 Cal. App. 3d at 613-16, 619-20.  The differences among state consumer protection laws, for example, in the requirement of defendant's intent or knowledge, or a statute of limitations that is shorter than California's, are material.  *See Mazza,* 666 F.3d at 590-91; *see also McCann v. Foster Wheeler LLC,* 48 Cal.4th 68, 88-90 (2010) (statute of repose under foreign law would bar the action).

If there is a material difference, the foreign law proponent must next establish the foreign "jurisdiction's interest in the application of its own law *under the circumstances of the particular case*" to show that "a true conflict exists." *Mazza*, 666 F.3d at 590 (quoting *McCann,* 48 Cal.4th at 90) (emphasis added). Defendant does not analyze the state interests under the circumstances of this particular case, but points to the findings made in *Mazza*.  (Doc. no. 170-1 at 36.)

*Mazza* observed that in the false advertising context, "[e]very state has an interest in having its law applied to its resident claimants," 666 F.3d at 591-92 (internal quotation marks, brackets and citation omitted); "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory," *id.* (citing *McCann,* 48 Cal.4th at 91); and "[e]ach state has an interest in balancing the range of products and prices offered to consumers with the legal protections afforded them," *id.* *Mazza* concluded that it was error to "discount[] or not recogniz[e] each state's valid interest in shielding out-of-state businesses from what the state may consider to be excessive litigation." *Id.* These interests are valid for any state. Based on the foregoing, in a case where a plaintiff seeks to apply California consumer protection law to a California corporation on behalf of foreign citizens who purchased defendant's products outside California, a true conflict arises where California law affords either greater or lesser consumer protection because other states may choose to offer lesser consumer protection and a more business-friendly climate than California, while others may offer more consumer protection and a less business-friendly environment.

> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Mazza,* 666 F.3d at 590 (quoting *McCann,* 48 Cal.4th at 82 (citations and quotation marks omitted)). In making this analysis,

> the court does not "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue. An attempted balancing of conflicting state policies in that sense is difficult to justify in the context of a federal system in which, within

- 30 -

constitutional limits, states are empowered to mold their policies as they wish. Instead, the process can accurately be described as a problem of allocating domains of law-making power in multi-state contexts—by determining the appropriate limitations on the reach of state policies—as distinguished from evaluating the wisdom of those policies. Emphasis is placed on the appropriate scope of conflicting state policies rather than on the 'quality' of those policies.

*McCann*, 48 Cal.4th at 97 (internal quotation marks, brackets, ellipses and citation omitted); *see also Mazza,* 666 F.3d at 593.

Defendant does not offer an analysis of its own, but relies entirely on the holding in *Mazza*: "because the interests of those other states in applying their own laws to their own consumers is stronger than California's 'attenuated' interest, the Ninth Circuit held that 'each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction where the transaction took place.'" (Doc. no. 170-1 at 36 (quoting *Mazza*, 666 F.3d at 594).)

California legislature expressed a strong interest in regulating false advertising which emanates from California into other states. It is unlawful under the UCL and FAL to make or disseminate a false or misleading statement "or cause [it] to be made or disseminated before the public in this state, or to make or disseminate [it] or cause [it] to be made or disseminated *from this state before the public in any state*." Cal. Bus. & Prof. Code §§ 17500, 17200 (incorporates § 17500 by reference). Under the facts of the pending case, applying these provisions to out-of-state sales is consistent with the principle that "a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders . . .." *McCann*, 48 Cal.4th at 97-98 (internal quotation marks and citations omitted).

Based on this principle, *McCann* and *Mazza* found foreign law applicable to their facts. In *Mazza*, the defendant, American Honda Motor Company, was

- 31 -

headquartered in California and its advertising agency, which produced the allegedly misleading materials, was located in California.  However, the advertising campaign, as it pertained to the relevant representations, was "very limited," and it was "likely that many class members were never exposed to the allegedly misleading advertisements." *Mazza,* 666 F.3d at 595.  In *Mazza,* whether a purchaser was exposed to the allegedly misleading statement depended in large part on whether the ultimate seller chose to present it, for example, when the representations were made in product brochures, Acura Style magazine, video or other presentations, which were available only at dealerships.  *Id.* at 586-87 (through "small scale marketing efforts," dealers were "encouraged" to show promotional materials at dealership kiosks).  Accordingly, "the communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles--took place in the various foreign states, not in California." *Id.* at 594.  In this regard, the Court concluded,

> We recognize that California has an interest in regulating those who do business within its state boundaries, . . ., but we disagree with the dissent that applying California law to the claims of foreign residents *concerning acts that took place in other states where cars were purchased or leased* is necessary to achieve that interest in this case.

*Id.* (emphasis added).

