FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
550 West C St., Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Attorneys for Plaintiffs*
*and the Classes*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAYLA CLAY, ERICA EHRLICHMAN, LOGAN REICHERT, and CHRIS ROMAN, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>CYTOSPORT, INC., a California corporation,<br><br>               Defendant. | Case No: 3:15-cv-00165-L-DHB<br><br>**DECLARATION OF TRENTON R. KASHIMA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Hearing date:    June 10, 2019<br>Time:             10:30 am<br>Judge:         Hon. M. James Lorenz<br><br>[No Oral Argument Unless Ordered by the Court] |

**DECLARATION OF TRENTON R. KASHIMA**

I, Trenton R. Kashima, declare:

1.      I am over eighteen years of age and an attorney of Finkelstein & Krinsk, LLP, counsel for Plaintiffs and Class Representatives Chayla Clay, Erica Ehrlichman, Logan Reichert and Chris Roman ("Plaintiffs"), as well as the Class in the above captioned case.  I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval.  I have personal knowledge of the facts set forth herein, and if called as a witness could and would competently testify thereto.

# I.      PROCEDURAL/SETTLEMENT BACKGROUND

## A.      Overview of the Parties' Claims and Defenses

2.      Plaintiff filed this class action on January 23, 2015.  *See generally* First Amended Complaint ("FAC") [Dkt. No. 156].  Defendant manufactures, distributes, and markets the popular Muscle Milk branded protein supplements.  Id. at ¶ 1. There are two product types involved in this case: the ready-to-drink Products ("Shake Products") and the powder Products ("Powder Products").  *Id*. at ¶¶ 2-3. The Shake Products come ready-to-drink and are sold in individual-sized containers. The Powder Products are sold in powder form, and the consumer typically mixes the powder with water or milk.

3.      Plaintiffs alleged that at times during the class period Defendant makes three distinct misrepresentations on the Class Products' Labels:

> (1)     Defendant represents that its Muscle Milk: Lean Muscle Protein Powder, Muscle Milk Light: Lean Muscle Protein Powder, Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein, Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder, and Monster Milk: Lean Muscle Protein Supplement are "lean", even though these products are fortified with significant amounts of oils and fats.

> (2)     Defendant represents that its Muscle Milk: Lean Muscle Protein Powder, Muscle Milk Light: Lean Muscle Protein Powder, Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein, Muscle Milk Gainer: High Protein Gainer Powder Drink Mix, and Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder contain L-Glutamine.  However, if any L-Glutamine is contained in the L-Glutamine Supplements, it is below the amount that can be detected through scientific testing.  In effect, there is none.

(3)     Defendant represents that its Cytosport Whey Isolate Protein Drink, Monster Milk: Protein Power Shake, Genuine Muscle Milk: Protein Nutrition Shake, and Muscle Milk Pro Series 40: Mega Protein Shake contain specific amounts of protein on the front and back of each of the Supplements' labels.     Yet, in every instance, the Cytosport RTD Supplements contain materially less protein than what their labels state.

*See generally id.*

### 1.     The Lean Claims

4.     Defendant labeled its Powder Products with the following "Lean" claims: (1) the front labels state that they contain "[XX] g LEAN PROTEIN"; (2) the Products identified as "LEAN MUSCLE PROTEIN," "LEAN MUSCLE PROTEIN SUPPLEMENT," "LEAN MUSCLE PROTEIN POWDER," or "NEW LEANER FORMULA"; and (3) the vast majority of the products also advertise that they contain "Lean Lipids."  *See* Declaration of Trenton Kashima ("Kashima Decl. I") [Dkt. No. 157-21], ¶¶ 7-9, App. A.  An example of Defendant labeling claims:



Kashima Decl. I, Ex. K, at p. 13 (revision 08.12/12 of the 2.47 lbs. Muscle Milk: Lean Muscle Protein Powder Label).

5.     The lean claims were removed from the Powder Products' labels by December 31, 2018, the end of the Powder Settlement Class Period.

6.     Plaintiffs contend that these "Lean" claims are both misleading and illegal under federal food labeling regulations.  FAC, ¶¶ 46-52.  Plaintiffs argued that

the Powder Products were never formulated to be low-fat products.  *See* Kashima Decl. I, ¶ 27.  Instead, Plaintiffs alleged Defendant fortified these Products with significant amounts of fat.  *See id.*, at ¶ 27.  Accordingly, Plaintiffs alleged that use of the term "lean" to describe these Products was misleading at best.

