1   Trenton R. Kashima, Esq. (SBN 291405)
    tkashima@sommerspc.com
2   SOMMERS SCHWARTZ, P.C.
    402 West Broadway, Suite 1760
3   San Diego, California 92101
    Telephone: (619) 762-2125
4   Facsimile: (619) 762-2127

5   Jason J. Thompson, Esq. (*Pro Hac Vice*)
    jthompson@sommerspc.com
6   SOMMERS SCHWARTZ, P.C.
    1 Towne Square, Suite 1700
7   Southfield, MI 48076
    Telephone: (248) 327-3084
8   Facsimile: (248) 436-8453

9   [Additional Counsel Listed on Signature Page]

10  *Attorneys for Plaintiffs*
    *and the Classes*

11                  **UNITED STATES DISTRICT COURT**

12          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

13  | | |
    |---|---|
14  | CHAYLA CLAY, ERICA EHRLICHMAN, LOGAN REICHERT, and CHRIS ROMAN, individually and on behalf of all others similarly situated, | Case No.: 3:15-cv-00165-L-DHB |
15  | | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF  MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
16  | Plaintiffs, | |
17  | v. | |
18  | CYTOSPORT, INC., a California corporation, | |
19  | Defendant. | Date:      October 19, 2020 |
20  | | Time:      10:30 a.m. |
    | | Judge:     Hon. M. James Lorenz |
    | | Ct Rm:     Courtroom 5B |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND INFORMATION .............................................................. 2

        A.      Overview of the Litigation ............................................................... 2

        B.      Terms of the Settlement ................................................................... 6

        C.      Dissemination of Class Notice ......................................................... 7

        D.      The Reaction of Settlement Class Members to the Settlement.................. 9

        E.      Plaintiffs' Incentive Awards and Class Counsel's Attorneys' Fees and Costs ...................................................................................................... 10

III.    THE SETTLEMENT CLASS SATISFIES ALL REQUIREMENTS OF RULE 23 For CLASS CERTIFIATION ........................................................ 10

IV.     THE SETTLEMENT SHOULD BE GRANTED FINAL APPROVAL........... 12

        A.      The Best Practicable Notice of Settlement Has Been Provided to the Class ................................................................................................. 12

        B.      The Settlement is Fair, Reasonable and Adequate.................................. 14

                1.      The Class Representative and Class Counsel have adequately represented the Settlement Class ..................................................... 15

                2.      The Settlement was Reached after Contentious and Informed Arms' Length Negotiations........................................................................ 16

                3.      The Settlement Provides Substantial, Certain Benefits................. 18

                4.      The Settlement Avoids the Risk, Cost, Delay, and Burden of Further Litigation........................................................................................ 20

                5.      The Allocation Is Fair and Reasonable and Should Be Approved 21

                6.      Reaction of the Class and Government Agencies .......................... 22

        C.      PLAINTIFFS' REQUESTED ATTORNEYS' FEES AND INCENTIVE AWARDS DO NOT DETRACT FROM THE REASONABLENESS OF THE SETTLEMENT ....................................................................... 24

V.      CONCLUSION ........................................................................................... 25

**<u>Cases</u>**

*Alberto v. GMRI, Inc.*,
  252 F.R.D. 652 (E.D .Cal. 2008) ................................................................17

*Arnold v. Fitflop USA, LLC*,
  No. 11-CV-0973, 2014 WL 1670133 (S.D. Cal. Apr. 28, 2014) ......................13

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979) ......................................................16, 24

*Brown v. Hain Celestial Grp., Inc.*,
  No. 3:11-CV-03082, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016).................22

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ..............................................................15

*Cicero v. DirecTV, Inc.*,
  No. EDCV 07-1182, 2010 WL 2991486 (C.D. Cal. July 27, 2010) ................24

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
  No. 6:12–1609, 2015 WL 965696 (W.D. La. Mar. 3, 2015)..........................19

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) .............................................................14

*Craft v. Cty. of San Bernardino*,
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...................................................24

*Czuchaj v. Conair Corp.*,
  No. 3:13-cv-1901, 2016 WL 4272374 (S.D. Cal. Aug. 15, 2016) ..................21

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)........................................................................12

*Faught v. Am. Home Shield Corp.*,
  No. 2:07-CV-1928-RDP, 2010 WL 10959223 ..........................................19

*Ferrington v. McAfee, Inc.*,
  2012 WL 1156399 (N.D. Cal. Apr. 6, 2012)............................................22

*Glass v. UBS Fin. Servs., Inc.*,
  No. C-06-4068, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) .......................17

*Greko v. Diesel U.S.A., Inc.,*
   No. 10-cv-02576 NC, 2013 WL 1789602 (N.D. Cal. Apr. 26, 2013).....................20

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1019 (9th Cir. 1998) .............................................................. 15, 18

*Hester v. Vision Airlines,* Inc.,
   No. 2:09-CV-00117, 2017 WL 4227928 (D. Nev. Sept. 22, 2017) ........................22

*In re Austrian & German Bank Holocaust Litigation,*
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ...........................................................23

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) ............................................................... 15, 24

*In re Cardizem Antitrust Litig.,*
   218 F.R.D. 508 (E.D. Mich. 2003) .............................................................23

*In re Ikon Office Solutions, Inc., Sec. Litig.,*
   194 F.R.D. 166 (E.D. Pa. 2000)................................................................18

*In re Magsafe Apple Power Adapter Litig.,*
   No. 5:09-CV-01911, 2015 WL 428105 (N.D. Cal. Jan. 30, 2015) ........................22

*In re Nasdaq Market–Makers Antitrust Litigation,*
   2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) ...................................................14

*In re New Motor Vehicles Canadian Export Antit. Litig.,*
   2011 WL 1398485 (D. Maine April 13, 2011).........................................23

*In re Nvidia Derivs. Litig.* No., C-06-06110,
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)...........................................20

*In re Pac. Enterprises Sec. Litig.,*
   47 F.3d 373 (9th Cir. 1995) ...................................................................24

*In re Prudential Ins. Co. of America Sales Practices Litig.,*
   962 F.Supp. 450 (D.N.J. 1997).......................................................... 18, 19

*In re Rite Aid Corp. Securities Litigation,*
   396 F.3d 294 (3rd Cir. 2005) .................................................................25

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,*
   2012 WL 2512750 (D. Minn. June 29, 2012) .........................................23

*In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig.,*
  No. 5:09-MD-02015-JF, 2011 WL 1877630 (N.D. Cal. May 17, 2011) .................25

*Keepseagle v. Vilsack,*
  118 F. Supp. 3d 98 (D.D.C. 2015)........................................................................22

*Knight v. Red Door Salons  Inc.,*
  No. 08-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009).....................................24

*Laguna v. Coverall North America, Inc.,*
  753 F.3d 918 ........................................................................................................16

*Laskey v. Int'l Union,*
  638 F.2d 954 (6th Cir. 1981) ...............................................................................23

*Low v. Trump Univ., LLC,*
  246 F. Supp. 3d 1295 ...........................................................................................17

*Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago,*
  834 F.2d 677 (7th Cir. 1987) ...............................................................................16

*Nat'l Rural Telecomms. Coop v. DirecTV,*
  221 F.R.D. 523 (C.D. Cal. 2004)....................................................................20, 24

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco,*
  688 F.2d 615 (9th Cir. 1982) ...............................................................................11

*Pappas v. Naked Juice Co of Glendora, Inc.,*
  No. CV1108276, 2014 WL 12382279 (C.D. Cal. Jan. 2, 2014) ............................13

*Peters v. Nat'l R.R. Passenger Corp.,*
  966 F.2d 1483 (D.C. Cir. 1992)............................................................................12

*Rodriguez v. W. Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009) ..........................................................................21, 25

*Schulte v. Fifth Third Bank,*
  805 F. Supp. 2d 560 .............................................................................................14

*Staton v. Boeing Co.,*
  327 F.3d 938 .................................................................................................19, 25

*Stoetzner v. U.S. Steel Corp.,*
  897 F.2d 115 (3d. Cir. 1990) ...............................................................................23