*Mazza* relies in large part on *McCann*, 48 Cal.4th 68 (2010), because the choice of law issue is governed by California law.  *Mazza,* 666 F.3d at 589. *McCann* decided that foreign law applied because the incident occurred in Oklahoma when the plaintiff was an Oklahoma resident and the defendant was conducting business in Oklahoma.  48 Cal.4th at 98.  The fact that the defendant was a New York company was not persuasive, because Oklahoma had an interest in promoting business, whether by domestic or foreign companies.  *Id.* at 97.  The fact that the plaintiff later moved to California for unrelated reasons was

happenstance that should not determine the choice of law.  *Id*.  The Court

recognized that the outcome could be different, if the defendant's conduct occurred

in California:

> California's interest in applying its laws providing a remedy to, or
> facilitating recovery by, a potential plaintiff in a case in which the
> defendant's allegedly tortious conduct occurred in another state is less
> than its interest when the defendant's conduct occurred in California.

*Id.* at 99.

In the pending case, the alleged misconduct occurred entirely in California.

(*See* Schrententhaler Depo. at 60-61).)  All allegedly false representations were

made on Defendant's product labels, and all products were sold with labels.  All

final decisions regarding the labels were made and approvals were given in

California, where Defendant is incorporated and maintains its principal place of

business.  Defendant distributed its products nationwide.

The fact that some products were purchased in one state rather than another

should be immaterial to the choice of law under the facts of the present case,

because the alleged misconduct occurred entirely in California.  Defendant points

to no state with a greater interest in enforcing its laws under the facts of this case.

Applying the UCL and FAL nationwide does not impede other states in applying

their policies, whether through consumer-friendly or business-friendly legislation,

to the conduct that occurs within their borders.  In light of the foregoing,

Defendant has provided no grounds to conclude that any other state's interest,

including any state's "interest in promoting business," *Mazza,* 666 F.3d at 593,

would be more impaired than California's, if California law did not apply.

Defendant's argument that the questions of law presented by each state's own

consumer protection laws defeat a showing of commonality and predominance is

rejected.  For the reasons stated above, and in the context of California consumer

protection claims, Plaintiffs meet the commonality and predominance requirements for the UCL and FAL claims on a nationwide basis to the extent they are based on statements of protein content on protein shake labels and "lean" statements on protein powder labels.

### 3. Typicality

The typicality requirement of Rule 23(a)(3) focuses on the relationship of facts and issues between the class and its representatives.

> [T]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Dukes*, 564 U.S. at 249 n.5 (internal quotation marks and citation omitted). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

> The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotation marks and citations omitted).

Defendant does not dispute that Plaintiffs' claims are typical of the class members' claims. Plaintiffs and putative class members were injured by the same conduct -- Defendant's allegedly misleading statements on product labels. The relevant conduct is not unique to named Plaintiffs. The legal theories Plaintiffs

/ / / / /

- 34 -

seek to assert on behalf of the class apply equally to Plaintiffs and the class members. Plaintiffs therefore meet the typicality requirement.

### 4. Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is grounded in constitutional due process concerns: "absent class members must be afforded adequate representation before entry of judgment which binds them." *Hanlon*, 150 F.3d at 1020. In reviewing this issue, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id*. In other words, the named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class. *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975).

Defendant does not dispute that the adequacy requirement is met. No conflict of interest is apparent from the record between Plaintiffs and their counsel on one hand and the putative class on the other.

With respect to Plaintiffs, the issue is whether they "maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (internal quotation marks, brackets and citation omitted). Based on Plaintiffs' declarations, they have suffered the same injury as they allege on behalf of the class, understand their duties if appointed class representatives, and are willing to undertake them, including vigilantly prosecuting the case on behalf of the class. To date, Plaintiffs have been actively involved in the prosecution of this action, including providing information to class counsel, participating in written discovery and giving deposition testimony. They intend to continue to actively prosecute the case on

- 35 -

behalf of the class. (Doc. no. 157-2 ("Roman Decl."); 157-3 ("Clay Decl."); 157-4 ("Reichert Decl."); 157-5 ("Ehrlichman Decl.").) Although Plaintiff Christopher Roman has criminal history, Defendant does not contend he cannot adequately represent the class. Roman's history does not include crimes which would adversely reflect on his credibility. (*See* Deposition of Christopher Roman ("Roman Depo.") at 12-18.)[16] Plaintiffs therefore meet Rule 23(a)(4) adequacy requirements.

Based on the counsels' declarations, California attorneys Jeffrey R. Krinsk and Trenton Kashima, as well as Michigan attorneys Nick Suciu III, Jason J. Thompson, and Amy L. Marino meet Rule 23(a)(4) adequacy requirements and Rule 23(g) requirements for appointment of class counsel. (Doc. no. 157-9 ("Suciu Decl."), 157-10 ("Thompson Decl."), 157-11 ("Krinsk Decl."), 157-11 (Ex. A to Krinsk Decl.), 157-13 ("Marino Decl.") at 2).

## B. Rule 23(b)(3) Requirements

Certification under Rule 23(b)(3) is proper when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3).

As discussed above, this action meets the predominance requirement. The superiority requirement includes consideration of:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

/ / / / /

---

[16] Excerpts from the Roman Depo. were filed as doc. no. 170-6 at 189-221, and doc. no. 185-8.