7.     Additionally, pursuant to Section 403 of the Food, Drug, and Cosmetic Act ("FDCA"), a "nutrient content claim" may only be made in accordance with the relevant regulations that authorize the use of such claims. 21 U.S.C. § 343(r)(1)(A). Federal regulations specifically prohibit the use of the word "lean" unless the food meets the definition set out in 21 C.F.R. § 101.62(e).  See 21 C.F.R. § 101.62(a). Plaintiffs allege that Defendant's use of the word "lean" in the names of each Lean Muscle Milk Product does not meet the definitional requirements of 21 C.F.R. § 101.62(e) and thus is a *per se* violation of the FDCA and independently actionable under parallel state consumer protection laws.

## 2.   Protein Claims

8.     Similarly, Plaintiffs alleged that Defendant's Shake Products do not contain the advertised amount of protein.  FAC, ¶¶ 16-30.  Defendant advertises that its Shake Products contain a specific number of protein grams per container. Kashima Decl., I ¶¶ 18-20, App. C; *see also id*., Exs. S & T.  For example, Defendant's Shake Products listed the total amount of protein, per bottle, on the front of the packaging, as well as the number of grams of protein per serving on the Nutrition Facts panel:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



Kashima Decl. I, Ex. S, at p. 17 (revision 10HPW.01/13 of the 14 oz. Genuine Muscle Milk: Protein Nutrition Shake).

9.     Again, Plaintiffs allege that Defendant's protein statements are both misleading and illegal.  Federal regulations require that the protein contained in the Shake Products must be at least equal to the amount listed in the nutrition facts panel.  Nonetheless, Defendant failed to ensure the accuracy of its Shake Products' labels in accordance with these federal regulations.   21 CFR 101.9(g)(4)(i).  Plaintiffs' initial testing revealed that the Shake Products contained between three and eleven less grams of protein per bottle then advertised.  FAC at ¶¶ 18-21.  This testing was also supported by independent sources, such as Labdoor.com.  *Id.*

10.     Based on these assertions, Plaintiffs alleged—on behalf of a National Class—that Defendant had violated ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 et seq., and the California False Advertising Law ("FAL") a CAL. BUS. & PROF. CODE §§ 17500 et seq.  FAC, ¶¶ 61-69, 83-104.  Plaintiffs also alleged, on behalf of classes of purchasers of Shake and Powder Products in California, Michigan, and Florida, that Defendant's advertisements violated their respective state's consumer protection statutes (the Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1700 *et seq.*, the

Michigan Consumer Protection Act, M.C.L. §§ 445.901 *et seq.* and the Florida Deceptive and Unfair Trade Practices Act, FL. STAT. §§ 501.201 *et seq.*, warranty laws, and the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.* FAC, ¶¶ 61-146.

11. Defendant has consistently denied Plaintiffs allegations and asserts a number of affirmative defenses. *See* Defendant's Answer to Plaintiffs' Amended Complaint [Dkt. No. 169].

**B.** **Procedural History**

1. Defendant's Motion to Dismiss

12. On March 30, 2015, Defendant moved to dismiss Plaintiffs' claims, arguing that Plaintiffs' Complaint had failed to state a cause of action. *See generally* Defendant's Motion to Dismiss [Dkt. No. 24-1]. Defendant argued that Plaintiffs' allegations were preempted by the FDCA, subject to the Primary Jurisdiction Doctrine, Plaintiffs lacked standing to bring their claims as to all of the alleged Class Products, and Plaintiff's complaint did not state allegations sufficient to satisfy the elements of their underlying cause of action. *See generally id.* More specifically, Defendant asserted that the use of "lean" on their labels was not a reference to the levels or amount of fat in the Powder Products, but a characterization of the type of muscle the product was intended to create (*i.e.* "lean muscle") and the protein levels (even as alleged by Plaintiffs) in Defendant's Shake Products were within FDA allowed twenty-percent tolerance for "naturally-occurring" ingredients in food products. *Id.*, at pp. 10:9-26 (citing 21 CFR 101.9(g)(4)(ii)) & 13:9-18.

13. The Court denied Defendant's Motion to Dismiss, in its entirety, on August 19, 2015. Order Denying Motion to Dismiss [Dkt. No. 53]. In doing so, the Court clarified the correct protein testing methodology under federal law:

> Specific requirements for compliance with the Food Labeling Rule are set out in 21 C.F.R. § 101.9(g). It states that "compliance [with the Food Labeling Rule] shall be determined" using a "sample for nutrient analysis [consisting] of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping

6

cases, to be representative of a lot." § 101.9(g)(2). This composite is then "analyzed by appropriate methods as given in the 'Official Methods of Analysis of the AOAC International,' 15th Ed. (1990) . . . or, if no AOAC method is available or appropriate, by other reliable and appropriate analytical procedures." *Id.* For foods with naturally occurring nutrients, the nutrient content of the composite must equal at least 80 percent of the value for the nutrient as declared on the label. § 101.9(g)(4)(ii). For foods where a nutrient is not naturally occurring, but instead added to the food, "the nutrient content of the composite [must be] at least equal to the value for that nutrient declared on the label." § 101.9(g)(4)(i).