*Thieriot v. Celtic Ins. Co.*,
 No. C 10-04462 LB, 2011 WL 1522385 (N.D. Cal. April 21, 2011) .....................20

*Tijero v. Aaron Bros., Inc.*,
 301 F.R.D. 314 (N.D. Cal. 2013).................................................................................16

*Touhey v. United States,*
 2011 WL 3179036 (C.D.Cal. July 25, 2011)..............................................................23

*True v. American Honda Motor Co.*,
 749 F.Supp.2d 1052 (C.D. Cal. 2010) ........................................................................21

*Wilson v. Airborne, Inc.*,
 No. EDCV 07-770 VAP(OPX), 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008)12, 13

## **Statutes**

15 U.S.C. § 2301 .................................................................................................................3
28 U.S.C. § 1715...............................................................................................................23
Cal. Bus. & Prof. Code §§ 17200 .......................................................................................3
Cal. Bus. & Prof. Code §§ 17500 .......................................................................................3
Cal. Civ. Code §§ 1700 .......................................................................................................3
Cal. Health & Safety Code § 110100 ..................................................................................3
Fl.St. § 500.11 .....................................................................................................................3
Fl.St. §§ 501.201 .................................................................................................................3
M.C.L. § 289.8101 ..............................................................................................................3
M.C.L. §§ 445.901 ..............................................................................................................3

## **Rules**

Fed. R. Civ. P. 23 (c)(1)(C) ..............................................................................................11
Fed. R. Civ. P. 23(c)(2)......................................................................................................12
Fed. R. Civ. P. 23(c)(2)(B)................................................................................................14
Fed. R. Civ. P. 23(e)(2)(A)-(C) ........................................................................................15
Fed. R. Civ. P. 23(e)(2)(B) ...............................................................................................16
Fed. R. Civ. P. 23(e)(2)(C) ...............................................................................................18
Fed. R. Civ. P. 23(e)(2)(C)(ii) ....................................................................................20, 21
Fed. R. Civ. P. 23(e)(2)(C)(iv).........................................................................................18
Fed. R. Civ. P. 23(e)(2)(D)...............................................................................................21
Federal Rule of Civil Procedure 23(e)...............................................................................14
Rule 23 ...............................................................................................................................25
Rule 23(a)(4).......................................................................................................................15

Plaintiff's Memorandum of Authorities in Support of Motion for Final Approval

Rule 23(e)(1)............................................................................12, 15

**Regulations**

21 C.F.R. § 101.62 (a) ...............................................................3
21 C.F.R. § 101.62(e) ................................................................3

**Other Authorities**

Newberg on Class Actions § 8:40 (4th ed.)............................14, 17
NEWBERG ON CLASS ACTIONS § 12:28 (5th ed. 2015)..................22

Plaintiffs Chayla Clay, Erica Ehrlichman, Logan Reichert, and Chris Roman respectfully request that this Court finally approve the parties' Joint Stipulation of Class Settlement and Release (the "Settlement Agreement" or "Agreement"):[1]

## I.    INTRODUCTION

The proposed Settlement resolves a nearly four-year litigation regarding Plaintiffs' claims that Defendant Cytosport, Inc. mislabels a number of its protein drinks, in violation of both state and federal law.  This Settlement has all the hallmarks of a fair, reasonable, and adequate compromise of the Classes' claims as it was the product of arm's length negotiations by experienced counsel, was reached only after significant investigation and discovery, and had the benefit of extensive motion practice to probe the strengths and weaknesses of each parties' respective legal positions.

Indeed, this Settlement was already preliminarily approved by the Court and notice has been provided both online and through print advertisement.  Since then, the response of the Settlement Class Members been overwhelmingly positive.  During the Claims Period, **167,394** claims were submitted or **5.58 percent** of the estimated approximately three million strong Settlement Class.  In addition, there have been **no objections** to the Settlement and only **227** requests for exclusion (or 0.0076 percent of the Settlement Class).

This reaction is unsurprising.  The Settlement provides Class Members with over 12 million dollars in benefits, in addition to other valuable non-monetary relief.  More specifically, the Settlement delivers participating Class Members with more than they could have expected at trial, on average **$46.79** per claim.  Defendant also agreed to address the underlying business practices giving rise to this action, removing the challenged "lean" references from the Powder Product's labels and agreeing to review its manufacturing processes to minimize variability of the protein content contained in

---

[1] The Amended Settlement Agreement is attached Exhibit A to the Declaration of Trenton R. Kashima in support of Renewed Motion for Preliminary Approval of Class Settlement [ECF No. 232-7] ("Kashima Decl. I").  All capitalized terms used herein have the same definitions as those defined in the Amended Settlement Agreement.

1    its Shake Products.  Agreement, at ¶ 4.01.  Accordingly, the Settlement achieves the

2    enumerated compensatory and prophylactic goals set forth in the Complaint.

3        And absent the Settlement, the Settlement Class would continue to face

4    significant risk and delay.  Before Plaintiffs could have their claims heard at trial, they

5    would have to face an appeal before the Ninth Circuit, which would likely take over

6    two years to resolve.  Assuming they were successful before the appellate court,

7    Plaintiffs would still face the normal litany of pre-trial motions and have to try a

8    complex class case.  Given that Defendant is unlikely to accept a favorable judgment,

9    future appeals would only delay any relief for another two years.  On the other hand,

10   this Settlement provides the Settlement Class immediate and real recovery.

11   Accordingly, the proposed Settlement satisfies all criteria for final settlement approval.

12   **II.    BACKGROUND INFORMATION**

13       **A.    Overview of the Litigation**

14       Plaintiffs filed this case on January 23, 2015.  *See generally* Plaintiffs' Complaint

15   [ECF No. 1].  Defendant manufactures and markets the popular Muscle Milk branded

16   protein supplements, which are offered as both "Powder Products" and the ready-to-

17   drink "Shake Products" (collectively referred to herein as the "Class Products").  *See*

18   *generally* First Amended Complaint ("FAC") [ECF No. 156] at ¶¶ 1-3.   The Powder

19   Products are protein drink powders that consumers typically mix with water or milk.

20   The Shake Products come in a premixed liquid form and are sold as individual serving-

21   sized containers.

22       During the Class Period, Defendant labeled its Powder Products with a number

23   of "Lean" claims, including: (1) the front labels stated that they contain "[XX] g LEAN

24   PROTEIN"; (2) the Products identified as "LEAN MUSCLE PROTEIN," "LEAN

25   MUSCLE PROTEIN SUPPLEMENT," "LEAN MUSCLE PROTEIN POWDER," or

26   "NEW LEANER FORMULA"; and (3) the vast majority of the products also advertise

27   they contain "Lean Lipids."  *See* Declaration of Trenton Kashima ("Kashima Decl. II")

28   [ECF No. 157-21], ¶¶ 7-9, App. A.

Plaintiffs contend that the "Lean" claims are both misleading and illegal under federal law.  FAC, ¶¶ 46-52.  The Powder Products are fortified with oils and fats. Kashima Decl. II, ¶ 27.  Plaintiffs, thus, argue that use of the term lean to describe these Products was misleading.[2]  Further, pursuant to the Food, Drug, and Cosmetic Act ("FDCA"), federal regulations prohibit the use of the word "lean" unless the food meets the requirements of 21 C.F.R. § 101.62(e).  *See* 21 C.F.R. § 101.62 (a).  Plaintiffs assert that each "Lean" Muscle Milk Product fails to satisfy 21 C.F.R. § 101.62(e) and is a *per se* violation of the FDCA.[3]

Plaintiffs further alleges that Defendant's Shake Products do not contain the advertised quantity of protein.  FAC, ¶¶ 16-30; Kashima Decl. II, ¶¶ 18-20, App. C; *see also id.*, Exs. S & T.[4]

Based on these assertions, Plaintiffs alleged—on behalf of a National Class—that Defendant had violated the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 *et seq.*, and the California False Advertising Law ("FAL") a CAL. BUS. & PROF. CODE §§ 17500 *et seq*.  FAC, ¶¶ 61-69, 83-104.  Plaintiffs also claimed, on behalf of classes of purchasers of Shake and Powder Products in California, Michigan, and Florida, that the advertisements of the Class Products violate their respective state's consumer protection statutes[5], warranty laws, and the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*.  FAC, ¶¶ 61-146.[6]

---

[2] The lean claims involved the following products: Muscle Milk: Lean Muscle Protein Powder; Muscle Milk Light: Lean Muscle Protein Powder; Muscle Milk Naturals: Nature's Ultimate Lean Muscle Protein; Muscle Milk Pro Series 50: Lean Muscle Mega Protein Powder; and Monster Milk: Lean Muscle Protein Supplement.