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b)(3). This inquiry "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair," such that the proposed class is superior to other methods for adjudicating the controversy. *Wolin,* 617 F.3d at 1175-76.

Defendant argues class action is not superior because individual issues predominate and there are material differences among state consumer protection laws. (Doc. no. 170-1 at 58-59.) Defendant also contends that "Plaintiffs have not offered any means [to] exclude uninjured class members." (*Id.* at 58 (citing *Chow v. Neutrogena Corp.*, 2013 WL 5629777 *2 (C.D. Cal. Jan. 22, 2013).) The latter argument is based on the contention that each class member may not have been exposed to the allegedly misleading advertisements, and therefore would not suffer the same injury. *See Chow,* 2013 WL 5629777 *1-2. All of Defendant's arguments were rejected in the context of analyzing the predominance requirement.

This is a consumer class action involving low-priced consumer goods and a large number of potential class members. Prosecution of the alleged claims requires discovery, including product testing, and expert analysis, including consumer surveys. It would therefore most likely not be feasible for class members to individually prosecute the consumer protection claims asserted herein. *See Briseno,* 844 F.3d at 1129. The class members' interest in individually controlling the prosecution of individual actions is small. According to Plaintiffs, no other similar cases are pending. (Doc. no. 157-1 at 41.)

This action bears a substantial connection to California, as Defendant is located in California (Schrententhaler Depo. at 61), two of the named Plaintiffs, as well as numerous other consumers, purchased Defendant's products during the

- 37 -

class period in California (*see* Clay Decl. at 2; Roman Decl. at 2). The record does not reflect any reason not to concentrate the litigation of the claims in this District. Finally, it does not appear that this action will be more difficult to manage than other class actions.

For the foregoing reasons, the Court finds that all requirements for class action certification under Rule 23(b)(3) are met with respect to (1) the nationwide classes as to the UCL and FAL claims to the extent they are based on statements of protein content on protein shake labels and "lean" statements on protein powder labels; (2) the California subclasses as to the UCL, FAL and CLRA claims to the extent they are based on statements of protein content on protein shake labels; and UCL and FAL claims to the extent they are based on "lean" statements on protein powder labels; (3) the Florida subclasses as to the FDUTPA violation based on the protein content statements on protein shakes and "lean" statements on protein powders; and (4) the Michigan subclass as to the MCPA violation based on the protein content statements on protein shakes.

## III. CONCLUSION

1. Plaintiffs' motion for class certification is granted in part and denied in part. The following classes are certified:

(a) A nationwide class comprising of all persons in the United States who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* to the extent the claims are based on the protein content statements on product labels.

(b)    A nationwide class comprising of all persons in the United States who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); and Monster Milk: Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products). The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* to the extent the claims are based on the "lean" statements on product labels.

(c)    All persons residing in California who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake.  The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* and California Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), to the extent the claims are based on the protein content statements on product labels.

(d)    All persons residing in California who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); and Monster Milk: Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products).  The class is certified for purposes of

prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* to the extent the claims are based on the "lean" statements on product labels.

(e) All persons residing in Florida who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.,* to the extent the claim is based on the protein content statements on product labels.

(f) All persons residing in Florida who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); Monster Milk: and Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products). The class is certified for purposes of prosecuting violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.,* to the extent the claim is based on "lean" statements on product labels.

(g) All persons residing in Michigan who, within six (6) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the Michigan Consumer

/ / / / /

Protection Act, Mich. Comp. Laws § 445.903(1)(c), to the extent the claim is based on protein content statements on product labels.

2. Excluded from the above classes are: (a) Defendant and any entity in which Defendant has or had a controlling interest; (b) the officers and directors of Defendant at all relevant times, the members of Defendant's officers' and directors' immediate families and their legal representatives, heirs, successors, or assigns; (c) any judge to whom this action is assigned, any members of such judges' staffs, and any members of such judges' immediate families; and (4) all persons or entities that purchased the relevant products for purposes of resale.

3. Plaintiffs Chayla Clay, Chris Roman, Erica Ehrlichman, and Logan Reichert are appointed as class representatives for the nationwide classes. In addition, Plaintiffs Chayla Clay and Chris Roman are appointed as class representatives for the California classes, Plaintiff Logan Reichert is appointed as class representative for the Florida classes, and Plaintiff Erica Ehrlichman is appointed as class representative for the Michigan class.

4. Attorneys Jeffrey R. Krinsk, Trenton Kashima, Nick Suciu III, Jason J. Thompson, and Amy L. Marino are appointed as class counsel under Rule 23(g).

5. No later than September 14, 2018, the parties shall jointly propose a class notice in compliance with Federal Rule of Civil Procedure 23(c)(2)(B).

6. Defendant's *Daubert* motion is granted with respect to the opinion of Elizabeth Howlett, Ph.D. that the statements on protein powder labels regarding

/ / / / /

L-glutamine were material. The opinion is excluded for purposes of this Order only. Defendant's motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated: September 7, 2018

Hon. M. James Lorenz
United States District Judge