*Id.* at pp. 5:20-6:4 & 7:3-23. However, the Court did not decide whether the protein contained in the Shake Products was a "naturally occurring nutrient." *Id.* at p. 7:15-23.

### 2.   Plaintiffs' Motion for Judgment on the Pleadings

14.   After Defendant answered the Complaint, Plaintiffs filed a Motion for Judgment on the Pleadings to challenge the validity of Defendant's twenty-seven affirmative defenses. Dkt. No. 68-1. Plaintiff argued that most of Defendant's affirmative defenses were not affirmative defenses at all, but simply negate the elements of Plaintiff's claims (for example, Defendant asserted affirmative defenses for "no causation," "no injury or damage," and "no reliance"). *See id.* Plaintiff also challenged the affirmative defenses as being pled without sufficient factual support or being legally untenable. *See id.* The Court ultimately granted Plaintiffs' Motion as to all but seven of Defendant's affirmative defenses. Order Granting in Part and Denying in Part Plaintiffs' Motion [Dkt. No. 163]. Between Defendant's Motion to Dismiss and Plaintiffs' Motion for Judgment on the Pleading, the parties had largely defined the scope of the dispute.

### 3.   Plaintiffs' Motion for Class Certification and Defendant's Motion for Partial Summary Judgment and to Exclude Certain Opinions of Dr. Howlett

15.   Plaintiffs originally moved to certify the pled classes on September 9, 2016. *See* Dkt. No. 109. Defendant, however, moved for an extension of the time to file its response to Plaintiffs' Motion for Class Certification, noting that Defendant needed additional time to conduct expert discovery. Defendant's *Ex Parte* Motion

for Extension of Time [Dkt. No. 121]. Plaintiff opposed Defendant's Motion as an attempt to reopen class discovery, which had been completed months before Plaintiff's class certification motion was filed. *See* Dkt. No. 122. In ruling on Defendant's Motion, the Court referred the discovery dispute to the assigned Magistrate Judge and denied Plaintiffs' Motion for Class Certification without Prejudice. *See* Order Granting in Part Defendant's *Ex Parte* Application [Dkt. No. 124]. Plaintiffs would be allowed to refile the class certification motion following the Magistrate Judge's decision on the discovery issue.

16. Therefore, the parties filed a Joint Motion for Determination of Discovery Dispute on September 12, 2016 with the Honorable Magistrate Judge David H. Bartick. Dkt. No. 125. Unfortunately, Judge Bartick became unavailable and the Honorable Magistrate Judge Louisa S. Porter was assigned to the case. Judge Porter granted Defendant's request to reopen class discovery, to allow Defendant time to depose Plaintiffs' class experts. *See* Order Re: Joint Motion for Determination of Discovery Dispute [Dkt. No. 128]. Judge Porter would later enter an order resetting the class certification deadline for March 3, 2017. Order Granting in Part and Denying in Part Joint Motion for a Status Conference and Briefing Schedule [Dkt. No. 133].

17. On December 19, 2016, Plaintiffs filed a Motion to Intervene seeking to join Chris Roman as a putative class representative. *See* Dkt. No. 143. Defendant agreed to not oppose the motion. *Id.* Mr. Roman was deposed on February 28, 2017.

18. On March 3, 2017 (the deadline for Plaintiffs to file the Motion for Class Certification), Defendant filed a Motion for Partial Summary Judgment. *See* Order Regarding Briefing Plaintiffs' Motion for Class Certification [Dkt. No. 154]. Defendant also expressed its intent to file another summary judgment motion relating to the claims asserted by Chris Roman. *Id.* At this time, counsel for the parties contacted the Court's clerk to discuss the hearing dates and scheduling of briefing for

Defendant's Motion for Partial Summary Judgment and Plaintiffs' forthcoming Motion for Class Certification. The Clerk directed the parties to submit a joint brief outlining their respective proposals on the issue.

19. Given the overlap between the legal issues, the Court denied Defendant's Motion for Partial Summary Judgment without prejudice and ordered that Defendant refile its Motion concurrently with its opposition to Plaintiffs' Motion for Class Certification. The Court set a briefing schedule on the parties' respective motions that would allow the concurrent briefing of both motions and a single hearing, if necessary. Order Regarding Briefing Plaintiffs' Motion for Class Certification [Dkt. No. 154].