[3] California, Florida and Michigan have each expressly adopted the requirements of FDCA into their own state statutory regimes. *See* CAL. HEALTH & SAFETY CODE § 110100; FL.ST. § 500.11; M.C.L. § 289.8101.

[4] The protein claims involved the following products: Cytosport Whey Isolate Protein Drink; Monster Milk: Protein Power Shake; Genuine Muscle Milk: Protein Nutrition Shake; and Muscle Milk Pro Series 40: Mega Protein Shake.

[5] For the California Subclass, the UCL, FAL, and Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1700 *et seq*.  For the Michigan Subclass, the Michigan Consumer Protection Act, M.C.L. §§ 445.901 *et seq*.  For the Florida Subclass, the Florida Deceptive and Unfair Trade Practices Act, FL.ST. §§ 501.201 *et seq*.

[6] Plaintiffs also challenged the L-Glutamine claims made on Defendant's Powder

The parties heavily contested this case.  Shortly after the complaint was filed, Defendant moved to dismiss Plaintiffs' claims [ECF No. 24-1] and Plaintiffs filed a Motion for Judgment on the Pleadings to contest the validity of Defendant's twenty-seven affirmative defenses [ECF No. 68-1].  The Court ultimately denied Defendant's Motion to Dismiss [ECF No. 53] and granted, in part, Plaintiffs' Motion for Judgment on the Pleadings [ECF No. 163].

Having established their pleadings, the parties engaged in extensive discovery. Plaintiffs propounded fifty-six document requests, thirty-two interrogatories, sixteen requests for admissions, and a number of subpoenas.  Kashima Decl. I, at ¶ 25.  As a result, Plaintiffs received and reviewed over 47,000 pages of documents, plus voluminous sales data.  *Id.* at ¶ 26.  Plaintiffs deposed several of Defendant's key employees, including Defendant's Chief Marketing Officer, Senior Vice President of Innovation and Business Development, and Compliance Manager.  *Id.*, at ¶ 27.  In total, Plaintiffs took six depositions over seven days.  *Id.*

Plaintiff further relied on the testimony of expert witness to support their case. Plaintiffs offered the declaration of Dr. William Campbell regarding the effects of L-glutamine on the human body, as well as the declarations of Dr. Jeffrey Harris and Dr. Elizabeth Howlett in support of Plaintiffs' proposed class damages model.  *See* ECF Nos. 157-6, 157-7 & 157-8.

This discovery allowed Plaintiffs to move for Class Certification, while Defendant moved for Summary Judgment.  Kashima Decl. I, at ¶ 20; ECF Nos. 157, 170.  To support their respective positions, the parties submitted 135 pages of briefing and seventeen declarations (including five expert declarations) with over 4,000 pages of evidence.  *Id.*  The Court ultimately granted in part, and denied in part, both Plaintiffs' Motion for Class Certification and Defendant's Motion for Summary Judgment.  The Court granted summary judgment as to Plaintiffs' Michigan Consumer Protection Act

---

Products.  FAC, ¶¶ 31-45.  These claims were not certified, and are no longer being pursued.

(sections 445.903(1)(a), (e), (s) and (cc); but not 445.903(1)(c)), express warranty and MMWA claims (Order Regarding Motion for Summary Judgment [ECF No. 209]), while certifying the following classes:

> (1) the nationwide classes as to the UCL and FAL claims to the extent they are based on statements of protein content on protein shake labels and "lean" statements on protein powder labels; (2) the California subclasses as to the UCL, FAL and CLRA claims to the extent they are based on statements of protein content on protein shake labels; and UCL and FAL claims to the extent they are based on "lean" statements on protein powder labels; (3) the Florida subclasses as to the FDUTPA violation based on the protein content statements on protein shakes and "lean" statements on protein powders; and (4) the Michigan subclass as to the MCPA violation based on the protein content statements on protein shakes."

Order Regarding Class Certification [ECF No. 210], at p. 38.

Following the Court's ruling, Defendant filed a Petition for Permission to Appeal the Court's decision on class certification pursuant to Rule 23(f). ECF No. 217. This Petition was accepted and the parties were preparing to brief the appeal. *See* ECF No. 218. However, this Court's ruling also spurred further settlement discussions between the parties. Kashima Decl. I, at ¶ 38.

The parties had previously discussed settlement of this case, but to no avail. On October 26, 2015, the parties attended an Early Neutral Evaluation Conference before Magistrate Judge David Bartick. *See* ECF No. 65. And, later, the parties agreed to meet for in-person settlement discussions in Walnut Creek, California. Kashima Decl. I, ¶¶ 36-37. While the parties discussed their respective legal positions, no significant progress was achieved. *Id.* But with the clarification provided by the parties' respective Motions for Class Certification and Summary Judgment, settlement discussions restarted. *Id.*, at ¶ 38.

The parties agreed to mediate before David Rotman, a respected neutral. The first mediation session with Mr. Rotman took place at his office in San Francisco, California on November 5, 2018. *Id.*, at ¶ 39. The parties discussed the structure of potential settlements and made some headway, but were unable to reach an agreement. *Id.*, at ¶ 48. The parties, nonetheless, continued their settlement discussions. *Id.*, at ¶

49.  The parties met with Mr. Rotman for a second session on March 7, 2019 and were able to come to an agreement on the material terms of the Settlement.  *Id*., at ¶ 50.  The Settlement Agreement was signed on May 12, 2019 after negotiating the remaining terms.  *Id*., at ¶ 51.

### B.   Terms of the Settlement

The Court preliminarily approved the Settlement on June 17, 2020.   Order Granting Class Plaintiffs' Renewed Motion for Preliminary Approval [ECF No. 345]. Under the parties' Agreement, Defendant will contribute $12 million to a non-reversionary common fund (the "Settlement Fund") which will be paid out to Class Members after payment of Class Counsel's attorneys' fees and costs and the requested incentive awards.  Agreement at ¶¶ 2.31, 4.01, 10.01.  Thus, the net Settlement Fund distributed to the Settlement Class will be, at least, $7,810,415 (the $12 million Settlement Fund, minus Plaintiffs' requested incentive awards (up to $40,000), and Plaintiffs' requested costs and attorney's fees (up to $4,149,585)).   Declaration of Trenton Kashima in support of Motion for Attorneys' Fees, Costs, and Incentive Award [ECF No. 239-2] ("Kashima Decl. III"), at ¶ 46 n.3.  g

Defendant agreed to separately pay the costs of notice and claims administration, which likely will amount to another approximately half million dollars.  Agreement at ¶¶ 4.01, 7.02; Kashima Decl. II, at ¶ 62. Because notice and claims administration are paid separate from the Settlement Fund, these costs will not reduce the amount paid to the Settlement Class.

The Settlement Fund will be distributed to the Settlement Class on a claims-made basis, according to the number of Shake and Powder Products purchased during the Class Period:

> For Shake Products, Class Members with proof of purchase may submit claims for $1 per purchased shake, with no limit on the number of shakes that may be claimed.  Class Members with no proof of purchase may submit claims for $1 per purchased shake, capped at $25.

> For the Powder Products, Class Members with proof of purchase may submit claims for $3 for each purchase of a product weighing 2 ¾ lbs or

less and $5 for each purchase of each product weighing more than 2 ¾ lbs, with no limit on the number of purchases that may be claimed. Class Members with no proof of purchase may submit claims for $3 for each purchase of a product weighing 2 ¾ lbs or less and $5 for each purchase of each product weighing more than 2 ¾ lbs, capped at $25.