20. In total, the parties submitted 135 pages of argument, seventeen declarations (including five expert declarations), and over 4,000 pages of evidence in support of their Motions for Summary Judgment and Class Certification. *See* Dkt. Nos. 157-1, 170-1, 185 & 191. Ultimately, the Court would grant in part, and deny in part, both Plaintiffs' Motion for Class Certification and Defendant's Motion for Summary Judgment. *See* Dkt. Nos. 209-210. The Court certified the following classes:

> (a) A nationwide class comprising of all persons in the United States who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, to the extent the claims are based on the protein content statements on product labels.
>
> (b) A nationwide class comprising of all persons in the United States who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); and Monster Milk: Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products). The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200

*et seq.*, and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, to the extent the claims are based on the "lean" statements on product labels.

(c) All persons residing in California who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, and California Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), to the extent the claims are based on the protein content statements on product labels.

(d) All persons residing in California who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); and Monster Milk: Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products). The class is certified for purposes of prosecuting violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, to the extent the claims are based on the "lean" statements on product labels.

(e) All persons residing in Florida who, within four (4) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, to the extent the claim is based on the protein content statements on product labels.

(f) All persons residing in Florida who, within four (4) years of the filing of this action, purchased Defendant's Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder (14 oz. to 10 lbs. products); Monster Milk: and Lean Muscle Protein Supplement (2.06 and 4.13 lbs. products). The class is certified for purposes of prosecuting violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, to the extent the claim is based on "lean" statements on product labels.

(g) All persons residing in Michigan who, within six (6) years of the filing of this action, purchased Defendant's Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake. The class is certified for purposes of prosecuting violations of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1)(c), to the extent the claim is based on protein

content statements on product labels.
Order Granting in Part and Denying in Part Plaintiffs Motion for Class Certification [Dkt. No. 210] at pp. 38:17-41:2. Notably, the Court did not certify any class as to Plaintiff's L-Glutamine Claims.

21.     Additionally, the Court appointed Plaintiffs Chayla Clay, Chris Roman, Erica Ehrlichman, and Logan Reichert as class representatives for the nationwide classes. *Id.* at p. 41:10-15. Plaintiffs Chayla Clay and Chris Roman were appointed as class representatives for the California classes, Plaintiff Logan Reichert was appointed as class representative for the Florida classes, and Plaintiff Erica Ehrlichman was appointed as class representative for the Michigan class. *Id.*

22.     The Court also appointed Jeffrey R. Krinsk, Trenton Kashima, Nick Suciu III, and Jason J. Thompson as class counsel under Rule 23(g). *Id.* at p. 41:16-17. Amy L. Marino was also appointed Class Counsel but has since withdrawn from the case after leaving Sommers Schwartz. *Id.*

4.     Defendant's Appeal

23.     On September 21, 2018, Defendant filed the Petition for Permission to Appeal the Court's decision on class certification pursuant to Rule 23(f). *See* Dkt. No. 218. Defendant specifically challenged the Court's certification of a national class under the UCL and FAL, as well as the sufficiency of Plaintiffs' proposed damages model. *See Chayla Clay et al. v. Cytosport, Inc*., Case No. 18-80123 [Dkt. No. 1-2]. Plaintiffs opposed the Petition on the grounds that the Court had correctly applied California and federal law, as written. *Id*., at Dkt. No. 5. Nevertheless, Defendant's Petition was granted on December 21, 2018. *Id*., at Dkt. No. 11.

24.     The parties participated in the Ninth Circuit's Mediation Conference on February 4, 2019. During this Conference, the parties informed the Circuit Mediator of their pending private mediation. The Circuit Mediator delayed the parties' briefing schedule at the parties' request. Thus, the parties have yet to brief Defendant's Appeal.

**C.    The Parties' Discovery Efforts**

25.    The parties have engaged in significant discovery for this case.  On November 12, 2015, Plaintiffs propounded its first set of written discovery on Defendant, including interrogatories and document requests.  Over the next year, Plaintiffs would serve additional discovery requests, including four more sets of Requests for Document Production and two sets of Request for Admissions.  In total, Plaintiffs propounded thirty-two interrogatories, fifty-six document requests, and sixteen requests for admissions.

26.    In response, Defendants made sixteen document productions which included over 47,000 pages of documents.  Each of the documents produced were reviewed by Plaintiffs' counsel, including highly technical documents that required the assistance of Plaintiffs' ESI vendor to convert into a useable format or experts to determine the document's relevance.

27.    Plaintiffs have also deposed several Defendants' key employees, both individually and *via* Rule 30(b)(6) depositions, including Defendant's Chief Marketing Officer (Nicole Brown), Senior Vice President of Innovation and Business Development (Adam Schretenthaler), Art Department Manager (Ana Kneisley-Spooner), and Compliance Manager (Dr. Elizabeth Kimball), and Supervisor Of Records And Information Management (Dynessa Nordrum).  In total, Plaintiffs took six depositions which were conducted over seven days.