Agreement at *¶* at ¶¶ 4.01-4.04.   But, if the funds claimed are less than the net Settlement Fund, each Class Member will receive a *pro rata* share of any remaining funds. *Id*., at ¶ 4.05.

To receive a cash payment, Class Members must have filed a timely and valid Claim Form. *Id.* at ¶¶ 4.02, 9.01. The Claim Form may be completed either online or by mail, providing the number and type of Class Product(s) purchased within the applicable Class Period. *Id.* The Settlement Administrator will be responsible for reviewing all claims to determine their validity. *Id.* at ¶ 9.02.

In additional to the monetary benefit, Defendant has removed the challenged "lean" references from the Powder Product's labels. Agreement, at ¶ 4.01. Defendant has also agreed to review its manufacturing processes and protocols to minimize variability of the protein content contained in its Shake Products. *Id.*

### C.   Dissemination of Class Notice

The Settlement Administrator provided Class Notice through a robust media campaign consisting of targeted internet banner advertisements, print publication notice in two widely-read consumer magazines (Sports Illustrated and People), sponsored notice on two leading class action-related websites (www.topclassactions.com and www.classaction.org), and two custom social media campaigns (Twitter and Facebook). *See generally* Declaration of Steven Weisbrot [ECF No. 232-2] ("Weisbrot Decl. I"); Declaration of Steven Weisbrot, concurrently filed herewith ("Weisbrot Decl. II").

The banner advertisements ran for 60 consecutive days, starting on July 3, 2020, and served approximately 8,541,514 impressions. Weisbrot Decl. II, at ¶ 21. These online advertisements used machine learning and a known and verifiable audience profile, to target possible Settlement Class Members. Weisbrot Decl. I, at ¶¶ 4-18.

Similarly, the social media advertisements targeted users who exhibited interest in fitness or protein supplements.  Weisbrot Decl. II, at ¶ 19.  The Facebook and Twitter advertisements ran for eight consecutive weeks.  The Facebook advertisements served approximately 674,070 impressions and Twitter advertisements reached approximately 387,519 people.  *Id.*  This method of notice was appropriate as the Settlement Class are heavy internet users, who surf the internet on average of 25 hours per week (compared to the national average of 19 hours per week).  Declaration of Steven Weisbrot [ECF No. 222-9] ("Weisbrot Decl. III") at ¶ 14

But the publication notice will also reach a significant number of potential Class Members.  Specifically, Class Notice appeared in the July 3, 2020 issue of *People* (with a circulation of 3,510,533) and in the July 21, 2020 issue of *Sports Illustrated* (with a circulation of 2,700,000), which have a strong reach among the Settlement Class.  Weisbrot Decl. II, at ¶¶ 16-17.  Additionally, a press release was provided to a total of 102 news outlets, with a potential audience of approximately 48,270,528.  *Id.* at ¶ 14.  Collectively, the notice regime was estimated to directly reach 78.86% of the Settlement Class with an average frequency of 3.43 views per person.  *Id.* at ¶ 29.

The notice program also included a dedicated website (https://www.leanproteinsettlement.com) and toll-free telephone line where Settlement Class Members could learn more about their rights under the Settlement.  *Id.* at ¶¶ 8-11.  The Settlement Website included the long-form Class Notice, which is written in an easy-to-understand and clear language and provides Class Members with (1) more extensive information about the lawsuit; (2) a description of the benefits provided by the Settlement; (3) an explanation of how Class Members can exercise their right to object to or opt-out of the Settlement; (4) an explanation that any claims against Defendant that could have been litigated in this action will be released; (5) the names of counsel for the Class and information concerning attorneys' fees and incentive awards; (6) the date and time of the fairness hearing, and (7) all relevant court filings.  *See* Agreement at Ex. B (Long Form Class Notice); *see* https://www.leanproteinsettlement.com.

### D.    The Reaction of Settlement Class Members to the Settlement

Settlement Class Members could submit a claim, either online or by mail, from July 3, 2020 to September 16, 2020.  Weisbrot Decl. II, at ¶ 23.  To do so, Class Members had to provide the number and type of Class Product(s) purchased within the applicable Class Period. Kashima Decl. IV, at ¶ 4.  Only if a claim exceeded the twenty-five dollar limit, was a Settlement Class Member required to provide proof of purchase. *Id*.  This simple process allowed any Class Member to make a claim against the Settlement Fund.

During the claims period, Settlement Class Members submitted a total of 167,394 claims, of which 3,631 were submitted with supporting documentation.  Weisbrot Decl. II, at ¶¶ 23-24.  When broken down by product type, Class Members submitted claims for: (1) 2,816,894 Shake Class products; (2) 210,608 Powder Class products of 2.75 lbs. or less; and (3) 424,263 Powder Class products of more than 2.75 lbs.  *Id*.  Before any *pro rata* adjustment, the total value of these claims was $2,816,894 for the Shake Products at $1.00 per product, $631,824 for the Powder Products 2.75 lbs. or less at $3.00 per product, and $2,121,315 for the Powder Products more than 2.75 lbs. at $5.00 per product, for a total "face value" of $5,570,033.  *Id*.[7]

Because the value of the initial claims does not fully exhaust the net Settlement Fund of $7,810,415, each participating Settlement Class Member will receive an upward adjustment to their recovery of approximately 40.22%.  Kashima Decl. IV, at ¶ 11.  The amount estimated to be actually distributed under the Settlement is:

|  | Total Claims Submitted | Pro Rata Value Per Claim | Total Value of Claims Submitted |
|---|---|---|---|
| **Shake Class Products** | 2,816,894 | $1.40 | $3,943,651.60 |
| **Powder Class Products 2.75 lbs. or less** | 210,608 | $4.20 | $884,553.60 |
| **Powder Class Products more than 2.75 lbs.** | 424,263 | $7.00 | $2,969,841.00 |

---

[7] As of the filing of this motion, the Settlement Administrator has processed 166,922 out of the 167,394 Claim Forms submitted, and the information provided herein is based on these reviewed claims.  Weisbrot Decl. II, at ¶ 40.  A supplement declaration will be provided once this review process is complete.

9                                    Case No.: 3:18-cv-01371

*Id.*, at ¶ 11.  The average value of the claim will be **$46.79** ($7,810,415 divided by 167,394 claims).  *Id.*  **No objections** were submitted to the Settlement and only **226 requests for exclusions** were submitted (0.0076 percent of the Settlement Class). Weisbrot Decl. II, at ¶¶ 26-27.  The Class's reaction to the Settlement has been overwhelming positive.

### E.   Plaintiffs' Incentive Awards and Class Counsel's Attorneys' Fees and Costs

As is customary in common fund cases, Class Counsel intend to seek up to 31.14% or $3,883,682.34 of the common fund as an award of attorneys' fees. Agreement at ¶ 5.01; Kashima Decl. III, at ¶ 53.  Plaintiffs' counsel also incurred over $265,902.66 in costs litigating this action to date, and those costs should be reimbursed from the common fund.  *Id.*  Finally, Class Counsel intend to seek incentive awards of $10,000.00 for each of the named Plaintiffs, for their assistance in helping to prosecute the case and for participating in discovery and multiple mediations.  Agreement at ¶ 5.02.

## III.   THE SETTLEMENT CLASS SATISFIES ALL REQUIREMENTS OF RULE 23 FOR CLASS CERTIFIATION

Previously, the Court granted, in part, Plaintiffs' Motion for Class Certification, certifying the following national class and state law subclasses:

> (1) the nationwide classes as to the UCL and FAL claims to the extent they are based on statements of protein content on protein shake labels and "lean" statements on protein powder labels; (2) the California subclasses as to the UCL, FAL and CLRA claims to the extent they are based on statements of protein content on protein shake labels; and UCL and FAL claims to the extent they are based on "lean" statements on protein powder labels; (3) the Florida subclasses as to the FDUTPA violation based on the protein content statements on protein shakes and "lean" statements on protein powders; and (4) the Michigan subclass as to the MCPA violation based on the protein content statements on protein shakes."