28.    Additionally, Plaintiff issued a number of subpoenas to third-parties, including Amazon.com, Bodybuilding.com, Coscto Wholesale, CVS Health, GNC, The Kroger Co., Sam's Club, The Vitamin Shoppe, and Wal-Mart Stores, Inc.  These subpoenas related to these entities' sale of the Class Products.

29.    Defendant similarly issued a number of discovery requests, including two sets of interrogatories and request for production to Plaintiffs Chayla Clay, Erica Ehrlichman, Logan Reichert and a set of interrogatories and request for production to Intervener Chris Roman.  Plaintiffs expended significant time gathering documents

CASE NO. 3-15-CV-00165-L-DHB

1  and information in responding to these requests. Defendant deposed each of the
2  Plaintiffs.

3  30.  Moreover, Defendant issued subpoenas to Albertsons, LLC, The Vons
4  Companies, Inc., Safeway, Inc., Amazon.com, Inc., Avomeen, Bodybuilding.com,
5  LLC, Costco, CVS Health, GNC Holdings Inc., The Kroger Company, Meijer,
6  Publix, Rite-Aid Corporation, Sam's Club, Stater Bros., thebetterhealthstore.com,
7  The Vitamin Shoppe, and Walgreens Co. to request information regarding Plaintiff's
8  purchases. These requests were strongly opposed by Plaintiffs, and the majority of
9  these subpoenas withdrawn. Defendant also issued subpoenas to ChromaDex and
10  LabDoor, who had tested the protein contents in the Class Products.

11  31.  The parties relied on expert witnesses as well. Plaintiffs offered the
12  declaration of Dr. William Campbell regarding the effects of L-glutamine on the
13  human body, as well as the declarations of Dr. Jeffrey Harris and Dr. Elizabeth
14  Howlett in support of Plaintiffs' proposed class damages model at Class
15  Certification. *See* Dkt. Nos. 157-6, 157-7 & 157-8. Drs. Campbell, Harris, and
16  Howlett were each deposed by Defendant.

17  32.  Defendant offered the declarations of Professor Ravi Dhar and Dr.
18  Keith R. Ugone to challenge the propriety of Plaintiffs' damages model. *See* Dkt.
19  Nos. 170-7 & 170-22.

20  33.  While the parties had conduced significant amounts of discovery to
21  date; the parties had not yet completed their discovery efforts. During the parties'
22  26(f) Conference, the parties had agreed that class certification discovery should be
23  bifurcated from merits discovery. Thus, prior to the Settlement Plaintiffs were
24  preparing additional discovery.

25  34.  Following certification of the Class, Plaintiffs and Defendant discussed
26  a protocol for testing the retained samples of the Shake Products (or "retains") for
27  their protein content.

28  35.  Not only have the parties' discovery efforts been extensive, but they

13

have also been contentious. The parties spent significant time meeting and conferring regarding the parties' various discovery requests and subpoenas. These discovery disputes required judicial intervention on three occasions. *See* Joint Motion for Determination of Discovery Dispute [Dkt. No. 89], Joint Motion for Determination of Discovery Dispute [Dkt. No. 95], Joint Motion for Determination of Discovery Dispute [Dkt. No. 125].

## II.    SETTLEMENT NEGOTIATIONS

36.    The parties first discussed the possibility of settlement on October 26, 2015 at the Early Neutral Evaluation Conference before Judge Bartick. At that time the parties were not able to resolve their dispute, despite Magistrate Judge's assistance.

37.    The parties, however, did agree to meet for in-person settlement discussions on March 1, 2016 at Defendant's facilities in Walnut Creek, California. The parties had a discussion regarding the merits of their legal positions, however the difference between the party's settlement positions was too far to bridge. Accordingly, the parties largely abandoned their settlement discussions and refocused on litigating the action.

38.    There would not be any additional settlement discussions until the Court's decision on the parties' respective Motions for Summary Judgment and Class Certification. Given the procedural posture of the case, both parties agreed that it would be prudent to discuss settlement. At this point, the parties had engaged in extensive discovery, including expert discovery regarding damages, and had the benefit of the Court's decision on the several key disputes. Therefore, Plaintiffs were aware of the respective strengths and weaknesses of their claims, and the potential liability of any adverse judgment.

39.    The parties eventually agreed to conduct mediation before Mr. David A. Rotman, Esq., a nationally recognized mediator of complex class actions and commercial matters with over twenty-five years of experience. Class Counsel had

14

previously used Mr. Rotman on several occasions and found him to be incredibly competent and helpful in resolving class actions.

40. In preparation for the mediation, Class Counsel prepared a detailed damages model. The model was created using state-by-state distribution information regarding each of the Class Products, along with as research regarding the average retail prices of these products. Based on this information, Plaintiffs were able to estimate the amount of damages associated with both the "lean" and "protein" claims for each state, as well as nationally.