Order Regarding Class Certification [Dkt. No. 210], at p. 38.

In doing so, the Court found that the Classes were sufficiently numerous (*id.* at pp. 5-13), shared common and predominating questions of law and fact (*id.* at pp. 13-34), that Plaintiffs were both typical and adequate representatives of the Classes (*id.*, at

pp. 34-36); and that class litigation is superior to individual actions (*id.*, at p. 36-38). These findings do not change given the current deposition of the case. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 633 (9th Cir. 1982) (Courts can apply a lesser standard of scrutiny when reviewing certification of classes for settlement than when determining the propriety of class certification for litigation.).

While classes were already certified in this case, the parties' Settlement contemplates slightly different class definitions for settlement purposes:

> "Powder Settlement Class" means and includes all consumers in the United States (including its states, districts or territories) who purchased a Powder Settlement Class Product that had the phrase "lean lipids," "lean protein," "lean muscle protein," or "new leaner formula" on the label during the Powder Settlement Class Period.

> "Shake Settlement Class" means and includes all consumers in the United States (including its states, districts or territories) who purchased a Shake Settlement Class Product during the Shake Settlement Class Period or, for members of the Michigan subclass only, the Michigan Shake Settlement Class Period.

Agreement at ¶ 2.29; *see also* FED. R. CIV. P. 23 (c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment." ).  These Settlement Classes were conditionally certified by the Court, for purposes of Settlement, at preliminary approval.  Order Granting Class Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement [ECF No. 235].

The reason for the amendment of the previously certified Classes was to narrow the Settlement Classes' definitions to only include "consumers" and to streamline the number of subclass. *Compare* Order Regarding Class Certification [Dkt. No. 210] *with* Agreement at ¶ 2.29.  But this narrowing of the certified classes does not displace the rational of the Court in granting Plaintiffs' Motion for Class Certification.  Order Granting Class Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement [ECF No. 235].  The Settlement Class still involves the same purchasers of the same products asserting the same claims.  Accordingly, the Court should finally certified Settlement Class for the reasons identified in its Class Certification Order.

## IV.   THE SETTLEMENT SHOULD BE GRANTED FINAL APPROVAL

### A.   The Best Practicable Notice of Settlement Has Been Provided to the Class

Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." FED. R. CIV. P. 23(e)(1). The purpose of the notice is to "afford members of the class due process which, in the context of the [R]ule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (*citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974)).  A notice program must provide the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See Eisen*, 417 U.S. at 173 (citing Fed. R. Civ. P. 23(c)(2); emphasis omitted).

In consumer product cases, "where settlement class members are retail purchasers of Defendants' consumer product, whose identities and contact information cannot readily be ascertained," publication notice is reasonable.  *Wilson v. Airborne, Inc.*, No. EDCV 07-770 VAP(OPX), 2008 WL 3854963, at *5 (C.D. Cal. Aug. 13, 2008).  Here, the Settlement Administrator provided notice by an extensive print and online advertisement campaign.  *See generally* Weisbrot Decl. I; Weisbrot Decl. II.  Notice was issued primarily through online advertisements (including on social media platforms such as Twitter and Facebook), which was targeted at the demographics most likely to include Settlement Class Members.  Weisbrot Decl. II, at ¶¶ 19-21.  In total, the online advertisements resulted in 9,603,103 impressions (8,541,514 from Banner advertisements, 387,519 from Facebook advertisements, and 674,070 from Twitter advertisements).  *Id.*  Furthermore, the Settlement was promoted on two leading class action settlement websites, www.topclassactions.com and www.classaction.org, [8] as

---

[8] Indeed, these two websites represent the top Google search results for "class settlements."  Accordingly, posting on these sites is designed reach those individual searching for the Settlement on the internet.

1  well as on the Settlement Website, leanproteinsettlement.com.  *Id.*, at ¶ 12.  The online

2  notice was provided through multiple methods, to ensure its wide reach.

3       The online notice was supplemented by advertisements in *People* (with a

4  circulation of 3,510,533) and *Sports Illustrated* (with a circulation of 2,700,000).  *Id.*,

5  at ¶ 16-17.  These publications were chosen for the notice program due to its strong

6  reach among the Settlement Class.  Weisbrot Decl. I, at ¶ 33.  The Settlement Class

7  reads an above-average 7 magazines per month, and these publications were popular

8  with both male and female members of the Settlement Class.  *Id.*, at ¶ 20 (*People*

9  *Magazine* readership is comprised of 72.2% female and 27.8% male, while *Sports*

10 *Illustrated* readership is comprised of 77.34% male and 22.66% female).  *Id.*; Weisbrot

11 Decl. III, at ¶ 16.  Also, the Settlement Administrator issued press releases to media

12 outlets with a potential audience of approximately 48,270,528.  Weisbrot Decl. II, at ¶

13 19.  Collectively, the notice regime reached 78.86 percent with an average frequency of

14 3.43 views per person.  *Id.*, at ¶ 29.  This is more than the Settlement Administrator's

15 original estimates.  *Compare* Weisbrot Decl. I, at ¶ 33 (estimating a 70.14% reach with

16 an average frequency of 2.93) *with* Weisbrot Decl. II. , at ¶ 29.

17      The notice distribution plan is based on a similar regime that was approved in

18 other consumer cases and provided the Settlement Class with sufficient opportunity to

19 participate in the Settlement.  *See, e.g., Wilson,* 2008 WL 3854963, at *4; *Arnold v.*

20 *Fitflop USA, LLC*, No. 11-CV-0973, 2014 WL 1670133, at *4 (S.D. Cal. Apr. 28, 2014);

21 *Pappas v. Naked Juice Co of Glendora, Inc*., No. CV1108276, 2014 WL 12382279, at

22 *5 (C.D. Cal. Jan. 2, 2014); *see also* The Federal Judicial Center, Judges' Class Action

23 Notice and Claims Process Checklist and Plain Language Guide (noting that it is

24 reasonable to reach between 70–95% of the class).  Indeed, 167,394 Class Members

25 were able to submit a claim, more than the amount originally estimated by Plaintiffs at

26 preliminary approval.  Weisbrot Decl. II, at ¶ 23; Kashima Decl. I, at ¶ 61 (estimating

27 that that approximately five percent of the Settlement Class, or 150,000 individuals,

28 will participate in the Settlement).  The notice regime provided the Settlement Class

with sufficient opportunity to participate or exclude themselves from this Settlement.

Additionally, Class Notice clearly and concisely states in plain, easily understood language: the nature of the action; the definition of the Settlement Class; the relevant claims, issues and defenses; the terms of the proposed Settlement; the time and manner for requesting exclusion, or to make an objection or claim; and the binding effect of a class judgment on Settlement Class member, even if they noting.  *See* FED. R. CIV. P. 23(c)(2)(B).

The Class Notice also referred Settlement Class to the Settlement website and a toll-free number for further information, and allowed submission of electronic claims, which "suggests that the claims process was designed to encourage—not discourage— the filing of claims."  Weisbrot Decl. II, at ¶¶ 8-11; *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 591 (N.D. Ill. 2011*In re Nasdaq Market–Makers Antitrust Litigation*, 2000 WL 37992, *4–5 (S.D.N.Y. Jan. 18, 2000) (recognizing that the "innovative use" of "electronic claim forms is likely to contribute to a far larger number of claims"); 3 Newberg on Class Actions § 8:40 (4th ed.) ("the inclusion of toll-free numbers in notices serves to facilitate, and thereby encourage, the filing of claims") (collecting cases).  Indeed, the Settlement Administrator and Class Counsel fielded at least 166 calls, totaling approximately 934 minutes, from interested individuals.  Weisbrot Decl. II, at ¶ 11; Kashima Decl. IV, at ¶ 5.  Thus, the Court-approved Class Notice program adequately informed Class Members of the proposed Settlement and allowed for Class participation, satisfying Rule 23(c)(2)(B).