41. Multiple damages models were developed during this process. The difference between these models was a function of Class Counsel's assumptions about the "price utility" assigned to the "lean" claims on the Powder Products and amount of protein that missing from the Shake Products.

42. Plaintiffs' proposed conjoint analysis produces utility values (or price utilities) for each selected feature of a product based on information provided through consumer surveys. These price utilities are essentially a measure of a consumer's valuation, preference, or satisfaction. When price is included as a variable in a conjoint study, it can be used to convert price utility into a dollar value (*e.g.* a consumer's willingness-to-pay for a particular product feature).

43. Based on information provided to counsel, and counsel's experience with conjoint analysis with other consumer class actions, Plaintiffs believed that the most realistic valuation of the "lean" claims would be approximately four to five percent of the product's retail value. To put this number in context, this would be similar to the price utility that consumers assign to "natural" claims on beverages and food products.

44. When these assumptions are applied to the Powder Products in this case, the per product amount of damages can be readily estimated. Plaintiff is aware of the retail pricing and the number of Powder Products distributed during the Class Period. Ignoring the total number of products distributed, the average retail price of

these Products was approximately thirty-eight dollars. Accordingly, the per product damages would average between $1.52 and $1.90, between 4% to 5% of $38.00. However, to provide a more concrete example, the most numerous Powder Product sold during the Class Period was the Genuine Muscle Milk Powder. The average retail price of the Genuine Muscle Milk Powder was approximately $25.00 for a 2.47 lbs. package and $49.00 for a 4.94 lbs. package. Thus, the expected recovery at trial for this product would have been between $1.00 and $2.45 per package (or between 4% of $25.00 and 5% of $49.00).

45. Additionally, Plaintiffs' damages expert was able to estimate that each gram of protein missing from the Shake Products would be worth approximately $0.06 per gram of protein using a hedonic regression analysis. Declaration of Dr. Jeffrey Harris [Dkt. No. 157-7] at ¶¶ 18, 23. This form of analysis breaks down the item being researched into its constituent characteristics, and obtains estimates of the contributory value of each characteristic through comparing different products with different prices and attributes.

46. Plaintiffs had alleged that Defendant's Shake Products contained between three and eleven less grams of protein per bottle than advertised. FAC at ¶¶ 18-21. Consequently, the expected individual recovery at trial for the protein claims was between $0.24 and $0.66 per bottle.

47. When these same assumptions are applied to Defendant's aggregate sales, Class Counsel estimated the total liability would be approximately *$41,754,742.56* to *$139,860,044.28*, if Plaintiffs were successful on all of the certified claims. This number is a function of four percent of the Powder Product's retail value being associated with the challenged "lean" claims and an estimate that between 3.4% to 10% of the stated amount of protein was missing from the Shake Products. Class Counsel, however, recognized that these assumptions may be optimistic. Additional damages models were developed that represented lower levels of success at trial (including models premised on Defendant's assertion that there

was more than the stated protein being provided to customers). Ultimately, it was these damages estimates that would inform Plaintiffs' negotiations with Defendant.

48. On November 5, 2018, the parties meet with Mr. Rotman and discussed their respective claims and defenses and the structure of a potential settlement. The parties made significant progress on some issues, but were unable to come to an agreement during the first mediation session.

49. After the November 5, 2018 mediation, the parties continued to discuss settlement. At the same time, the parties discussed their outstanding discovery disputes, protein testing protocols, and Defendant's appeal.

50. The parties ultimately agreed to return to Mr. Rotman on March 7, 2019 for another mediation session. It was only at this second mediation that the parties were able to come to an agreement on the material terms of the Settlement. However, the parties still had to draft the Settlement Agreement and discuss additional terms related to class administration and notice.

51. The final Settlement Agreement would not be finalized and fully executed until May 12, 2019. Attached hereto as **Exhibit A**, is a true and correct copy of the parties' executed Settlement Agreement.

## III. THE PROPOSED SETTLEMENT BENEFIT

52. The Settlement Agreement will provided relief to the Settlement Classes, defined as:

> The Shake Class definition includes all persons in the United States (including its states, districts or territories) who purchased Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake from January 23, 2011 to the date of entry of the Preliminary Approval Order ("Shake Class"). For members of the Michigan subclass only, the starting date of the class period will be January 23, 2009.

> The Powder Class definition includes all persons in the United States (including its states, districts or territories) who purchased Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Gainer; High Protein Gainer Powder Drink Mix; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder; and

Monster Milk: Lean Muscle Protein Supplement that had the phrase "lean lipids," "lean protein," "lean muscle protein," or "new leaner formula" on the label from January 23, 2011 to December 31, 2018 ("Powder Class").