## B.    The Settlement is Fair, Reasonable and Adequate

Federal Rule of Civil Procedure 23(e) requires judicial approval of any class settlement.  Although the Ninth Circuit has emphasized that a strong judicial policy favors settlement of class actions, *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992), Rule 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court."  The Ninth Circuit has instructed district courts to consider multiple factors when assessing the fairness of the settlement

of a case, which include:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) *citing Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also* FED. R. CIV. P. 23(e)(2)(A)-(C) (listing factors to be examined).

This Court previously reviewed the Settlement and found that the Settlement is fair, reasonable and adequate on a preliminary basis.  Order Granting Class Plaintiffs' Renewed Motion for Preliminary Approval [ECF No. 345].  Now after completing notice to the Settlement Class and receiving their reaction to the Settlement, it is clear that the weight of evidence overwhelmingly supports approval of this Settlement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1019, 1026 (9th Cir. 1998) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

### 1. The Class Representative and Class Counsel have adequately represented the Settlement Class

Rule 23(e)(1) requires that the Court consider whether "the class representatives and class counsel have adequately represented the class" throughout the litigation.  The Ninth Circuit has articulated two criteria for determining adequacy of representation under Rule 23(a)(4): "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Both elements are met here.

Plaintiffs initiated this litigation (and accepted the associated risk with filing such a complaint), represented the class during settlement negotiations, were willing to (and did) assume the responsibilities as class representatives, had no disabling conflicts of

1    interest, and have vigilantly protected and advanced the rights of the similarly situated

2    Settlement Class. *See* Declarations of Plaintiffs Roman [ECF No. 157-2], Clay [ECF

3    No. 157-3], Reichert [ECF No. 157-4], and Ehrilichman [ECF No. 157-5]. Plaintiff

4    also chose competent and experienced counsel to pursue their claims. *See* Declarations

5    of Suciu [ECF No. 157-9], Thompson [ECF No. 157-10], and Krinsk [ECF No. 157-

6    11]. Both Plaintiffs and Class Counsel litigated this case through class certification and

7    dispositive motions, evidencing their adequacy. Thus, this Settlement does not

8    engender the same concerns associated with cases where class certification is delayed

9    until a class settlement has been reached. *See, e.g., Mars Steel Corp. v. Cont'l Illinois*

10   *Nat. Bank & Tr. Co. of Chicago*, 834 F.2d 677, 681-82 (7th Cir. 1987) (noting the

11   criticisms and practical concerns with negotiating a class settlement before class

12   certification) (J, Posner). The Settlement Class is adequately represented.

13              2.    <u>The Settlement was Reached after Contentious and Informed</u>
                      <u>Arms' Length Negotiations</u>

14

15          This Settlement was the result of arm's-length negotiations spanning over several

16   months. *See* FED. R. CIV. P. 23(e)(2)(B). It is presumed that a proposed settlement is

17   fair and reasonable when it is negotiated between adversaries. *Laguna v. Coverall*

18   *North America, Inc.*, 753 F.3d 918, 924 (9th Cir. 2014 ("we put a good deal of stock in

19   the product of an arms-length, non-collusive, negotiated resolution"); *see also Boyd v.*

20   *Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of

21   plaintiffs' counsel should be given a presumption of reasonableness."). This is

22   especially true when the parties, such it this case, had substantially litigated their claims

23   before settlement. *Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 324 (N.D. Cal. 2013)

24   ("[T]he record reveals that the parties aggressively litigated this action and were

25   appropriately informed in negotiating the settlement, which further supports the

26   conclusion the proposed settlement is the product of serious, informed, noncollusive

27   negotiations.")

28          The Class Counsel zealously negotiated on behalf of the Settlement Class's best

interests.  The Settlement was reached only after multiple rejected settlement proposals and painstaking negotiation, with the assistance of a neutral mediator on *two* separate occasions.  Kashima Decl. I, at ¶¶ 36-51.  The parties attended an Early Neutral Evaluation Conference before Magistrate Judge David Bartick on October 26, 2015 and meet for in person settlement discussion on March 1, 2016 at Defendant's offices in Walnut Creek, California.  *Id.*, at ¶¶ 36-37.  These efforts did not produce any substantial results and parties only restarted their negotiations after the Court's decision on Plaintiffs' Motion for Class Certification and Defendant's Motion for Summary Judgment.  *Id.*, at ¶¶ 36-38.  To facilitate their discussions, the parties engaged David Rotman, a mediator with substantial experience in class actions.  *Id.*, at ¶ 39.  The first mediation session with Mr. Rotman, on November 5, 2018, ended without an agreement.  *Id.*, at ¶¶ 48-49.  It was only after additional discussions and a second mediation on March 7, 2019, that the main deal points were agreed.  *Id.*, at ¶ 50.  The final settlement terms were negotiated over the following month, with the Settlement Agreement being executive on May 12, 2019.  *Id.*, at ¶ 51.

During the mediation, Mr. Rotman helped to manage the Parties' expectations and provide a useful, neutral analysis of the issues and risks to both sides.  *Id.*, at ¶ 50. The parties also had the benefit of extensive discovery, as well as the Court's orders on a number of key issues. Rubenstein, Conte, & Newbert, *Newberg on Class Actions* § 11.41 (4th ed. West 2011 (What is required is that "sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently.").  Here, the Parties' negotiations were adversarial, non-collusive, and informed, indicating that the Settlement constitutes a fair compromise.  *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 666 (E.D .Cal. 2008); *Glass v. UBS Fin. Servs., Inc*., No. C-06-4068, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) ("The settlement was negotiated and approved by experienced counsel on both sides of the litigation, with the assistance of a well-respected mediator with substantial experience in employment litigation [and] this factor supports approval."); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1302 (S.D.

Cal. 2017.

3.    The Settlement Provides Substantial, Certain Benefits

All settlements are necessarily an "offspring of compromise." *Hanlon*, 150 F.3d at 1027.  Therefore, "the court must not hold [class] counsel to an impossible standard" requiring that their settlement negotiations obtain the best conceivable outcome, regardless of the reality of the present circumstances.  *See In re Ikon Office Solutions, Inc., Sec. Litig*., 194 F.R.D. 166, 179 (E.D. Pa. 2000).  Instead, the correct measure of the Settlement is whether it confers real and substantial benefits upon the Settlement Class Members.  *See, e.g., In re Prudential Ins. Co. of America Sales Practices Litig*., 962 F.Supp. 450, 557 (D.N.J. 1997) ("The Court rejects also the argument that if the cost of Basic Claim Relief to Prudential is low, then Basic Claim Relief is worthless… The cost of the relief to Prudential is not the measure of class member benefit. The value of the relief to the Class, which may be substantial, is what matters."); *see also* FED. R. CIV. P. 23(e)(2)(C).

Nonetheless, Settlement provides complete relief for participating members of the Settlement Class.[9]  After the *pro rata* adjustment, each Settlement Class Member will receive, on average, **$46.79** (or approximately **$1.40** per Shake Product and **$4.20** per Powder Product weighing 2 ¾ lbs. or less and **$7.00** for Powder Product weighing more than 2 ¾ lbs. Kashima Decl. IV, at ¶ 11.  This is more than the originally allocated amount under the Settlement of $1.00 per Shake Product and $3.00 for each Powder Product weighing 2 ¾ lbs. or less, and $5 for each Powder Product weighing more than 2 ¾ lbs.  Agreement at ¶¶ 4.01-4.04.

This is also more than the amount that could have been expected at trial. Plaintiffs estimated that each gram of protein missing from the Shake Products would be worth *approximately $0.06 per gram*.  Declaration of Dr. Jeffrey Harris [Dkt. No. 157-7] at ¶¶ 18, 23.  Plaintiffs further alleged that Defendant's Shake Products

---

[9] There are no additional agreements made in connection with the Settlement, which represents the totality of the relief provided to the Class.  FED. R. CIV. P. 23(e)(2)(C)(iv).

contained _between three and eleven less grams of protein per bottle then advertised_. FAC, at ¶¶ 18-21.  Consequently, the expected individual recovery at trial for the protein claims was between _$0.24 and $0.66_ per Shake Product.  On the other hand, Plaintiffs estimated damages associated with the "lean" claims would be approximately 4-5% of the retail price of the Powder Products.  _Id._ at ¶ 44.  Based on discovery, Defendant's most popular product during the Class Period was the Genuine Muscle Milk Powder.  _Id._  The average retail price of the Genuine Muscle Milk Powder was approximately $25.00 for a 2.47 lbs. package and $49.00 for a 4.94 lbs. package.  _Id._  Thus, Plaintiffs anticipated a possible recovery at trial of between _$1.00 and $2.45_ per Powder Product.