Agreement at ¶¶ 2.09, 2.29. These Settlement Classes closely track the litigation classes certified by the Court, with minor modifications for clarity. The parties agree to move for a conditional amendment of the Class definition set forth in the Settlement Agreement for the exclusive purpose of effectuating a settlement of this action. *Id.*, ¶¶ 3.01-3.02. Plaintiffs agree and acknowledge that by entering into this Settlement, CytoSport is not waiving its right to oppose class certification in this action if the Settlement is not approved or in any other action. *Id.*

53.     Under the terms of the Settlement Agreement, Defendant will contribute $12 million to a non-reversionary common fund (the "Settlement Fund"). *Id.*, ¶¶ 2.31, 4.01.   Valid claims, Class Counsel's attorneys' fees and costs, and any incentive awards are to be paid from the Settlement Fund. *Id.*, at ¶ 10.01.[1]   There will be no reversion of any portion of the Settlement Fund to Defendant. *Id.*, at ¶ 2.31.

54.     Class Members may make a claim for the following relief:

- For Shake Products, Class Members with proof of purchase may submit claims for $1 per purchased shake, with no limit on the number of claims that may be submitted.  Class Members with no proof of purchase may submit claims for $1 per purchased shake, capped at $25.

- For the Powder Products, Class Members with proof of purchase may submit claims for $3 for each purchase of a product weighing 2 ¾ lbs or less and $5 for each purchase of each product weighing more than 2 ¾ lbs, with no limit on the number of claims that may be submitted.  Class Members with no proof of purchase may submit claims for $3 for each purchase of a product weighing 2 ¾ lbs or less and $5 for each purchase of each product weighing more than 2 ¾ lbs, capped at $25.

*Id.*, at ¶¶ 4.01-4.04.

55.     Should the amount of claims exceed the net Settlement Fund, the payment to participating Class Members will be reduced *pro rata*. *Id.*, at ¶ 4.05.

---

[1] The Settlement allows Plaintiffs to submit a request of up to 33 1/3 percent of the total Settlement Benefit (at least $12.45 million)—or approximately $4,149,585—for their costs and attorneys' fees, combined.  Agreement, at ¶ 5.01.

Similarly, the Settlement envisions a *pro rata* distribution of any unallocated funds to the participating Class Members. *Id.* Should any Class Members fail to negotiate the check paid from the Settlement Fund, there will be a second distribution of any unclaimed funds to participating Class Members. *Id.*, at ¶ 4.06. This will ensure that as much of the Settlement Fund as possible is distributed to the Class.

56. Based on Class Counsel's experience in consumer class actions, the experiences of other cases, Plaintiffs estimate that approximately five percent of the Settlement Class, or 150,000 individuals, will participate in the Settlement. *See Ferrington v. McAfee, Inc.*, No. 10–CV–01455, 2012 WL 1156399, at *4 (N.D. Cal. Apr. 6, 2012) ("the prevailing rule of thumb with respect to consumer class actions is 3–5 percent"); *see also Touhey v. United States*, No. EDCV 08–01418, 2011 WL 3179036, at *7–8 (C.D. Cal. July 25, 2011) (finding a 2% response rate acceptable); *In re Cardizem Antitrust Litig.*, 218 F.R.D. 508, 526 (E.D. Mich. 2003) (finding favorable class reactions in a 6.9% response rate). Given the *pro rata* distribution clause within the Settlement, Plaintiffs estimate that the average recovery will be approximately $52.07 (the net Settlement Fund[2] divided by 150,000 claimants). But even if the claims rate is double Plaintiffs' estimates, ten percent of the Settlement Class or 300,000 individuals, the average recovery will be $26.03.

57. In addition to the Settlement Fund, Defendant will separately pay for the costs of notice and claims administration. *Id.*, at ¶¶ 4.01, 7.02. It is estimated that the notice and claims administration will be $446,944 and $654,989, depending on the number of claims submitted under the Settlement (the former estimate is for 150,000 claims and the latter 300,000 claims).

## IV. **COUNSEL STRONGLY SUPPORTS THE SETTLEMENT**

58. Finkelstein & Krinsk LLP is one of the longest-tenured class action

---

[2] The net Settlement Fund would be approximately $7,810,415 (the $12 million Settlement Fund, minus Plaintiffs' incentive awards ($40,000), and Plaintiffs' costs and attorney's fees (up to $4,149,585)). Because notice and claims administration are paid separate from the Settlement Fund, they are not deduced.

litigation firms in California, bringing to bear decades of experience prosecuting class actions in both federal and state venues nationwide. Our litigation experience includes prosecuting cases against large corporate defendants, and we have extensive knowledge of the laws and regulations applicable to this case. Our Firm is committed to practicing law in a professional manner that ensures the best possible outcome for our clients and the classes we represent. Attached hereto as **Exhibit B** is a true and correct copy of the firm resume of Finkelstein & Krinsk LLP.