   This Settlement benefit is extraordinary when compared even to the most successful class settlements.  _See City of Omaha Police & Fire Ret. Sys. v. LHC Grp._, No. 6:12–1609, 2015 WL 965696, at *7-8 (W.D. La. Mar. 3, 2015) (finding that a "7.4%–10.3% [recovery] of estimated provable damages" amounts to "a high degree of success" because "[t]he typical recovery in most class actions generally is three-to-six cents on the dollar."); _Faught v. Am. Home Shield Corp._, No. 2:07-CV-1928-RDP, 2010 WL 10959223, at *14 (N.D. Ala. Apr. 27, 2010) ("Any settlement typically offers far less than a full recovery. Indeed, settlements, by their nature, do not yield one hundred percent recovery for plaintiffs.")

   When viewed in the aggregate, the Settlement similarly significant.  Plaintiffs estimated that the total liability, at trial, would be between $41 million and $139 million.  Kashima Decl. I, at ¶ 47.  Here, the Settlement provides for at least $12.45 million in relief to the Settlement Class, or _approximately 9-30% of the total outstanding liability_.[10]  This is well within the bounds of reasonableness in a consumer class action

---

[10] The total benefit to the Class is measured as the value of the Settlement Fund ($12 million) and the cost of administration of the Settlement (estimated to be between $446,944 and $654,989) or, at least, $12,446,944.  _See_ Kashima Decl. I, at ¶ 62; _Staton v. Boeing Co._, 327 F.3d 938, 966 (9th Cir. 2003 ("constructing a hypothetical fund' by adding together the amount of money Boeing would pay in damages, the amount of fees provided to various counsel, the cost of the class action notices paid for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement")

(*See City of Omaha Police & Fire Ret. Sys*, *supra*, at *7-8) and is more favorable than a recently approved settlement in a similar protein supplement case.  *See Gregorio v. Premier Nutrition Corporation*, 1:17-cv-05987, ECF No. 101 (S.D.N.Y Jan. 17, 2019) (unpublished) (approving a $9 million class settlement regarding allegations that a popular protein drink did not contain the amount of protein advertised).  This Settlement offers the Settlement Class the best possible outcome.

4.    The Settlement Avoids the Risk, Cost, Delay, and Burden of Further Litigation

The Court should further consider that the Settlement provides for payment to the Class now, rather than a speculative payment many years down the road.  *See In re Nvidia Derivs. Litig*. No., C-06-06110, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008); FED. R. CIV. P. 23(e)(2)(C)(ii).  When a party continues to deny liability, there is an inherent risk in continuing litigation.  *Thieriot v. Celtic Ins. Co*., No. C 10-04462 LB, 2011 WL 1522385, at *5 (N.D. Cal. April 21, 2011).  And "even with a strong case, further litigation would be time-consuming and expensive...."  *Greko v. Diesel U.S.A., Inc*., No. 10-cv-02576 NC, 2013 WL 1789602, at *4 (N.D. Cal. Apr. 26, 2013).  Continuing to litigate this action would require extensive resources coupled with significant time to proceed through trial and post-trial motions; which can often take years.  "Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation."  *Nat'l Rural Telecomms. Coop v. DirecTV*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

Plaintiffs' victory was far from guaranteed.  Class Counsel would have to successfully oppose an appeal before securing a judgment at trial.  Plaintiffs expect that the parties would extensively challenge each other's expert witnesses and it is these experts would form the foundation of the parties' case at trial.  Kashima Decl. I, at ¶ 69.  Exclusion of any evidence would be fatal.  Similarly, the jury's ability to understand and digest consumer surveys and various damages models is uncertain.  *Compare* Declarations of Drs. Harris and Howlett [ECF Nos. 157-7 & 8] *with* Drs. Dhar and

Ugone [ECF Nos. 170-7 & 22].   Plaintiffs would also have to maintain class certification through trial, which has become increasing difficult for national consumer classes.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) ("A district court may decertify a class at any time.");  *Czuchaj v. Conair Corp.*, No. 3:13-cv-1901, 2016 WL 4272374, at *2 (S.D. Cal. Aug. 15, 2016).  But a verdict for the Class would not end the case, Defendant has already shown itself more than willing to appeal an unfavorable judgment.

Litigating these complex claims would also require additional discovery and further pre-trial motions (including motions for decertification), as well as the consideration, preparation, and presentation of voluminous documentary and testimonial evidence.  For these reasons, food labeling cases have been difficult to litigate on a classwide basis.  In contrast, the Settlement will yield a prompt, certain, and substantial recovery for the Class Members.

### 5.   The Allocation Is Fair and Reasonable and Should Be Approved

The method of distributing relief and processing class-member claims is as efficient as possible.  FED. R. CIV. P. 23(e)(2)(C)(ii).  Settlement Class Members may participate in the Settlement by submitting a claims form stating the number and type of products purchased (as well as provide proof of purchase, if required) to participate.  Agreement, ¶ 9.01.  This information can be submitted to the Settlement Administrator either online or by mail.  *Id*.  The Settlement distributes the funds in an equitable and logical manner, as Class Members are entitled to the same relief calculated from the same formula: the number of products purchased.  FED. R. CIV. P. 23(e)(2)(D); *True v. American Honda Motor Co.*, 749 F.Supp.2d 1052, 1067 (C.D. Cal. 2010) ("[D]ifferential treatment of class members may be appropriate where 'the settlement terms are rationally based on legitimate considerations.'").

If this Settlement is approved, the Settlement Administrator provided payment directly to each Settlement Class Member by a check.  If Settlement checks are not cashed, any unallocated funds will be subject a secondary distribution of any unclaimed

21

funds after the initial payment.  Agreement, at ¶¶ 4.05-.06.   This "redistribution of unclaimed class action funds to existing class members is proper and preferred" because it "ensures that 100% of the [settlement] funds remain in the hands of class members." *Hester v. Vision Airlines,* Inc., No. 2:09-CV-00117, 2017 WL 4227928, at *2 (D. Nev. Sept. 22, 2017); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 117 (D.D.C. 2015) (citing NEWBERG ON CLASS ACTIONS § 12:28 (5th ed. 2015)) ("as a general matter, 'a court's goal in distributing class action damages is to get as much of the money to the class members in as simple a manner as possible'").  Only after this secondary distribution, are unallocated funds used to pay for settlement administration.  Agreement, at ¶ 10.01.

This process ensures that as much of the Settlement Funds are received by those injured and all funds benefit that Settlement Class.   Such allocations have been approved in other customer class settlements.  *See, e.g., Brown v. Hain Celestial Grp., Inc.,* No. 3:11-CV-03082, 2016 WL 631880, at *3, 11 (N.D. Cal. Feb. 17, 2016) (approving a similar claims process); *In re Magsafe Apple Power Adapter Litig*., No. 5:09-CV-01911, 2015 WL 428105, at *9 (N.D. Cal. Jan. 30, 2015) (approving a similar claims process, even absent the ability to submit claims online).  Given the risks, the proposed Settlement represents the best possible result and Settlement Class Members may participate in the Settlement *via* a clear and uncomplicated claims process.

### 6.   Reaction of the Class and Government Agencies

The reaction of the Settlement Class Members unequivocally supports approval of the Settlement.  Significantly, after dissemination of the notice to the Class, which provided each Class Member with the terms of the Settlement, there have been **227 requests for exclusion (or 0.007% of the Class)** and **zero (0) objections**.  Weisbrot Decl. II, at ¶¶ 26-28.  Moreover, **5.58 percent** of the Class submitted a claim.  Kashima Decl. IV, at ¶ 9.  This rate was more than the estimate provided by Plaintiffs at Preliminary Approval and demonstrates the Class's approval of the Settlement terms. Kashima Decl. I, at ¶ 61 (Plaintiffs estimated that 5% of the Settlement Class will submit a claim.); *See also Ferrington v. McAfee, Inc.*, 2012 WL 1156399, at *4 (N.D. Cal. Apr.