59. Finkelstein & Krinsk LLP, along with Sommers Schwartz P.C., and Barbat, Mansour & Suciu PLLC, have been responsible for prosecuting this case and negotiated the Settlement Agreement that is now before the Court. Declarations from lead attorneys from those firms are also attached to the Motion for Preliminary Approval. Having conducted extensive proceedings, discovery and investigation in this case, including litigating this matter through the parties motions for Class Certification and Summary Judgment, Counsel were optimally positioned to evaluate the legal and economic consequences of Plaintiffs' and the Settlement Class members' claims.

60. Aside from aspects of this litigation apparent from the Docket, Finkelstein & Krinsk LLP became fully apprised of the factors affecting Settlement through extensive discovery and litigation described above. Based on this activity, Counsel was fully informed of the factual disputes at issue and were able to prepare a preliminary damages model, to estimate the total liability in this case.

61. While Plaintiffs remain confident in the claims, there remain significant obstacles to the Class's recovery. For example, Plaintiff will have to successfully defend the Court's class certification decision before the Ninth Circuit as well as maintain the Class through trial.

62. Additionally, while certifying a class and surviving summary judgment are important steps in this litigation, Plaintiffs still have the burden of proving liability on a classwide basis. This will involve costly expert and scientific discovery

that may be difficult for a jury to comprehend.  For example, Plaintiffs anticipate submitting a damages model based on a conjoint analysis, as well as hedonic regression analysis.  These methods of damages analysis have encountered difficulties in the past and often require extensive briefing to educate courts.  *See, e.g., Saavedra v. Eli Lilly & Co*., 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (rejecting damages model where expert had not yet collected any data from which to determine class-wide damages); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *12-13 (N.D. Cal. Dec. 15, 2014) (rejecting damages model that failed to control for other critical factors affecting price).  Additionally, litigating a complex case through trial is inherently perilous regardless of the strengths of merits of the claims.  Thus, the outcome of this case is not certain.

63.  But, even if Plaintiffs were to secure a favorable judgment, it would not end this dispute.  Finkelstein & Krinsk LLP maintains an appellate practice and understands that the post-trial appellate process poses a risk and can significantly delay any relief recovered.  Indeed, Finkelstein & Krinsk LLP recently argued *Heckart v. A-1 Self-Storage, Inc*., Case No. S23232, before the California Supreme Court.  This appeal took approximately four years and ultimately ended in an opinion favoring defendants.  Similarly, within the past year, Finkelstein & Krinsk LLP successfully overturned an adverse judgment before the Court of Appeal, Second Appellate District, in *Hansen, et al. v. Newegg.com Americas,* Inc., Case No. B271477.  Yet, even this successfully litigated appeal before an appellate court of first instance, required two years and was fraught with numerous perils.  Accordingly, Counsel is acutely aware that securing a favorable judgment is not the end of the litigation process.

64.  Plaintiffs fully expect that any judgment for the Class may be appealed by Defendant, as Defendant's counsel have stated as much and Defendant has already successfully petitioned the Ninth Circuit for review of the Class Certification Order pursuant to Rule 23(f).  According to the Ninth Circuit Appellate Practice

Guide, "roughly one in every ten appeals results in some form of reversal." An appeal, in this case, represents a real risk to the Class's recovery.

65. It was the factors and concerns referenced above that informed Plaintiffs' negotiations for this case. All settlements are a product of compromise, and this Settlement is no exception. Counsel understood that some settlement discount would be required. Nevertheless, Counsel was able to negotiate a settlement that offers participating Class Members the opportunity to recover more than they may have received at trial.

66. Indeed, each participating Class Member may receive $1 per purchased Shake Product under the terms of the Settlement. This is more than the $0.24 and $0.66 per bottle damages that Plaintiffs estimated would be recovered if successful at trial. Additionally, each Class Member may receive $3 for each purchase of a Powder Product weighing 2 ¾ lbs or less, and $5 for each purchase of a Powder Product weighing more than 2 ¾ lbs under the Settlement. Again, this is more than the expected $1.00 and $2.45 per package damages.

67. This result also forgoes the approximately four years that the parties would need to prepare this case for trial, as well as any potential appeal. Put differently, the Settlement provides immediate and substantial relief for the Class. Based on Finkelstein & Krinsk LLP experience, this firm encourages the Court's approval of this Settlement.

68. Class Counsel confirmed with Defendant's counsel that Defendant does not oppose Plaintiff's Motion for Preliminary Approval of the Class Action Settlement.

I declare under penalty of perjury under the laws of the United States, that the forgoing statements made by me are true and correct

Dated: May 13, 2019              /s/ Trenton R. Kashima
                                Trenton R. Kashima