6, 2012) ("the prevailing rule of thumb with respect to consumer class actions is 3–5 percent"); *Touhey v. United States,* 2011 WL 3179036, at \*7–8 (C.D.Cal. July 25, 2011) (finding a 2% response rate acceptable); *In re Cardizem Antitrust Litig.,* 218 F.R.D. 508, 526 (E.D. Mich. 2003) (finding favorable  class reactions in a 6.9% response rate); *In re New Motor Vehicles Canadian Export Antit. Litig.*, 2011 WL 1398485, at \*3 (D. Maine April 13, 2011) (finding favorable class reaction in a 3.9% response rate).

The Settlement Class's participation and absence of any objector strongly supports the fairness, reasonableness and adequacy of the Settlement.  *See In re Austrian & German Bank Holocaust Litigation*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-119 (3d. Cir. 1990) (29 objections out of 281 member class "strongly favors settlement"); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (The fact that 7 out of 109 class members objected to the proposed settlement should be considered when determining fairness of settlement.)  Here, where there are no objections, the approval of the Class is evident.

In addition to the lack of any opposition from the Class, the various state and federal agencies charged with enforcing their respective consumer protection laws have not challenged the terms of the Settlement, despite the fact that notice was sent pursuant to the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1715.  Weisbrot Decl. II, at ¶¶ 4-7; Kashima Decl. IV, at ¶¶ 18-19.  The fact that no federal or state agency has objected to this Settlement or brought a parallel regulatory action further supports approval of the Settlement.  *See In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig*., 2012 WL 2512750, at \*10 (D. Minn. June 29, 2012) *aff'd*, 716 F.3d 1057 (8th Cir. 2013) (noting the lack of objections to a national settlement by any state Attorneys General, combined with minimal objections from class, supported approval).

Clearly the goal of this litigation, to obtain redress for the class has been met by this Settlement.  Given the amount of the Settlement, the risks of litigation, arm's length

1   negotiations between experienced counsel and reaction of interested parties, the

2   settlement is fair and reasonable and is therefore entitled to final approval.

### C.   PLAINTIFFS' REQUESTED ATTORNEYS' FEES AND INCENTIVE AWARDS DO NOT DETRACT FROM THE REASONABLENESS OF THE SETTLEMENT[11]

5   In contemplating the approval of a proposed settlement, "[t]he recommendations

6   of plaintiffs' counsel should be given a presumption of reasonableness." *Knight v. Red*

7   *Door Salons  Inc.*, No. 08-01520, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009)

8   (*citing Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979)); *see also Nat'l*

9   *Rural Telecomms. Coop.*, 221 F.R.D. at 528. "Parties represented by competent counsel

10  are better positioned than courts to produce a settlement that fairly reflects each party's

11  expected outcome in litigation." *In re Pac. Enterprises Sec. Litig.,* 47 F.3d 373, 378

12  (9th Cir. 1995).  Nothing suggests that the Court should depart from this assumption.

13  Plaintiffs' counsel is well-seasoned both in litigating complex class actions and

14  also litigated Plaintiffs' claims *via* several important motions.  Based on this experience,

15  and information gleaned from discovery in this case, Class Counsel was able to

16  negotiate a substantial recovery for the Settlement Class.

17  Additionally, there is no indication of collusion by Class Counsel to undersell

18  the Settlement Class's claims for their own benefit.  *See In re Bluetooth*, 654 F.3d at

19  947 (None of the traditional "'indicia of possible implicit collusion" are associated with

20  this Settlement).  The amount requested by Class Counsel equals **31.14 percent** of the

21  "total" settlement benefit (the settlement including class counsel's fees and expenses

22  and the costs of notice and administration).  *See* Fee Motion.  These numbers are within

23  the norm awarded within this Circuit, and reasonable give the more than complete

24  recovery that this Settlement represents.  *See, e.g., Cicero v. DirecTV, Inc.,* No. EDCV

25  07-1182, 2010 WL 2991486, at *6 (C.D. Cal. July 27, 2010); *Craft v. Cty. of San*

---

[11] The proprietary of Plaintiffs' request for Attorneys' Fees, Costs, and Incentive Awards is more fully set forth in Plaintiffs' Motion for Attorneys' Fees, Costs, and Incentive Awards [ECF No. 239-2] ("Fee Motion") previously filed and incorporated fully herein.

1   *Bernardino,* 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008) (Where the settlement does
2   not involve "mega-fund" case (settlements of $50 million or more), an award above the
3   25% benchmark is particularly appropriate.); *In re Rite Aid Corp. Securities Litigation,*
4   396 F.3d 294, 303 (3rd Cir. 2005) ("[O]ne study of securities class action settlements
5   over $10 million ... found an average percentage fee recovery of 31%.).   Additionally,
6   Class Counsel's fees represent a modest **1.40** loadstar multiplier.   *See, e.g., In re*
7   *Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig*., No. 5:09-
8   MD-02015-JF, 2011 WL 1877630, at *7 (N.D. Cal. May 17, 2011) (multiplier of 2.2
9   "is well within the acceptable range").   There is nothing to suggest that Plaintiffs' fees
10  are disproportionate to the benefit provided to the Settlement Class or the work done.

11          Defendant further agreed to pay a service award of $10,000 to each Plaintiffs
12  (collectively $40,000) for the time and effort contributed to this case as Class
13  Representatives.   *See* Agreement, at ¶ 5.02.   Plaintiffs devoted extensive time and effort
14  on behalf of the Settlement Class, sat for depositions, assisted in understanding the
15  product labels at issue and settlement, and they should be compensated for their efforts.
16  Such awards are a normal feature of a class action settlement, *Rodriguez*, 563 F.3d 948,
17  958 (9th Cir. 2009), and provide compensation for the time and effort the plaintiff
18  expended in pursuing the litigation on behalf of the class.   *Staton*, 327 F.3d at 977.

19  **V.      CONCLUSION**

20          For all of the foregoing reasons, Plaintiffs respectfully move this Court to issue
21  an Order: (1) certifying the Settlement Class for settlement purposes; (2) granting final
22  approval of the proposed Settlement; (3) finding that the Notice Program satisfied the
23  requirements of Rule 23; and (4) directing the entry of Final Judgment, dismissing this
24  Action (including all individual and Class claims presented thereby) on the merits with
25  prejudice.

26
27
28

1   Dated:  October 2, 2020                    Respectfully submitted,

2                                              SOMMERS SCHWARTZ, P.C.

3                                              /s/ Trenton R. Kashima
                                               Trenton R. Kashima, Esq.
4                                              402 West Broadway, Suite 1760
                                               San Diego, California 92101
5                                              Telephone: (619) 762-2126
                                               Facsimile:  (619) 762-2123
6

7                                              Jason J. Thompson, Esq. (Pro Hac Vice)
                                               jthompson@sommerspc.com
8                                              SOMMERS SCHWARTZ, P.C.
                                               One Towne Square, Suite 1700
9                                              Southfield, Michigan 48076
                                               Telephone: (248) 355-0300
10                                             Facsimile: (248) 436-8453

11
                                               BARBAT MANSOUR SUCIU & TOMINA PLLC
12                                             Nick Suciu III, Esq. (Pro Hac Vice)
                                               nicksuciu@bmslawyers.com
13                                             6905 Telegraph Rd., Ste. 115
                                               Bloomfield Hills, MI 48301
14                                             Telephone: (313) 303-3472

15
                                               FINKELSTIEN & KRINSK LLP
16                                             Jeffrey R. Krinsk, Esq.
                                               jrk@classactionlaw.com
17                                             550 West C Street, Suite 1760
                                               San Diego, California 92101
18                                             Telephone: (619) 238-1333
                                               Facsimile:  (619) 238-5425
19

20                                             *Attorneys for Plaintiffs*
                                               *and the Putative Classes*
21

22

23

24

25

26

27

28